# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION

|  |  |
|---|---|
| VICTORIA BOUFFARD, MICHELLE SULLIVAN, HOLDEN SHERIFF, and TIARA SCOTT, individually and on behalf of all others similarly situated, | ) ) ) ) ) |
|  | CASE NO. 1:17-CV-193 |
| Plaintiffs, | JURY TRIAL REQUESTED |
| vs. |  |
| LABORATORY CORPORATION OF AMERICA HOLDINGS, |  |
| Defendant. |  |

## CLASS ACTION COMPLAINT

Plaintiffs Victoria Bouffard, Michelle Sullivan, Holden Sheriff, and Tiara Scott (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Laboratory Corporation of America Holdings ("LabCorp" or the "Company"), and allege upon information and belief, except as to the allegations that pertain to Plaintiffs and their counsel, which are based on personal knowledge, as follows:

## INTRODUCTION

1.      This is a class action on behalf of a national class defined as all persons who were charged fees for services by LabCorp that were in excess of the negotiated or mandated fair market value rates established for those services between LabCorp and private or public health insurers (the "Class").

2.      The United States is undergoing a healthcare crisis.  Healthcare recipients are increasingly being required to absorb greater costs for health care, through higher insurance

premiums, copays, deductibles, and exclusions.

3.     LabCorp operates within the United States healthcare field, engaging in the business of providing laboratory testing services to healthcare recipients worldwide.  LabCorp described itself in its Form 10-K for the period ended December 31, 2016, filed with the U.S. Securities and Exchange Commission ("SEC") on February 27, 2017 (the "10-K"), as a "world leading life sciences company that is deeply integrated in guiding patient care, providing comprehensive clinical laboratory and end-to-end drug development services."

4.     LabCorp has more than 52,000 employees, and has more than 110 million patient encounters per year.  LabCorp serves a broad range of customers, which include managed care organizations, biopharmaceutical companies, governmental agencies, physicians and other healthcare providers, hospitals and health systems, employers, and patients and consumers.  According to the 10-K, LabCorp "generated more revenue from laboratory testing than any other company in the world in 2016."

5.     LabCorp divides itself into two segments for reporting purposes, LabCorp Diagnostics ("LCD") and Covance Drug Development.   LCD is an independent clinical laboratory business, while the Covance Drug Development segment provides drug development solutions around the world, primarily to companies in the pharmaceutical and biotechnology industries.

6.     This action addresses a particularly pernicious business practice of defendant LabCorp, specifically LCD (referred to hereafter interchangeably with LabCorp).

7.     LabCorp maintains a price list of diagnostic lab tests that is grossly disproportionate to fair market value rates, as negotiated or mandated by third-party payers, such as private or public (governmental) healthcare insurers ("Benefit Plans").  However, when

2

a Benefit Plan refuses to cover LabCorp's diagnostic lab test, LabCorp charges the patient the grossly excessive list prices (or "rack rates") that are frequently more than ten times greater than the fair market value rates.

8.     For example, plaintiff Victoria Bouffard was billed by LabCorp $616.00 for a Vitamin D, 1,25 + 25-Hydroxy test (CPT code[1] 82652), performed on October 26, 2016. LabCorp also performed six additional tests, with the rack rates of these additional tests aggregating to $370.00. Ms. Bouffard's insurer (Horizon BlueCross BlueShield of New Jersey) covered all but the Vitamin D, 1,25 test, and paid LabCorp just $63.65, or approximately 17% of the aggregate rack rate for the six additional tests. Nonetheless, LabCorp insists on billing Ms. Bouffard the full rack rate of $616.00 for the Vitamin D, 1,25 + 25-Hydroxy test. Had Ms. Bouffard's insurer covered the test, the cost would have been substantially less.

9.     Plaintiff Michelle Sullivan was charged $132.00 for a Vitamin D, 25-Hydroxy test (CPT 82306), performed on October 4, 2016. LabCorp performed twelve additional tests, with the rack rate of these additional tests aggregating to $860.25. Ms. Sullivan's insurer (Independence Blue Cross) covered all but the Vitamin D test, and paid LabCorp just $113.50, or approximately 13.2% of the aggregate cost of the twelve additional tests. Had Ms. Sullivan's insurer covered the cost of the Vitamin D test, it would have been substantially less than the rack rate. Nonetheless, LabCorp insists on billing Ms. Sullivan the full rack rate of $132.00.

10.     Plaintiff Holden Sheriff was charged $2,988.00 for a series of eighteen tests, performed on November 22, 2016. Ms. Sheriff's insurer (Cigna) denied coverage of three tests (CPT codes 81240, 81291, 81241), which were genetic test not sought by Ms. Sheriff or her

---

[1] "CPT code" means Current Procedural Terminology code, and is a set of medical codes for healthcare-related laboratory procedures, and is maintained by the American Medical Association.

referring doctor. The fifteen covered tests had an aggregate rack rate of $1,944.21, yet Cigna paid just $800.13 for these tests. LabCorp then billed Ms. Sheriff the aggregate rack rate of $1,043.79 for the three uncovered tests. Had Cigna covered the cost of the tests, the amount paid to LabCorp would have been substantially less. Notably, the invoice provided by LabCorp to Ms. Sheriff included only eight line items, which misleadingly identifies the tests performed.

11. Plaintiff Tiara Scott was charged $1,194.00 for a series of twelve tests, performed on July 12, 2016. Ms. Scott's insurer (Medicare) denied coverage of all twelve tests. LabCorp then billed Ms. Scott the full rack rate of $1,194.00 for the twelve tests. Had Medicare covered the cost of the tests, the amount paid to LabCorp would have been substantially less than $1,194.00. Notably, the invoice provided by LabCorp to Ms. Scott included only ten line items, misleadingly identifying the number and type of tests performed.

12. Postings on the internet are replete with stories from LabCorp's patients who were denied insurance coverage and were overbilled by LabCorp (similar to the allegations raised here by Plaintiffs on behalf of the Class).

13. Compounding the problem of LabCorp's overbilling, LabCorp customarily issues invoices to patients (including Plaintiffs) that are intentionally deceptive and misleading. Specifically, LabCorp's invoices contain only the (i) aggregate charges for multiple lab tests, (ii) aggregate third-party payments and/or discounts applied to all of the lab tests, and (iii) aggregate copays, deductibles or other payments billed directly to patients.

14. As a result, LabCorp's patients are not informed by LabCorp what, if any, insurance discounts or insurance payments are being applied to each individual lab test, or what amounts, if any, patients are being required to pay as a copay or deductible for each individual lab test.

4

15.     LabCorp also does not inform patients whether certain tests were not covered by their insurer, and whether patients are being required to pay LabCorp's grossly excessive rack rates for those tests versus the fair market value rates, as would be paid by the patient's insurer. No Class member would have knowingly paid an excessive rate.

16.     To make matters worse for individuals who receive these excessive bills (such as Plaintiffs), LabCorp aggressively threatens to, and does, turn the invoices over to credit agencies for collection if unpaid.

17.     This action seeks recovery by Plaintiffs and the Class of amounts paid by patients to LabCorp in excess of the fair market value rates, and a declaration that Plaintiffs and members of the Class owe LabCorp only amounts equal to the fair market value rates.  In the event there is no fair market value rate established for a particular LabCorp service by any Benefit Plan, Plaintiffs seek a declaration as to a reasonably comparable fair market value rate. A fair market value rate for these purposes is defined as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts." *See* IRS Publication 561.

18.     This action also seeks transparency in the manner that LabCorp bills patients, and specifically requests an order directing LabCorp to bill patients on a more particularized basis, providing the specific amounts of any discount, Benefit Plan payment, and/or the patient's financial obligation on a test-by-test basis, rather than solely on an aggregate basis.

## JURISDICTION AND VENUE

19.     Plaintiffs invoke the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §1332(d), which confers original jurisdiction upon this Court over this class action based on diversity of citizenship: (a) there are 100 or more Class members; (b) the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (c) at least one

Plaintiff and member of the Class is a citizen of a state different from the Defendant.

20. This Court also has supplemental jurisdiction over Plaintiffs' state law and common law claims pursuant to U.S.C. §1367(a).

21. This Court possesses personal jurisdiction over the Defendant based on LabCorp's residence, presence, transaction of business and contacts within this District.

22. Venue is proper in this District pursuant to 28 U.S.C. §1391 because LabCorp maintains its principal place of business in this District, and at all times conducted substantial business in this District.

## PARTIES

### Plaintiffs

23. Ms. Victoria Bouffard is a resident of the State of New York. At all times relevant hereto, Ms. Bouffard maintained healthcare insurance through Horizon BlueCross BlueShield of New Jersey.

24. Ms. Michelle Sullivan is a resident of the state of California. At all times relevant hereto, Ms. Sullivan maintained healthcare insurance through Independence Blue Cross.

25. Ms. Holden Sheriff is a resident of the state of Tennessee. At all times relevant hereto, Ms. Sheriff maintained healthcare insurance under Cigna Corporation ("Cigna").

26. Ms. Tiara Scott is a resident of the state of Maryland. At all times relevant hereto, Ms. Scott maintained healthcare insurance through Medicare.

### LabCorp

27. LabCorp is a Delaware corporation with its principal place of business and headquarters located at 358 South Main Street, Burlington, North Carolina. LabCorp is a publicly traded company, trading on the New York Stock Exchange under the ticker: "LH".

6

28.     LabCorp is a holding company of numerous subsidiaries and other entities that provide laboratory testing, patient billing and related services.

## FACTUAL ALLEGATIONS

### The U.S. Laboratory Testing Industry

29.     The U.S. laboratory testing industry is made up of three types of providers: hospital-based, physician-office, and independent clinical and anatomical pathology laboratories.

30.     According to LabCorp's 10-K, the U.S. clinical laboratory testing industry generated revenues of approximately $80 billion in 2016.

31.     Within the laboratory testing industry, there are numerous different lab tests performed for a variety of purposes.  As such, a majority of lab tests performed in the United States have a unique five-digit CPT code, which is commonly used for billing purposes.

32.     Many participants within the laboratory testing industry generate significant revenue by performing lab work on behalf of patients insured by public insurers, *i.e.*, Medicare or Medicaid.  Under Medicare and Medicaid, the maximum reimbursement rates for outpatient clinical laboratory services are disclosed in a publicly available Clinical Laboratory Fee Schedule ("CLFS"), organized by CPT code.

33.     In 2014, Congress passed the Protecting Access to Medicare Act ("PAMA"), which includes the most extensive reform of the CLFS since it was established in 1984.  Under PAMA, beginning in 2017, most rates for laboratory services on the CLFS will be derived using the weighted median private payer rates, net of discounts, rebates, coupons and other price concessions, which reflect the scope of prices paid across the laboratory industry (subject to certain phase-in limitations on test price reductions during the first several years of implementation).  The CLFS provides strong support for what constitutes the usual and

customary rate for any given lab service, if not otherwise negotiated by a patient's Benefit Plan.

**LabCorp's Laboratory Testing Business**

34.     LabCorp's LCD division is an independent clinical and anatomical pathology laboratory business, and serves a large universe of customers, including managed care organizations, biopharmaceutical companies, governmental agencies, physicians and other healthcare providers, hospitals and health systems, employers, patients and consumers, and independent clinical laboratories.

35.     LCD is made up of a network of primary testing laboratories, specialty testing laboratories, branches, patient services centers, and STAT laboratories, which offer routine and frequently ordered tests that can be performed, with results reported to the physician, quickly.

36.     In its 10-K, LabCorp describes LCD as "an independent clinical laboratory business," that consists of a network of approximately 1,750 patient service centers. " LabCorp's LCD segment employs over 36,000 employees, and processes tests on approximately 500,000 patient specimens daily.

37.     According to LabCorp's 10-K, the Company's most frequently requested tests include, among others, blood chemistry analyses, urinalyses, blood cell counts, thyroid tests, Pap tests, Hemoglobin A1C tests, sexually transmitted disease testing, hepatitis C (HCV) tests, and Vitamin D tests.  LabCorp also performs a range of other testing, including wellness testing.

38.     A majority of the laboratory tests performed by LabCorp are done for patients covered by Benefit Plans.  In accordance with the Benefit Plans, private health insurers, employee organizations, and others sign agreements with LabCorp to provide laboratory testing and other health-related services to participants and beneficiaries of their Benefit Plans. LabCorp also performs medical testing on patients covered by Medicare and Medicaid (federal

and state governmental insurance programs designed to provide health insurance to seniors, the disabled, and the economically disadvantaged), which limits the reimbursement rate for each lab test.

39.     The rates negotiated between LabCorp and the various Benefit Plans are indicative of fair market value rates, *i.e.*, the price agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts.

40.     LabCorp also maintains a list of rack rates for each CPT code that are well above what Benefit Plans are willing to pay, and are therefore significantly higher than the fair market value rates of those services.  LabCorp's rack rates are commercially unreasonable and take advantage of Plaintiffs' and Class members' lack of information and bargaining power.

41.     At times, Benefit Plans, to limit their own costs, deny coverage of laboratory tests because, for example, the Benefit Plans determine that the lab tests are "experimental," "obsolete," or "not medically necessary."

42.     When a patient either lacks insurance coverage or their insurer denies coverage, LabCorp requires that the patient pay the grossly excessive rack rate, a commercially unreasonable amount, rather than the negotiated or government-mandated fair market value rates.

43.     LabCorp is further unwilling to negotiate rates with patients, although patients are unaware that they are being charged grossly excessive rates for LabCorp's services at the time the services are rendered.  In other words, individuals, whether insured or not, are forced to pay artificially inflated and egregious rates that are often 10 times or more than the fair market value rate typically paid by Benefit Plans.

44.     As LabCorp acknowledged in its 10-K, "[a] growing portion of revenue is derived from patients in the form of deductibles, coinsurance, copayments, and **charges for non-covered tests**." [Emphasis added].

45.     LabCorp is knowingly and willfully overcharging patients when lab tests are not covered by insurance (whether publicly or privately sponsored) by requiring patients to pay egregious rack rates.  For example, LabCorp participates in Medicare, although it is not obligated to do so and Medicare limits lab test reimbursement rates to the CLFS.  Nonetheless, LabCorp's participation in Medicare establishes its acceptance of the CLFS rates as an approximation of the fair market value of LabCorp's services.   Yet, when a lab test is performed for an individual with Medicare, and Medicare declines to cover any or all of the lab tests, LabCorp charges the insured patient its rack rate, rather than the CLFS fair market value rate.

46.     LabCorp has previously been charged with similar conduct.  In 2011, LabCorp entered into a $49.5 million settlement to end a lawsuit by the State of California alleging that LabCorp had charged Medi-Cal, California's medical program for the poor, higher rates for diagnostic services than LabCorp had charged private insurers.

**LabCorp's Manipulative Billing Practices**

47.     The New York Times' Tina Rosenberg criticized health providers' cryptic billing practices, pointing out that "[u]nlike everything else we buy, when we purchase a medical treatment, surgery or diagnostic test, we buy blind.  We do not know the cost of health procedures before we buy.  When we do get the bill, we have no idea what the charges are based on and have no way to evaluate them."  Tina Rosenberg, *Revealing a Health Care Secret: The Price*, THE NEW YORK TIMES (July 31, 2013).

48.     This ability to "hide the ball" has resulted in unfairly inflated rack rates, sometimes referred to as "chargemaster prices," for health services. "Chargemaster prices are set by the hospital alone and reflect what the hospital would like you to pay. They are the basis for calculating the discounts given to insurers, and they are generally what's billed to people without insurance." *Id.* These rack rates, or chargemaster prices, vary widely between health service providers. An example of the variation, "[t]he average charge for a joint replacement at a hospital in Ada, Okla., was $5,300. The comparable charge in Monterey Park, Calif., was $223,000." *Id.* Benefit Plans nonetheless do not pay the rack rates for health services rendered to plan participants, but instead pay substantially discounted rates.

49.     Ms. Rosenberg's article relies, in part, on a report in The New York Times dated May 8, 2013, summarizing findings from data released for the first time by the Centers for Medicare and Medicaid Services ("CMS"). This data "show[ed] that hospitals charge Medicare wildly differing amounts — sometimes 10 to 20 times what Medicare typically reimburses — for the same procedure, raising questions about how hospitals determine prices and why they differ so widely." Barry Meier, Jo Craven McGinty and Julie Creswell, *Hospital Billing Varies Wildly, Government Data Shows*, THE NEW YORK TIMES (May 8, 2013). According to the article, neither Medicare nor private insurers pay the rack rates; it is the uninsured and those with inadequate insurance that are forced to pay these rates. As reported in The Times, "the people who can afford it least — those with little or no insurance — are getting hit with extremely high hospitals bills that may bear little connection to the cost of treatment." *Id.*

50.     Here, Plaintiffs received invoices from LabCorp after all lab work was performed. In the invoices, LabCorp insisted that Plaintiffs pay LabCorp's grossly exaggerated rack rates for any lab test not covered by insurance, rather than the lower fair market value rates.

As a result of this overbilling, LabCorp received payments from individuals far in excess of the reasonable fair market value rates for LabCorp's services.

51.     LabCorp also makes it as difficult as possible for patients to understand their bills.  LabCorp aggregates all discounts/adjustments and Benefit Plan reimbursements, and subtracts this figure from the total charges to calculate the remaining balance owed by the patient.  Through this method, the patient cannot determine, based on the LabCorp invoice, whether the amounts due from the patient stem from co-pays, deductibles, or rack rates for any test not covered by their Benefit Plan.

52.     Moreover, LabCorp at times forces patients to provide credit or debit card information in advance of performing any services.  The credit or debit card is used to pay the rack rate for uncovered services after billing the patient's insurance provider, leaving the patient without any recourse with respect to excessive charges.

53.     Notably, if a patient fails to pay the grossly exaggerated rack rate, LabCorp mails multiple copies of invoices and threatening letters over a period of months, demanding payment, wrongly declaring delinquency, threatening to add the patient to a delinquency list, threatening debt collection, and threatening legal action and liability for costs and expenses.

54.     LabCorp follows through on its threats to use outside debt collection agencies to collect and attempt to collect debts from individual patients.

55.     The practice of LabCorp to overbill patients without insurance coverage, as described herein, is deceptive and unfair, as well as in violation of the implicit agreement between the patient and LabCorp: any lab testing provided by LabCorp requires payment of the fair market value rate for the service(s) performed.  LabCorp's overbilling practice unjustly enriches LabCorp to the detriment of Plaintiffs and the other Class members.

*Victoria Bouffard*

56.     At all relevant times, Victoria Bouffard maintained health insurance through Horizon BlueCross BlueShield of New Jersey ("Horizon").

57.     On December 6, 2016, LabCorp sent Ms. Bouffard a bill for laboratory testing conducted by LabCorp on October 26, 2016 (the "Bouffard Bill"). The Bouffard Bill included seven separate tests as individual line items, listing the rack rate for each test, and computing the aggregate total to be $986.00. The Bouffard Bill also included an "Adjustments" column, which deducted a total of $306.34 from the aggregate rack rate (not apportioned by line item), and an "Insurance Paid" column that provided an aggregate total of $63.65 (not apportioned by line item). The remaining $616.00 was billed to Ms. Bouffard in full.

58.     On November 8, 2016, prior to receipt of the Bouffard Bill, Horizon sent Ms. Bouffard an explanation of benefits that described which of the seven tests were covered under Ms. Bouffard's insurance plan. Of the seven tests listed on the Bouffard Bill, six were covered. The seventh test, listed on the Bouffard Bill as a "Vitamin D, 1,25 + 25-Hydroxy" test with a rack rate of $616.00, was listed on the explanation of benefits as two separate line items – one for $351.08, and one for $264.92 (totaling $616.00), although not specifically identified. Horizon declined coverage of both line items because the procedure was "not medically necessary."

59.     Because neither LabCorp nor Horizon listed the CPT codes of the laboratory tests on the Bill or explanation of benefits, respectively, it is unclear whether there were multiple tests (thus multiple CPT codes), or a single test for the Vitamin D, 1,25 test. Nonetheless, given that only a single line entry was on LabCorp's bill to Ms. Bouffard, which

13

demanded payment of $616.00 for a "Vitamin D, 1,25 + 25-Hydroxy" test, it is likely that the CPT code is 82652 (a Vitamin D assay test labeled as "Vitamin D, 1, 25 Dihydroxy, includes fraction(s), if performed").

60.     Of the six tests that Horizon did cover, the aggregate rack rate was $370.00. However, the aggregate rack rate was discounted by a total of $306.34, and Horizon paid only $63.66 for the six tests.  In other words, Horizon paid 17.2% of the aggregate rack rates.

61.     Additionally, the Bouffard Bill only disclosed the aggregate amounts of the adjustment and insurance payment, rather than identifying the allocation of these items on a test-by-test basis, although adjustments were made, and Horizon paid LabCorp, on a test-by-test basis.

62.     Had Horizon covered the cost for the Vitamin D, 1,25 test, the amount actually paid would have been substantially lower than $616.00.  For example, under the 2016 CLFS, which lists the maximum payment amounts for various laboratory tests covered by Medicare, the cost of a CPT code 82652 test would have been only $52.44.

63.     Nonetheless, because Horizon declined coverage, LabCorp insisted on billing Ms. Bouffard the entire rack rate of $616.00, rather than the fair market value of the services provided.

64.     Ms. Bouffard offered to pay LabCorp $50 for the tests, an amount similar to what Medicare would have paid, but LabCorp declined to accept her offer.

65.     LabCorp and Ms. Bouffard had not reached any agreement in advance with respect to the fees to be charged for the excluded test(s).  Rather, Ms. Bouffard assumed that, at worst, LabCorp would charge her the fair market value rate for any test not covered by insurance.  She would not have knowingly paid an excessive rate.

14

66.     Ms. Bouffard has continued to protest LabCorp's bill, and has therefore not yet made payment on it, but has instead been subjected to LabCorp's debt collection practices.

**Michelle Sullivan**

67.     At all relevant times, Michelle Sullivan maintained health insurance through Independence Blue Cross ("Independence").

68.     On November 26, 2016, LabCorp sent Ms. Sullivan a bill for laboratory testing conducted by LabCorp on October 4, 2016 (the "Sullivan Bill").  The Sullivan Bill included thirteen separate tests as individual line items, listing the rack rate for each test, and computing the aggregate total to be $992.25.  The Sullivan Bill also included an "Adjustments" column, which deducted a total of $746.75 from the aggregate rack rate (although not apportioned by line item), and an "Insurance Paid" column that provided an aggregate total of $113.50 (again, not broken down by line item).  The remaining $132.00 was billed to Ms. Sullivan in full.

69.     On October 12, 2016, prior to receipt of the Sullivan Bill, Independence sent Ms. Sullivan an explanation of benefits that described which of the thirteen tests were covered under Ms. Sullivan's insurance plan.  Of the thirteen tests listed on the Sullivan Bill, twelve were covered.  Independence declined coverage of the thirteenth test, listed on the Sullivan Bill as a "Vitamin D, 25-Hydroxy" test (CPT code 82306) with a rack rate of $132.00, because Independence does not "cover this service or item when provided for the diagnosis reported."

70.     Of the twelve tests that Independence did cover, the aggregate rack rate was $860.25.  However, the rack rates for the twelve tests were discounted by a total of $746.75, and Horizon paid only $113.50 in total, a mere 13.2% of the rack rates listed for the twelve tests.

71.     Additionally, the Sullivan Bill only disclosed the aggregate amounts of the adjustment and insurance payment, rather than identifying the allocation of these items on a

15

test-by-test basis, although adjustments were made, and Independence paid LabCorp, on a test-by-test basis.

72.     Had Independence covered the cost for the Vitamin D test, the amount actually paid to LabCorp would have been substantially lower than $132.00.  Indeed, under the 2016 CLFS, the maximum payment by Medicare for a CPT code 82306 test would be $40.33.

73.     Because Independence declined coverage, LabCorp insisted on billing Ms. Sullivan the entire rack rate of $132.00, rather than the fair market value of the services provided.

74.     LabCorp and Ms. Sullivan had not reached agreement in advance with respect to the fees to be charged for the excluded test.  Rather, Ms. Sullivan assumed that, at worst, LabCorp would charge her the fair market value rate for any test not covered by insurance.  She would not have knowingly paid an excessive rate.

75.     Under protest, Ms. Sullivan has made payment, in whole or in part, on the Sullivan Bill.

### *Holden Sheriff*

76.      At all relevant times, Holden Sheriff maintained health insurance under Cigna.

77.     On January 4, 2017, LabCorp sent Ms. Sheriff a $2,988.00 bill for laboratory testing conducted by LabCorp on November 22, 2016 (the "First Sheriff Bill").  The First Sheriff Bill included eight separate individual line items, listing the rack rate for each line, and computing the aggregate total to be $2,988.00.  The First Sheriff Bill also represented that the lab tests were performed by LabCorp Burlington, located at 1447 York Court, Burlington, North Carolina 27215.

78.     On December 11, 2016, prior to receipt of the First Sheriff Bill, Cigna sent Ms.

Sheriff an explanation of benefits that denied coverage entirely because "[e]xpenses for genetic testing are not covered under this Plan."

79.     Thereafter, on January 22, 2017, after the receipt of the initial LabCorp invoice, Cigna provided a second explanation of benefits in which Cigna covered a portion of the lab tests.

80.     On February 8, 2017, LabCorp sent Ms. Sherriff a second invoice including eight individual line items (the "Second Sheriff Bill"). In the Second Sheriff Bill, an adjustment of $1,144.08, and a Cigna payment of $800.13, were applied to the bill, leaving a $1,043.79 balance for which Ms. Sheriff was responsible. The Second Sheriff Bill also represented that the lab tests were performed by LabCorp Burlington, located at 1447 York Court, Burlington, North Carolina 27215.

81.     The eight line items in the First and Second Sheriff Bills were the result of LabCorp misleadingly grouping multiple tests into single line items. In fact, it was *eighteen* tests that were performed and billed to Cigna. Of those eighteen, Cigna covered fifteen. The fifteen covered tests had an aggregate rack rate of $1,944.21, yet Cigna paid only $800.13 for these tests. LabCorp then billed Ms. Sheriff the aggregate rack rate of $1,043.79 for the three uncovered tests (CPT codes 81240, 81291, 81241).

82.     Had Cigna covered the cost of the three additional tests, the amount actually paid to LabCorp would have been substantially lower than $1,043.79. For example, according to the CLFS, Cigna would have only received $209.73 from Medicare for the same three tests.

83.     Additionally, the Second Sheriff Bill only disclosed the aggregate amounts of the adjustment and insurance payment, rather than identifying the allocation of these items on a test-by-test basis, although adjustments were made, and Cigna paid LabCorp, on a test-by-test

basis.

84.     Moreover, the First and Second Sheriff Bills failed to provide Ms. Sheriff with any information necessary to properly determine what testing was completed, and what basis LabCorp had for demanding $2,988.00 in the first instance.   Indeed, both LabCorp invoices only included eight line items, although LabCorp was billing her and Cigna for *eighteen* individual tests.   This action prevented Ms. Sheriff from being fully informed as to what services she was being billed for.

85.     Nonetheless, because Cigna denied coverage for the three tests, LabCorp insisted on billing Ms. Sheriff the entire rack rate of $1,043.79, rather than the fair market value of the services provided.

86.     LabCorp and Ms. Sheriff had not reached agreement in advance with respect to the fees to be charged for the excluded test.   Rather, Ms. Sheriff assumed that, at worst, LabCorp would charge her the fair market value rate for any test not covered by insurance.   She would not have knowingly paid an excessive rate.

87.     Ms. Sheriff has continued to protest LabCorp's bill, and has therefore not yet made payment on it, but continues to face LabCorp's collection practices.

### *Tiara Scott*

88.      At all relevant times, Tiara Scott maintained health insurance through Medicare.

89.     LabCorp sent Ms. Scott a $1,194.00 bill for laboratory testing conducted by LabCorp on July 12, 2016 (the "Scott Bill").   The Scott Bill included ten separate tests as individual line items, listing the rack rate for each test, and computing the aggregate total to be $1,194.00.

90.     On August 25, 2016, LabCorp sent Medicare a claim for the lab services

18

provided to Ms. Scott, and on August 30, 2016, Medicare processed LabCorp's claim, denying coverage for all twelve tests.

91.    Had Independence covered the cost of the twelve tests, the amount actually paid to LabCorp would have been substantially lower than $1,194.00.  Indeed, under the 2016 CLFS, the maximum payment by Medicare for the twelve tests would have been $392.57.  The comparative breakdown between LabCorp's rack rate, the 2016 CLFS maximum rates for Maryland, and 2016 maximum CLFS rates nationwide, is as follows:

| CPT Code | Test Description | LabCorp's Rack Rate | 2016 CLFS Maximum Amount (Maryland) | 2016 CLFS Maximum Amount (Any State) |
|---|---|---|---|---|
| 85025 | Complete Blood Cell Count | $    31.00 | $    10.59 | $    10.59 |
| 80053 | Blood Test | $    46.00 | $    14.39 | $    14.39 |
| 81003 | Urinalyis Test | $    31.00 | $      3.06 | $      3.06 |
| 87491 | Detection Test (Chlamydia) | | $    42.32 | $    47.80 |
| 87591 | Detection Test (Neisseria Gonorrehoeae) | | $    42.32 | $    47.80 |
| 87661 | Infectious Agent Detection | | $    42.32 | $    47.80 |
| | *Total for 87491, 87591, 87661* | *$    384.00* | *$    126.96* | *$    143.40* |
| 83036 | Hemoglobin A1c Level | $    66.00 | $    12.68 | $    13.22 |
| 86706 | Hepatitis B Surface Antibody Measurement | $    87.00 | $    13.83 | $    14.63 |
| 82306 | Vitamin D-3 Level | $  273.00 | $    40.33 | $    40.33 |
| 86803 | Hepatitis C Antibody Measurement | $  107.00 | $    19.44 | $    19.44 |
| 87340 | Detection Test (Hepatits B) | $    74.00 | $    14.07 | $    14.07 |
| 86709 | Hepatits A Antibody Measurement | $    95.00 | $    10.26 | $    15.33 |
| | **TOTALS** | **$  1,194.00** | **$  392.57** | **$  431.86** |

92.    Because Medicare denied coverage, LabCorp insisted on billing Ms. Scott the entire rack rate of $1,194.00, rather than the fair market value of the services provided.

93.    Notably, when LabCorp billed Ms. Scott, it combined three tests into one line item (87491, 87591, and 87661), charging $384.00 for the three tests without identifying the charge for each individual test.  This action prevented Ms. Scott from being fully informed as to what tests LabCorp performed, and the cost of each.  Furthermore, LabCorp's act of combining

multiple tests into one line item limited Ms. Scott's ability to analyze what basis LabCorp was relying on to charge for each individual testing service.

94.    LabCorp and Ms. Scott had not reached agreement in advance with respect to the fees to be charged for the excluded test.  Rather, Ms. Scott assumed that, at worst, LabCorp would charge her the fair market value rate for any test not covered by insurance.  She would not have knowingly paid an excessive rate.

95.    Under protest, Ms. Scott has been making payments to LabCorp pursuant to a payment plan to satisfy the Scott bill. Moreover, as identified herein, LabCorp billed each of the named Plaintiffs in the aggregate, without a breakdown of reimbursement and discount for each individual diagnostic test, although LabCorp was reimbursed by the Plaintiffs' Benefit Plans on an individual test-by-test basis.

### Other Complaints

96.    Many consumers have voiced complaints on public forums against LabCorp that are similar to the Plaintiffs' allegations:[2]

>    a.  Patient in New Jersey, posted on December 24, 2016
>
>    I received a LabCorp bill for Vitamin D, 25 Hydroxy lab test for $273.00. I was told at the time of my test it is coded correctly and Medicare will pay for it. The test was done on September 8, 2016[.]  It's funny how [their] other $510.00 charges in the same blood test were paid by Medicare for $36.71.  Now I found the excel net fee schedule form LabCorp and I see that the net fee they charge providers is $18.94. Why should I have to be charged almost 15 times more. In any other industry that's called racketeering. I would pay the reasonable $18.94 but LabCorp will not answer my emails.  My doctor says her prescription is correct whatever that means. LabCorp will not respond to my customer service emails thus I guess they are waiting for the bill to go to their in house collection people. I will demand a hearing.  Realistically I would love to go to Washington and produce all these documents at a hearing on the ridiculous charges from medical providers that only those that cannot afford it pay.
>
>    b.  Patient in North Carolina, posted on December 8, 2011

---

[2] *Available at*, https://www.complaintsboard.com/labcorp-b119709.

I had health insurance with Horizon Blue Cross Blue Shield of New Jersey (Horizon). In network outpatient lab work was provided by Laboratory Corporation of America Holdings (Labcorp). Due to the limitations of the policy, there was a limit of $500.00 per year for this benefit. During October 2010, I visited my primary doctor, blood was drawn and sent to Labcorp. Horizon was billed for four (4) tests - two (2) were paid in full, one was paid partially and the last was not paid. The Explanation of Benefits sent to me did not show the remaining balance for out patient testing. For the partially paid test, Horizon was billed at $104.00, allowed amount $20.21, paid $1.85. The last test was billed at $66.00, allowed amount $11.68, not paid. When this first started, I offered to pay the unpaid contract amounts of $30.04 - not accepted. I see no reason why I should pay more than five times the contract amount for a test. Also, I have not worked since January 2008 and can't afford to pay $66.00.

97.     Additional complaints provide:[3]

a.  Posted on January 23, 2017

I recently had a drug screen done as part of my medical training. I, having health insurance, elected to first attempt to bill the service to my insurance to help offset the cost. My insurance later rejected the charge as a non-covered service. Lab Corp then sends me a bill for $381 [] for... the service. Fellow colleagues who paid cash for the exact same lab done at the exact same providers office were only billed $90. This represent a 236% increase. After calling Labcorp they say this is their "cash pay" discount. Labcorp does not make it known they charge more for services billed to insurance so there is no way for the consumer to know if attempting to utilize their health insurance is even worthwhile. Secondly a 236% or $291 increased charged simply because a customer has an insurance is deceitful at best and at worse abusive and fraudulent. Again, a $291 markup to simply reject an insurance claim is absurd.

b.  Posted on December 29, 2016

Date of Service 1-5-2016. Lab Corp submitted to ******** 2 wrong diagnosis along with services of $334.00 of which a previous Lab had a charge of $58. Lab Corp submitted to ******** diagnosis codes of ****** (other Malaise) & ***** (other hyperlipidemia). ******** denied coverage for the charges of... $334.00 as the above are not covered diagnosis. ******** did pay for charges of $58.62 in 2014 for the same 3 tests.

c.  Posted on November 7, 2016

LabCorp has billed me $567 for lab work that has a fair market value of $179, evidenced by internet offers that use LabCorp for the bloodwork. On 6/2/16 I had bloodwork performed at LabCorp in Fairhope, AL, as a prerequisite for an internship

---

[3] *Available at,* http://www.bbb.org/.

21

Case 1:17-cv-00193-TDS-JLW   Document 1   Filed 03/08/17   Page 21 of 39

at a hospital. This bloodwork was not covered by BCBS even though my doctor believed it would be. I have received several bills and collections threats, concerning invoice number XXXXXXXX. This invoice is for $567. A quick internet search finds that the bloodwork I received would cost $179 at the same location, if purchased online. The online price does not require any form of membership. LabCorp's price gouging is unconscionable and potentially illegal. I have offered in writing and on a recorded call to pay the FMV of the services received.

d.  Posted on October 17, 2016

LabCorp invoices consumer 7 times the amount they will accept from **********
for the same exact test if ********** denies it vs approves it. I asked my Dr. office
for an annual physical - which was supposedly free under my health plan with
**********. The Dr. office asked me to come in on 6/15... for blood/urine tests - a
week before my physical on 6/22. I learned later the Dr. office sent these tests out to
LabCorp. Out of several tests run on 6/15, one of them (Procedure Code:
***************************) was denied by ** because they decided it's Not
Covered under preventative care. But on 6/22 the Dr. didn't like one of my numbers
on that test & had me take it again. Weeks later I was informed that ** Denied my
coverage for the 6/15 test & I was billed the full list price of $72 by LabCorp. **
said the claim from 6/22 was covered because it was for medical reasons... So they
discounted that $72 bill from LabCorp by $61.85 (86% discount) to make it only
$10.15, of which I paid my 20% copay of $2.03. How is it possible that LabCorp
will accept $10.15 for the same exact test (code *****) on 6/22 but expect me, the
consumer, to pay 7X the rate of $72 when they did the test on 6/15. This is
outrageous! I tried calling LabCorp initially to get a lower rate, but they said that's
just how it is... I also tried appealing to my Dr's office, and **, and my employer's
HealthAdvocate to get some help changing the bill to a rational amount. But
everyone just says that's how insurance works... Finally, today I called LabCorp back
because they're about to sent the $72 invoice to a 3rd party collection agent & hurt
my credit score. Supposedly, the most their customer service is authorized to
discount a bill is 5%. So I paid the $68.40 so it won't go to collections. But this is
still outrageous that they will nail the consumer with 7X the amount they will accept
from ** for the SAME EXACT PROCEDURE done one week apart. This seems like
an unfair & deceptive trade practice! I never agreed to pay LabCorp anything in June
& didn't even know they were who the Dr office farmed these tests out to. I just
asked my Dr for an annual physical. But now they have the power to charge me $72
for a test that they normally get paid $10.15 for. What is to stop them from charging
$720 for a $10 test the next time, or $7,200?

e.  Posted on August 23, 2016

Excessive charges for one blood test. In August of 2015 I went to my doctor to get
my thyroid checked, he was covered by my insurance. He said he would need a
blood sample and that the lab was in his office. I did as instructed by my doctor and
had my blood drawn. On this date of August 27,2016... (one year later) I received an

invoice from Labcorp stating that I owe $521.00 for my one blood draw for one test. I could not believe that one test cost $521.00 and that I received a bill a year later. I am a student and I barely can afford my cost of living. I called to see if they could settle with $150.00 because that is all I had in my savings and the employee on the phone said that she could only give me a discount off the bill but it still would be over $400.00. I believe this company is price gouging patients. I have insurance but they still won't settle on my co-pay. I was not told by Labcorp that I would have to pay $521.00 for my test, if I knew that I would of went somewhere else for the test. This company is not honest and I would like for them to settle for my co-pay.

## CLASS ACTION ALLEGATIONS

98.     Plaintiffs bring this action on behalf of themselves and on behalf of the national Class, defined above as all persons who were charged fees for services by LabCorp that were in excess of the negotiated or mandated fair market value rates established for those services between LabCorp and private or public health insurers.  In the event there is no fair market value rate established for a particular LabCorp service by any Class members' private or public health insurers, Plaintiffs seek a declaration as to the a reasonably comparable fair market value rate.  A fair market rate for these purposes is defined as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts."  *See* IRS Publication 561.  Excluded from the Class is LabCorp, its parents, subsidiaries, officers, directors, employees, partners, and co-ventures.

99.     Plaintiffs also brings this action on behalf of the following Sub-Classes:

a.   All persons residing in the State of New York who were charged fees for services by LabCorp that were in excess of the fair market value rates established for those services, as negotiated or mandated by or between LabCorp and private or public health insurers (the "New York Sub-Class");

b.   All persons residing in the State of California who were charged fees for services by LabCorp that were in excess of the fair market value rates established for

23

those services, as negotiated or mandated by or between LabCorp and private or public health insurers (the "California Sub-Class");

  c. All persons residing in the State of Tennessee who were charged fees for services by LabCorp that were in excess of the fair market value rates established for those services, as negotiated or mandated by or between LabCorp and private or public health insurers (the "Tennessee Sub-Class"); and

  d. All persons residing in the State of Maryland who were charged fees for services by LabCorp that were in excess of the fair market value rates established for those services, as negotiated or mandated by or between LabCorp and private or public health insurers (the "Maryland Sub-Class").

100. This action is brought as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3). The Class and Sub-Classes (collectively, the "Class") satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

101. **Numerosity**. The members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members can be determined only by appropriate discovery, Plaintiffs believe that there are thousands of Class members residing throughout the United States. Indeed, LabCorp claims to have more than 110 million patient encounters per year, and to process tests on approximately 500,000 patient specimens *daily*.

102. Because of the geographic dispersion of Class members, there is judicial economy arising from the avoidance of a multiplicity of actions in trying this matter as a class action.

103. **Typicality**. Plaintiffs' claims are typical of the claims of the members of the

Class. Plaintiffs have no interests that are adverse or antagonistic to those of the Class. Plaintiffs' interests are to obtain relief for themselves and the Class for the harm arising out of the violations of law set forth herein.

104. **Commonality**. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether LabCorp violated the North Carolina Unfair and Deceptive Trade Practices Act, the New York Consumer Protection Law, the California Consumers Legal Remedies Act, the California Unfair Competition Law, the Tennessee Consumer Protection Act of 1977, and the Maryland Consumer Protection Act;

b. Whether LabCorp breached its implied contractual obligations to Plaintiffs and the Class;

c. Whether the amount LabCorp is entitled to charge patients is equivalent to the fair market value rates of its services;

d. Whether LabCorp billed Plaintiffs and members of the Class amounts in excess of the fair market value rates of its services;

e. Whether LabCorp deceived Plaintiffs and members of the Class by billing for services at excessive rates, without disclosing that it had agreed with Benefit Plans to accept negotiated rates that reflect the fair market value rates of its services;

f. The proper measure of damages to be paid to Plaintiffs and the Class;

g. Whether Plaintiffs and the Class are entitled to injunctive or other

equitable relief to remedy LabCorp's continuing violations of law alleged herein; and

      h.  Whether LabCorp has been unjustly enriched by their inequitable and unlawful conduct, and if so, whether LabCorp should be forced to disgorge inequitably obtained revenues or provide restitution.

105.    **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in complex and consumer class action litigation.

106.    A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by the members of the Class may be relatively small in comparison to the expense and burden of individual litigation, it is virtually impossible for Plaintiffs and members of the Class to individually seek redress for the wrongful conduct alleged herein.

107.    In addition, as alleged herein, LabCorp has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

108.    The Class is readily definable, and prosecution of this action and a class action will reduce the possibility of repetitious litigation.

109.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

110.    Reliance among Class members may be assumed because no one would knowingly pay an excessive rate.

### FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

111.    LabCorp has engaged in fraudulent, misleading and deceptive efforts to conceal

26

the true nature of its unlawful conduct from Plaintiffs and the Class. LabCorp intended to and has in fact accomplished their concealment by their active misrepresentations and omissions, as described herein.

112. Specifically, LabCorp mails invoices to patients that groups all lab work charges together, and identifies only the aggregate insurance discounts and third-party payments. LabCorp fails to inform patients of the specific instances where a health insurer denies coverage, and patients are not provided with the discounts negotiated by the Benefit Plans.

113. Due to LabCorp's fraudulent concealment, many Plaintiffs have only recently learned of the existences of their claims against LabCorp.

114. Plaintiffs' lack of knowledge as to their claims against LabCorp were not due to any fault or lack of diligence on their part, but rather due entirely or substantially to LabCorp's acts designed to conceal and hide the true and complete nature of their unlawful and inequitable conduct.

## CAUSES OF ACTION

### COUNT I
**Violations of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. §§ 75-1, *et seq.***
**(On behalf of Plaintiffs and the Class)**

115. Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

116. LabCorp's laboratory testing services are "in or affecting commerce" under N.C. Gen. Stat. § 75-1.1(a).

117. The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") declares unlawful any "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

27

118.    As alleged herein, LabCorp has engaged in unfair or deceptive acts or practices affecting commerce by billing individuals at the unreasonably excessive rack rates when lab tests are not covered by a Benefit Plan.  LabCorp also impermissibly aggregates the billing-related adjustments and Benefit Plan payments on its invoices.  These acts and practices violate the UDTPA.

119.    Each invoice sent by LabCorp that overbills Plaintiffs and each member of the Class establishes a separate offense of the UDTPA pursuant to N.C. Gen. Stat. § 75-8.

120.    Plaintiffs and the other members of the Class have been and continue to be injured as a direct and proximate result of LabCorp's violations of the UDTPA.

121.    Plaintiffs and the other members of the Class either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value rate.  No person would have knowingly paid an excessive rate.

122.    Plaintiffs are entitled to pursue a claim on behalf of the national Class against LabCorp seeking actual damages and treble damages pursuant to N.C. Gen. Stat. § 75-16, which provides

> [i]f any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict..

123.    Plaintiffs and the other members of the Class are also entitled to seek attorney's fees for bringing this action to remedy LabCorp's violations of the UDTPA, under N.C. Gen. Stat. § 75-16.1.

28

<u>**COUNT II**</u>
**Violations of the New York Consumer Protection Law,**
**N.Y. Gen. Bus. Law §§ 349,** *et seq.*
**(On behalf of Plaintiff Bouffard and the New York Sub-Class)**

124.     Plaintiff Bouffard herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

125.     The New York Consumer Protection Law ("NY CPL") declares unlawful any "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a).

126.     As alleged herein, LabCorp has engaged in deceptive acts or practices by billing individuals at the unreasonably excessive rack rates when lab tests are not covered by a Benefit Plan. LabCorp also impermissibly aggregates the billing-related adjustments and Benefit Plan payments on its invoices. These acts and practices violate the NY CPL.

127.     Ms. Bouffard and the other members of the New York Sub-Class have been and continue to be injured as a direct and proximate result of LabCorp's violations of the NY CPL.

128.     Ms. Bouffard and the other members of the New York Sub-Class either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value rate. No person would have knowingly paid an excessive rate.

129.     Ms. Bouffard is entitled to pursue a claim on behalf of the New York Sub-Class against LabCorp pursuant to N.Y. Gen. Bus. Law § 349(h), which provides

> any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one

29

thousand dollars, if the court finds the defendant willfully or knowingly violated this section.

130.    Ms. Bouffard and the New York Sub-Class are also entitled to seek attorney's fees for bringing this action to remedy LabCorp's violations of the NY CPL.

**COUNT III**
**Violations of the California Consumers Legal Remedies Act,**
**Cal. Civ. Code §§ 1750, *et seq*.**
**(On behalf of Plaintiff Sullivan and the California Sub-Class)**

131.    Plaintiff Sullivan herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

132.    LabCorp is a "person" as defined in Cal. Civ. Code § 1761(c).

133.    LabCorp's laboratory testing services constitute "services" under Cal. Civ. Code § 1761(b).

134.    The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in … services to any consumer," which occurs when, among other instances, a person is "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions" or "[i]nserting an unconscionable provision in the contract."  Cal. Civ. Code § 1770(a).

135.    As alleged herein, LabCorp has engaged in unfair or deceptive acts or practices by billing individuals at the unreasonably excessive rack rates when lab tests are not covered by a Benefit Plan.  LabCorp also impermissibly aggregates the billing-related adjustments and Benefit Plan payments on its invoices.  These acts and practices violate the CLRA.

136.    Plaintiff Sullivan and the other members of the California Sub-Class have been and continue to be injured as a direct and proximate result of LabCorp's violations of the CLRA.

30

137. Plaintiff Sullivan and the other members of the California Sub-Class either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value rate. No person would have knowingly paid an excessive rate.

138. Plaintiff Sullivan is entitled to pursue a claim against LabCorp on behalf of the California Sub-Class to enjoin LabCorp from continuing its unfair or deceptive acts or practices under Cal. Civ. Code § 1781 and § 1780, as well as to pursue costs and attorney's fees for bringing this action to remedy LabCorp's violations of the CLRA pursuant to § 1780(e).

139. This claim is brought for the purposes of obtaining injunctive relief.

**COUNT IV**
**Violations of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
**(On behalf of Plaintiff Sullivan and the California Sub-Class)**

140. Plaintiff Sullivan herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

141. LabCorp is a "person" as defined in Cal. Bus. & Prof. Code § 17201.

142. Under the California Unfair Competition Law ("UCL"), "unfair competition" is defined broadly to mean and include "any unlawful, unfair or fraudulent business act or practice…." Cal. Bus. & Prof. Code § 17200.

143. As alleged herein, LabCorp has engaged in an unlawful, unfair or fraudulent business act or practice by billing individuals at the unreasonably excessive rack rates when lab tests are not covered by a Benefit Plan. LabCorp also impermissibly aggregates the billing-related adjustments and Benefit Plan payments on its invoices. These acts and practices violate the UCL.

144.    Plaintiff Sullivan and the other members of the California Sub-Class have been and continue to be injured as a direct and proximate result of LabCorp's violations of the UCL.

145.    Plaintiff Sullivan and the other members of the California Sub-Class either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value rate.  No person would have knowingly paid an excessive rate.

146.    Plaintiff Sullivan is entitled to pursue a claim against LabCorp on behalf of the California Sub-Class pursuant to Cal. Bus. Prof. Code §§ 17203, 17204, 17205, and/or 17206 for damages, restitution, and equitable relief to remedy LabCorp's violations of the UCL, and to move under Cal. Code Civ. Proc. § 1021.5 for costs and attorney's fees for any significant benefit conferred upon the general public or a large class of persons in relation to enjoining LabCorp from continuing to violate the UCL.

### COUNT V
**Violations of the Tennessee Consumer Protection Act of 1977,**
**Tenn. Code §§ 47-18-101, *et seq.***
**(On behalf of Plaintiff Sheriff and the Tennessee Sub-Class)**

147.    Plaintiff Holden Sheriff herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

148.    LabCorp is a "person" as defined in the Tennessee Consumer Protection Act of 1977 ("TN-CPA").  Tenn. Code § 47-18-103(13).

149.    LabCorp's laboratory testing services constitute "trade" or "commerce" under the TN-CPA.  Tenn. Code § 47-18-103(19).

150.    The TN-CPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," which includes "[m]aking false or misleading statements of

32

fact concerning the reasons for, existence of, or amounts of price reductions." Tenn. Code § 47-18-104(11).

151.    As alleged herein and above, LabCorp has engaged in an unfair or deceptive act or practice by billing individuals at the unreasonably excessive rack rates when lab tests are not covered by a Benefit Plan. LabCorp also impermissibly aggregates the billing-related adjustments and Benefit Plan payments on its invoices. These acts and practices violate the TN-CPA.

152.    Ms. Sheriff and the other members of the Tennessee Sub-Class have been and continue to be injured as a direct and proximate result of LabCorp's violations of the TN-CPA.

153.    Ms. Sheriff and the other members of the Tennessee Sub-Class either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value. No person would have knowingly paid an excessive rate.

154.    Ms. Sheriff is entitled to pursue a claim on behalf of the Tennessee Sub-Class against LabCorp under Tenn. Code § 47-18-109 for actual damages, treble damages, equitable relief, and attorney's fees and costs to remedy LabCorp's violations of the TN-CPA.

## COUNT VI
### Violations of the Maryland Consumer Protection Act,
### Md. Code Ann., Com. Law §§13-101, *et seq.*
### (On behalf of Plaintiff Scott and the Maryland Sub-Class)

155.    Plaintiff Tiara Scott herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

156.    LabCorp is a "person" as defined in the Maryland Consumer Protection Act ("MD-CPA"). Md. Code Ann., Com. Law §13-101(h).

33

157. The MD-CPA prohibits "any unfair or deceptive trade practice," which includes "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers," "[f]ailure to state a material fact if the failure deceives or tends to deceive," and "[f]alse or misleading representation of fact which concerns…[t]he reason for the existence or amount of a price reduction." Md. Code Ann., Com. Law §§13-301, 303.

158. As alleged herein and above, LabCorp has engaged in an unfair or deceptive trade practice by billing individuals at the unreasonably excessive rack rates when lab tests are not covered by a Benefit Plan. LabCorp also impermissibly aggregates the billing-related adjustments and Benefit Plan payments on its invoices. These acts and practices violate the MD-CPA.

159. Ms. Scott and the other members of the Maryland Sub-Class have been and continue to be injured as a direct and proximate result of LabCorp's violations of the MD-CPA.

160. Ms. Scott and the other members of the Maryland Sub-Class either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value. No person would have knowingly paid an excessive rate.

161. Ms. Scott is entitled to pursue a claim on behalf of the Maryland Sub-Class against LabCorp under Md. Code Ann., Com. Law §13-408 for damages and attorney's fees and costs to remedy LabCorp's violations of the MD-CPA.

## COUNT VII
### Breach of Implied Contract or Quasi-Contract,
### and for Unjust Enrichment
### (On behalf of Plaintiffs and the Class)

162.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

163.    An implied contract exists between LabCorp and each of the Plaintiffs, as well as each member of the national Class, whereby there is a mutual understanding that LabCorp is providing laboratory testing services in exchange for payment equal to the fair market value of its services.

164.    Additionally, if a patient is insured and their insurer denies coverage for the tests performed (in whole or in part), the patient would then be accountable for the fair market value of those specific tests, equal to the fair market value rate as described herein (the *quantum meruit* of the services performed), which would be substantially similar to the rate the patient's insurer would have paid had the lab services been covered.

165.    LabCorp breached the terms of the implied contract by billing Plaintiffs and other members of the national Class at excessive rack rates that were multiple times higher than the fair market value rates, as agreed to between LabCorp and Benefit Plans, or as otherwise applicable to Plaintiffs and the Class.

166.    By virtue of LabCorp's breach of the implied contract, LabCorp was unjustly enriched to the detriment of Plaintiffs and the members of the national Class.  Plaintiffs and the Class thereby sustained monetary damages.

167.    LabCorp should be compelled to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and the national Class, all proceeds received by LabCorp from Plaintiffs and the Class as a result of any unlawful or

Case 1:17-cv-00193-TDS-JLW    Document 1    Filed 03/08/17    Page 35 of 39

inequitable act described herein, which has inured and continues to inure to the unjust enrichment of LabCorp.

168.     LabCorp should also be enjoined from continuing to engage in any unlawful or inequitable methods, acts and/or practices as alleged herein.

<u>COUNT VIII</u>
**Common Law Fraud (in the Alternative)**
**(On behalf of Plaintiffs and the Class)**

169.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

170.     In the alternative to the allegations of unfair and deceptive trade practices, Plaintiffs allege that LabCorp intentionally, knowingly, willfully and recklessly charged and collected fees for laboratory testing and other services in excess of the fair market value rates it was entitled to.

171.     On its invoices, LabCorp does not identify claims that are rejected by Benefit Plans, the amount Benefit Plans pay for individual lab tests, what portion of the charged amounts patients are paying for individual lab tests (whether some or all), and what amount the Benefit Plan would pay for lab tests had it not rejected the claim.

172.     LabCorp misused its position of superior knowledge and financial strength to defraud and induce consumers into paying bills and costs LabCorp knew were excessive and beyond the fair market value rates of its services.

173.     Certain Plaintiffs and the other members of the national Class were compelled to pay these bills in reliance upon the various statements, and representations and omissions of material fact made by LabCorp.  These statements, representations, and omissions were made for the purpose of inducing reliance thereon by Plaintiffs and the Class to pay fees in an amount

36

LabCorp was not entitled to.

174.     Plaintiffs and the other members of the Class had a right to rely on, and did reasonably rely on, LabCorp's statements, misrepresentations, and omissions.

175.     Each of LabCorp's misrepresentations and omissions were material, in that Plaintiffs and the Class would not have paid the improper fees and charges if they had known that the statements and representations of LabCorp were false, misleading, incomplete, unfair and untrue.

176.     Each of the misleading statements, misrepresentations, and omissions made by LabCorp, as identified herein, were false, misleading, incomplete, and untrue, and were known or should have been known by LabCorp to be false, misleading, incomplete, and untrue when made.   Each misleading statement, misrepresentation, and omission was made with intent to deceive and defraud, or to conceal the truth about LabCorp's deceptive billing practices, or with disregard for its truth or completeness, or in spite of the fact that it was untrue.   Each misleading statement, misrepresentation, and omission was made to induce Plaintiffs and the Class to pay LabCorp's fees and charges well above the fair market value rate.

177.     Plaintiffs and the other members of the Class had no knowledge of the falsity, incompleteness, or untruthfulness of LabCorp's statements and representations when they paid their bills to LabCorp.

178.     By reason of LabCorp's misleading statements, misrepresentations, and omissions, Plaintiffs and the other members of the Class suffered financial injuries.

179.     Moreover, the conduct of LabCorp in perpetrating the fraud described above was malicious, willful, wanton, and oppressive, or in reckless disregard of the rights of Plaintiffs and the other members of the Class, thereby warranting the imposition of punitive damages against

LabCorp.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against LabCorp as follows:

1) Certifying the Class pursuant to Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as representatives of the Class, and designating their counsel as counsel for the Class;

2) Declaring that LabCorp has engaged in the unlawful and inequitable conduct alleged herein;

3) Awarding Plaintiffs and the Class damages for their claims;

4) Awarding Plaintiffs and the Class statutory and exemplary damages where permitted;

5) Awarding Plaintiffs and the Class punitive damages;

6) Ordering LabCorp to disgorge into a common fund or a constructive trust all monies paid by Plaintiffs and the Class to the full extent to which LabCorp was unjustly enriched by their unlawful and inequitable conduct alleged herein;

7) Permanently enjoining LabCorp from continuing to engage in the unlawful and inequitable conduct alleged herein;

8) Granting Plaintiffs and the Class the costs of prosecuting this action and reasonable attorneys' fees; and

9) Granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the Class demand a trial by jury on all issues so triable.

Dated: March 8, 2017

ELLIS & WINTERS LLP

*/s/ Jonathan D. Sasser*

Jonathan D. Sasser
N.C. State Bar No. 10028
Jeremy M. Falcone
N.C. State Bar No. 36182
P.O. Box 33550
Raleigh, North Carolina 27636
Telephone Number: (919) 865-7000
Facsimile Number: (919) 865-7010
jon.sasser@elliswinters.com
jfalcone@elliswinters.com

OF COUNSEL

Robert C. Finkel
Joshua W. Ruthizer
Sean M. Zaroogian
WOLF POPPER LLP
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone Number: (212) 759-4600
Facsimile Number: (212) 486-2093
rfinkel@wolfpopper.com
jruthizer@wolfpopper.com
szaroogian@wolfpopper.com

*Counsel for Plaintiffs*

39