# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### GREENSBORO DIVISION

|  |  |  |
|---|---|---|
| SHERYL ANDERSON, MARY CARTER, TENA DAVIDSON, ROBERT HUFFSTUTLER, RAMZI KHAZEN, CHAIM MARCUS, LILY MARTYN, JONAH MCCAY, HOLDEN SHERIFF, VICTORIA SMITH, MICHELLE SULLIVAN, SHONTELLE THOMAS, JOSEPH WATSON, and MICHAEL WILSON individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 1:17-cv-193 |
| Plaintiffs, | ) ) | JURY TRIAL REQUESTED |
| vs. | ) ) | |
| LABORATORY CORPORATION OF AMERICA HOLDINGS, | ) ) ) | |
| Defendant. | ) ) ) | |

**AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

JURISDICTION AND VENUE ......................................................................... 7

PARTIES ............................................................................................................ 7

    A.    Plaintiffs ................................................................................................ 7

    B.    Defendant .............................................................................................. 9

FACTUAL ALLEGATIONS ............................................................................. 9

    A.    LabCorp and the Clinical Lab Testing Industry ................................. 9

    B.    LabCorp's Business Model ................................................................ 12

    C.    LabCorp's Annual Revenues ............................................................ 14

    D.    LabCorp's Internal Cost Structure .................................................... 18

    E.    LabCorp's Tenuous Relationship with Patients ................................ 20

    F.    List Prices for Healthcare Services, Generally ................................ 21

    G.    LabCorp Chooses to do Business Without Written Customer Agreements ..... 26

    H.    Determining the Actual Market Rate for Clinical Lab Testing Services .......... 27

        1.    Medicare Rates for Clinical Lab Testing Services are Based on Actual Third-Party Payer Rates ............................................................ 29

        2.    Medicaid Rates are Based on State-Specific Determinations of Reasonable Rates ................................................................ 33

        3.    Private Third-Party Payer Rates are Considered Proprietary and Maintained as Closely Guarded Secrets ................................................ 34

        4.    Potential Models for Calculating the Market Rate for Clinical Lab Testing Services ................................................................ 35

    I.    In the Absence of an Agreement, The Court Should Establish the Reasonable Price of LabCorp's Services ........................................ 36

    J.    Plaintiffs' Claims .............................................................................. 38

K.     Confidential Witness Allegations ........................................................ 88

L.     LabCorp's Unreasonable List Prices ................................................ 90

M.    LabCorp's Manipulative Billing Practices ........................................ 96

       1.     LabCorp Fails to Provide Test Codes or Medical Diagnoses Necessary to Assess the Charges for Diagnostic Services .................. 96

       2.     Aggregating Insurance Discounts and Payments Deceives Patients Into Believing that Their Diagnostic Testing is Fully Covered by Insurance .............................................................................. 97

       3.     LabCorp Sends Out Threatening Letters Demanding Payment ........... 98

N.     Other Complaints About LabCorp's Billing Practices ..................................... 99

O.     It is an Unreasonable Burden on the Physician or Patient to Determine Insurance Coverage or the Market Rate of Clinical Lab Tests ..................... 107

CLASS ALLEGATIONS ............................................................... 113

CAUSES OF ACTION ................................................................. 118

PRAYER FOR RELIEF ............................................................... 136

JURY DEMAND ........................................................................ 138

Sheryl Anderson, Mary Carter, Tena Davidson, Robert Huffstutler, Ramzi Khazen, Chaim Marcus, Lily Martyn, Jonah McCay, Holden Sheriff, Victoria Smith, Michelle Sullivan, Shontelle Thomas, Joseph Watson, and Michael Wilson (collectively, "Plaintiffs," and each individual, "Plaintiff"), individually and on behalf of all others similarly situated, bring this complaint against Laboratory Corporation of America Holdings, inclusive of all subsidiaries and affiliates ("LabCorp," the "Company," or "Defendant"). Plaintiffs' allegations are based upon information and belief, including the investigation of counsel, except as to the allegations that pertain to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1.      LabCorp provides diagnostic clinical lab testing services on behalf of patients worldwide. LabCorp has more than 115 million patient encounters per year and typically processes clinical lab tests on more than 2.5 million patient specimens per week. For 2017, LabCorp claims to have generated more revenue from clinical lab testing services than any other company in the world.

2.      This Action is brought as a class action on behalf of all LabCorp patients in the United States who, without any express contract with LabCorp that establishes the amount of fees to be paid to LabCorp, were charged fees for clinical lab testing services performed by LabCorp that were in excess of the reasonable market rates for the same services (the "Class").

3.      Plaintiffs and the Class seek a declaratory judgment that because no express contract exists between LabCorp and the members of the Class, the parties are subject to

1

a contract either implied-in-law or implied-in-fact, pursuant to which LabCorp is entitled to recover only a reasonable price for its clinical lab testing services. See Restatement (Second) of Contracts, §§ 5 and 204. Plaintiffs and the Class also seek a declaratory judgment that LabCorp's list prices are not a reasonable price for its services because the list prices far exceed the usual and customary rate for the services provided, *i.e.*, the market rates typically paid for the same services by third-party payers who are responsible for an overwhelming majority of LabCorp's revenue (approximately 83% of LabCorp's United States clinical lab testing revenue), and include a grossly excessive markup on LabCorp's cost to provide the services.

4.      Plaintiffs also assert claims against LabCorp for unjust enrichment/restitution and unfair and deceptive trade practices in violation of state statutes.

5.      The Class consists of patients who contribute less than 10% of LabCorp's net revenue (and less than 17% of its United States clinical lab testing revenue), but have been charged LabCorp's list prices for clinical lab tests. LabCorp's list prices are up to ten times higher than the negotiated rates paid by LabCorp's other customers – those financially responsible for clinical lab testing services performed on behalf of patients (referred to herein as "third-party payers"). While healthcare service providers such as LabCorp *charge* exorbitant list prices for their services, those list prices are rarely *paid*. Rather, the list prices are intended solely as a negotiating starting point with third-party payers (*e.g.*, insurance companies), who negotiate huge discounts, and to charge patients whose insurance denies coverage or who are uninsured (*i.e.*, the Class members).

2

6.      Typically, physicians write prescriptions for clinical lab tests and the specimens are collected at the physician's office or, on some occasions, at a LabCorp location.  Either way, LabCorp is provided with the medical diagnosis code and/or CPT code[1] or HCPCS code[2] for each prescribed clinical lab test, as well as the patient's insurance information (for insured patients).  LabCorp performs the prescribed clinical lab tests whether the billing information is correct or complete.  If the service is covered by insurance, LabCorp bills the third-party payer at a negotiated rate.  If the service is not covered by insurance, there is customarily no express agreement as to the appropriate price and LabCorp chooses to bill the patient at its list rate.

7.      Insurance denies coverage when clinical lab tests, in the opinion of the insurer as opposed to the physician, are not "medically necessary" or otherwise violates the insurer's protocol for coverage of lab tests.  Except in certain instances, including when Medicare is involved, the customer is not advised in writing of the list price of the service or whether insurance is likely to cover the service prior to the clinical lab testing services being provided.

8.      Third-party payers, who contribute an overwhelming majority of LabCorp's net revenue (approximately 83% of LabCorp's United States clinical lab

---

[1] "CPT code" means Current Procedural Terminology code, and is a set of medical codes for healthcare-related laboratory procedures, and is maintained by the American Medical Association.

[2] "HCPCS code" means Healthcare Common Procedure Coding System code, which is a major code set for healthcare services and was developed by the Centers for Medicare and Medicaid Services ("CMS").

3

testing revenue), typically pay negotiated rates that are substantially lower than list prices. For instance, when comparing the list prices LabCorp charged Plaintiffs to the median third-party payer rate across the United States (as reported by CMS in relation to Medicare's 2017 rates), the implied markup averaged 2.91 times the third-party payer rates, with a median of 2.86 times. *See* ¶ 414. Comparing the same list prices to the 2018 Medicare rates, which are equal to the median third-party payer rates derived from data produced by large independent clinical lab testing service providers (such as LabCorp) following a governmental finding that Medicare was overpaying for clinical lab tests, the implied markup averaged 4.68 times the 2018 rates, with a median of 4.75 times. *See id.* As such, LabCorp's list prices do not represent reasonable market rates.

9.     Moreover, LabCorp's list prices are grossly in excess of cost. For example, the negotiated rates paid by third-party payers are highly profitable. Indeed, LabCorp reported a gross profit margin (which reflects the percent of net revenue after subtracting the cost of services) of approximately 33.9% for 2017, with approximately 59% of its net revenue being contributed by its United States clinical lab testing segment, and 83% of that segment being derived from third-party payers. Given the profitability of the negotiated rates, the outrageously inflated list prices are by far more profitable.

10.    Plaintiffs are not disputing LabCorp's right to charge its patients higher prices than it typically receives, but, rather, contend that LabCorp *must* secure patients' consent in advance of demanding payment of higher amounts. Absent a written agreement to pay list prices, LabCorp's charges *must* be limited to reasonable prices.

4

11.     Notably, LabCorp does not attempt to enter into an arrangement to collect its egregious list prices until *after* services are performed and adjudication—the process of billing any financially responsible third-party payer for its negotiated rate—is completed and the patient is deemed financially responsible for one or more of LabCorp's clinical lab tests.

12.     LabCorp clearly has the ability to advise its patients in advance and secure their consent to charge list prices.  For instance, LabCorp is required to disclose the self-pay amount with respect to Medicare patients when Medicare denial of coverage is "expected to be denied."[3]  This is completed through an Advanced Beneficiary Notice (ABN) form.  Indeed, absent such disclosure, there is no meeting of the minds as to price. Without a meeting of the minds, LabCorp must be limited to charging reasonable, market prices.

13.     Notably, the amounts LabCorp is typically paid for its services by third-party payers (other than government payers such as Medicare and Medicaid) are deemed proprietary information and considered highly confidential.  These market-based rates are therefore unavailable to patients and physicians, which creates an opaque marketplace that fails to reflect the true value of the services being invoiced.

14.     Although neither LabCorp nor insurers disclose negotiated rates, to the extent the negotiated rates were disclosed to Plaintiffs, those rates frequently were lower

---

[3] https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/abn_booklet_icn006266.pdf

Case 1:17-cv-00193-TDS-JLW   Document 42   Filed 08/10/18   Page 8 of 142

than Medicare rates. This further supports relying on Medicare rates as a reasonable proxy for negotiated rates. *See* ¶¶ 89-98.

15. Additionally, LabCorp's invoices aggregate testing procedures and fail to break down the services being billed by CPT code and the amounts paid by third-party payers, making it extremely difficult (if not impossible) to discern what services are being billed for and at what rate. Patients who refuse to pay, and those who inquire as to the basis for their invoices, are subjected to a slew of aggressive and unlawful collection efforts. *See e.g.*, ¶¶ 137-147.

16. Patients receiving LabCorp's outrageous bills are left with limited recourse given the lab tests have already been performed, the non-transparent nature of LabCorp's invoices, and the lack of a marketplace from which to calculate a reasonable value. They are forced to either pay LabCorp outrageous amounts or endure LabCorp's collection efforts, which includes the potential foreclosure of LabCorp performing clinical lab testing services in the future, threats of the debt being sold to a collection agency, and the risk of a negative report being submitted to credit rating agencies.

17. Plaintiffs and the Class are therefore entitled to relief in the form of a declaratory judgment declaring the rights and obligations of LabCorp and the Class to pay a reasonable price under an implied contract (whether in-law or in-fact).

18. This Action is also brought on behalf of a sub-class of all LabCorp patients in the United States who, without any express contract with LabCorp that establishes the amount of fees to be paid to LabCorp, were charged fees and paid LabCorp for clinical lab testing services at prices in excess of the reasonable market rates for the same

6

services (the "Payor Sub-Class"). To prevent LabCorp from being unjustly enriched, the Payor Sub-Class is seeking restitution equal to the amount of overcharge (the difference between the amount paid and the reasonable market rate). Plaintiffs also assert claims under North Carolina and other states' consumer protection acts.

## JURISDICTION AND VENUE

19. Plaintiffs invoke the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §1332(d), which confers original jurisdiction upon this Court over this class action based on diversity of citizenship: (a) there are 100 or more Class members; (b) the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and (c) at least one Plaintiff and member of the Class is a citizen of a state different from the Defendant.

20. This Court also has supplemental jurisdiction over Plaintiffs' state law and common law claims pursuant to U.S.C. §1367(a).

21. This Court possesses personal jurisdiction over the Defendant based on LabCorp's residence, presence, transaction of business and contacts within this District.

22. Venue is proper in this District pursuant to 28 U.S.C. §1391 because LabCorp maintains its principal place of business in this District, and at all times conducted substantial business herein.

## PARTIES

**A.  PLAINTIFFS**

23. Sheryl Anderson resides in Alabama. At all relevant times, Anderson maintained health insurance through BlueCross BlueShield of Alabama.

7

24.     Mary Carter resides in Maryland.  At all relevant times, Carter maintained health insurance through Cigna.

25.     Tena Davidson resides in Florida.  At all relevant times, Davidson maintained health insurance through UMR, a UnitedHealthcare company

26.     Robert Huffstutler resides in Alabama.  At all relevant times, Huffstutler maintained health insurance through BlueCross BlueShield of Alabama.

27.     Ramzi Khazen resides in Texas.  At all relevant times, Khazen maintained health insurance through Golden Rule, a UnitedHealthcare company.

28.     Chaim Marcus resides in New Jersey.  At all relevant times, Marcus maintained health insurance through QualCare.

29.     Lily Martyn resides in New York.  The clinical lab testing services at issue herein were performed in North Carolina, which was her primary place of residence at the time.  At all relevant times, Martyn was uninsured.

30.     Jonah McCay resides in Alabama.  At all relevant times, McCay maintained health insurance through BlueCross Preferred Care.

31.     Holden Sheriff resides in Tennessee.  At all relevant times, Sheriff maintained health insurance through Cigna.

32.     Victoria Smith resides in Alabama.  At all relevant times, Smith maintained health insurance through BlueCross BlueShield of Alabama.

33.     Michelle Sullivan resides in California.  At all relevant times, Sullivan maintained health insurance through Independence Blue Cross.

8

34.     Shontelle Thomas resides in Tennessee.  At all relevant times, Thomas was uninsured.

35.     Joseph Watson resides in Alabama.  At all relevant times, Watson maintained health insurance through BlueCross BlueShield of Alabama.

36.     Michael Wilson resides in Alabama.  At all relevant times, Wilson maintained health insurance through BlueCross Preferred Care.

B.     DEFENDANT

37.     LabCorp is a Delaware corporation with its principal place of business and headquarters located at 358 South Main Street, Burlington, North Carolina.  It is one of the largest provider clinical lab testing services in the world, with over 52,000 employees and more than 110 million patient encounters each year.  LabCorp is the parent company of numerous subsidiaries that provide lab testing, patient billing and related services. LabCorp is a publicly traded company and is listed and traded on the New York Stock Exchange under the ticker symbol "LH."

## FACTUAL ALLEGATIONS

A.     LABCORP AND THE CLINICAL LAB TESTING INDUSTRY

38.     According to LabCorp's most recent 10-K for the year ended December 31, 2017 (the "10-K"), "[l]aboratory tests and procedures are used generally to assist in the diagnosis, monitoring and treatment of diseases and medical conditions through the examination of substances in blood, tissues and other specimens. The results of such tests can help in the evaluation of health, the detection of conditions or pathogens and the selection of appropriate therapies."  Moreover, clinical lab testing "is generally

9

categorized as either clinical pathology testing, which is performed on body fluids including blood, or anatomical pathology testing, in which a pathologist examines histologic or cytologic samples (*i.e.*, tissue and other samples, including human cells). Clinical and anatomical pathology procedures are frequently ordered as part of regular healthcare office visits and hospital admissions in connection with the diagnosis and treatment of illnesses."  [10-K at 7].

39.     There are approximately 1,400 different CPT codes for clinical lab tests. "Several hundred of those tests are used in general patient care by physicians to establish or support a diagnosis, to monitor treatment or to search for an otherwise undiagnosed condition. The most frequently requested lab tests include blood chemistry analyses, urinalyses, blood cell counts, thyroid tests, Pap tests, hemoglobin A1C, prostate-specific antigen (PSA), tests for sexually-transmitted diseases [e.g. chlamydia, gonorrhea, trichomoniasis and human immunodeficiency virus (HIV)], hepatitis C (HCV) tests, vitamin D, microbiology cultures and procedures, and alcohol and other substance-abuse tests."  [10-K at 8].

40.     Throughout the United States, clinical lab testing services generally must be prescribed by a physician.  For example, pursuant to 42 CFR 410.32, Medicare requires that lab tests "be ordered by the physician who is treating the beneficiary."  In Arizona, however, a physician's prescription is required only under Medicare regulations.

41.     Orders for clinical lab testing services are primarily referred from a physician, although the physician is generally not responsible for paying for the services. The service provider customarily performs the lab testing services prior to processing the

10

billing information and determining the anticipated price or financially responsible party. Price and paying party information is determined during the claims adjudication process, which typically involves a third-party payer (*e.g.*, an insurance company) determining the extent of its financial responsibility on behalf of a patient. If the third-party payer decides to deny or reduce payment to the service provider, this decision is typically based on the ground that the lab testing services were either not covered under the patient's health insurance plan, or the billed service level was not appropriate for the medical diagnosis or procedure codes included on the claims submission. Coverage and price are determined during the claims adjudication process, although the price is typically derived from a negotiated fee schedule in place with any third-party payer for whom the service provider is in-network.

42.     LabCorp's principal operating and administrative facilities as of December 31, 2017 were located in the following 48 cities located in 26 states: Birmingham, Alabama; Phoenix, Arizona; Prescott, Arizona; Calabasas, California; Los Angeles, California; Monrovia, California; San Diego, California; San Francisco, California; Tustin, California; Englewood, Colorado; Shelton, Connecticut; Hollywood, Florida; Tampa, Florida; Tucker, Georgia; Chicago, Illinois; Itasca, Illinois; Lenexa, Kansas; Louisville, Kentucky; Lafayette, Louisiana; Westborough, Massachusetts; Battle Creek, Michigan; Roseville, Minnesota; St. Paul, Minnesota; Kansas City, Missouri; Ewing, New Jersey; Raritan, New Jersey; Santa Fe, New Mexico; New York, New York; Burlington, North Carolina (5 facilities); Charlotte, North Carolina; Greensboro, North Carolina; McLeansville, North Carolina; Raleigh, North Carolina; Research Triangle

11

Park, North Carolina (3 facilities); Dublin, Ohio; Oklahoma City, Oklahoma; Brentwood, Tennessee; Knoxville, Tennessee; Austin, Texas; Dallas, Texas; Houston, Texas; San Antonio, Texas; Chesapeake, Virginia; Herndon, Virginia; Lorton, Virginia; Seattle, Washington; Spokane, Washington; and Charleston, West Virginia.  [10-K at 43].

## B.    LABCORP'S BUSINESS MODEL

43.    LabCorp describes itself as "a leading global life sciences company that is deeply integrated in guiding patient care."  [10-K at 4].  LabCorp "provides diagnostic, drug development and technology-enabled solutions for more than 115 million patient encounters per year. Typically processing tests on more than 2.5 million patient specimens per week, the Company believes that it generated more revenue from laboratory testing than any other Company in the world in 2017."  [10-K at 4].

44.    LabCorp consists of two business segments:  LabCorp Diagnostics (LCD) and Covance Drug Development (CDD).

45.    The LCD segment is labeled as "an independent laboratory business."  [10-K at 6].  More specifically, it "offers a comprehensive menu of frequently requested and specialty testing through an integrated network of primary and specialty laboratories across the U.S."  [10-K at 6].  LabCorp's LCD segment provides "patient access points" around the U.S., "including more than 1,900 PSCs [patient service centers] operated by the Company and more than 5,000 in-office phlebotomists [individuals who draw blood] who are located in customer offices and facilities."  [10-K at 6-7].

46.    LabCorp's CDD segment "provides end-to-end drug development, medical device and diagnostic services from early-stage research to clinical trial management and

12

commercial market access. CDD provides a wide range of drug research and development (R&D) and market access services to biopharmaceutical companies and medical device companies across the world." [10-K at 15].[4]

47.     LabCorp's customers include "managed care organizations (MCOs), biopharmaceutical companies, governmental agencies, physicians and other healthcare providers (e.g. physician assistants and nurse practitioners, generally referred to herein as physicians), hospitals and health systems, employers, patients and consumers, CROs [contract research organizations], food and nutritional companies and independent clinical laboratories." [10-K at 4].

48.     Regarding billing, fees for clinical lab testing services "are billed either to the physician, the physician group, the patient or the patient's third-party payer, such as an MCO, Medicare or Medicaid." [10-K at 19]. These typically take the form of "fee-for-service," versus a capitated payment arrangement. "Under a capitated reimbursement arrangement, the clinical laboratory receives a per-member, per-month payment for an agreed upon menu of laboratory tests provided to MCO [managed care organization] members during the month, regardless of the number of tests performed." [10-K at 33].

49.     Additionally, "[i]f the billings are to the physician, they are based on a customer-specific fee schedule and are subject to negotiation. Otherwise, the patient or third-party payer is billed at the Company's patient fee schedule, subject to third-party

_____

[4] This litigation is focused primarily on LabCorp's LCD segment. Therefore, all references to "LabCorp" are made in reference to the LCD business segment, unless otherwise indicated.

payer contract terms and negotiation by physicians on behalf of their patients." [10-K at 19]. Generally, only patients are responsible for LabCorp's list rates on its patient fee schedule.

50.    LabCorp also positions itself to control a larger share of the market through strategic agreements to become an exclusive service provider for large third-party payers. For instance, "[i]n 2006, the Company signed a 10-year agreement with UnitedHealthcare to become its exclusive national laboratory in the U.S. In September 2011, the Company extended this agreement for an additional two years through the end of 2018." [10-K at 14].

51.    In regard to specimen collection for purposes of running clinical lab tests, "most patient specimens are collected **by the customer's staff at their office or facility**, or in some cases, by an LCD phlebotomist who has been placed in a physician office, hospital or other healthcare facility for the specific purpose of collecting specimens to be tested by LCD." [10-K at 8].

52.    These samples are then "sent principally through LCD's in-house courier system (and to a lesser extent, through independent couriers), to a branch or directly to one of LCD's laboratories for testing." [*Id.*] In other words, LabCorp typically performs clinical lab tests based upon the prescription and referral of a physician, and on a specimen that was collected from the patient while at the physician's office.

## C.    LABCORP'S ANNUAL REVENUES

53.    LabCorp's net revenue for the year ended December 31, 2017, was approximately $10.206 billion. Of that figure, approximately $7.17 billion was

14

contributed by the LCD segment. [10-K at 52]. Below are the net revenues for 2015 through 2017, broken down by division:

| | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2017 | | 2016 | | 2015 |
| LCD | $ | 7,170.5 | $ | 6,593.9 | $ | 6,199.3 |
| CDD | | 3,037.2 | | 2,844.1 | | 2,306.4 |
| Intercompany eliminations | | (1.8) | | (0.8) | | — |
| Total | $ | 10,205.9 | $ | 9,437.2 | $ | 8,505.7 |

54.     As indicated above, 70.3% of revenues were contributed from the LCD segment for 2017, with the remaining being contributed by the CDD segment. [10-K at 6]. "LCD recognizes revenue for services rendered when the testing process is complete and test results are reported to the ordering physician." [10-K at 60].

15

55.     Although not disclosed in the 10-K, in LabCorp's Form 10-Q, filed with the Securities and Exchange Commission ("SEC") for the first quarter of 2018 (the "1Q10-Q"), it reported the following breakdown of the Company's revenue by customer group for the three months ended March 31, 2018:

| Payer/Customer | For the Three Months Ended March 31, 2018 | | | | | | |
| | United States | Canada | United Kingdom | Switzerland | Other Europe | Other | Total |
|---|---|---|---|---|---|---|---|
| *LCD* | | | | | | | |
| Clients | 16% | 1% | 1% | —% | —% | —% | 18% |
| Patients | 10% | —% | —% | —% | —% | —% | 10% |
| Medicare and Medicaid | 9% | —% | —% | —% | —% | —% | 9% |
| Third-party | 23% | 2% | —% | —% | —% | —% | 25% |
| *Total LCD revenues by payer* | 59% | 3% | 1% | —% | —% | —% | 62% |
| | | | | | | | |
| *CDD* | | | | | | | |
| Biopharmaceutical and medical device companies | 19% | —% | 3% | 5% | 4% | 7% | 38% |
| | | | | | | | |
| Total revenues | 78% | 3% | 4% | 5% | 4% | 7% | 100% |

56.     Below is the same data for the three months ended March 31, 2017:

16

| | For the Three Months Ended March 31, 2017 (As Restated) | | | | | | |
|---|---|---|---|---|---|---|---|
| Payer/Customer | United States | Canada | United Kingdom | Switzerland | Other Europe | Other | Total |
| *LCD* | | | | | | | |
| Clients | 18% | 1% | 1% | —% | —% | —% | 20% |
| Patients | 10% | —% | —% | —% | —% | —% | 10% |
| Medicare and Medicaid | 10% | —% | —% | —% | —% | —% | 10% |
| Third-party | 26% | 2% | —% | —% | —% | —% | 28% |
| *Total LCD revenues by payer* | 64% | 3% | 1% | —% | —% | —% | 68% |
| | | | | | | | |
| *CDD* | | | | | | | |
| Biopharmaceutical and medical device companies | 15% | —% | 2% | 5% | 4% | 6% | 32% |
| | | | | | | | |
| Total revenues | 79% | 3% | 3% | 5% | 4% | 6% | 100% |

57.     As indicated above, only 10% of net revenues are received from patients, which remained constant for the first quarter of 2017, compared to the first quarter of 2016.  Notably, nearly half of LabCorp's net revenues were contributed by payers other than patients, *e.g.*, health insurers, government payers, physicians, and others (collectively referred to herein as "third-party payers").[5]

58.     In focusing on LCD's net revenue amounts, about 16.9% of LCD's contribution to net revenue is received from patients, while the remaining 83.1% is contributed by third-party payers.  While the overwhelming majority of revenue comes from third-party payers, only patients are required to pay LabCorp's grossly excessive list

_____

[5] As referred to in the table above, "Clients" is defined in the 1Q10-Q as "physicians, hospitals, health systems, accountable care organizations (ACOs), employers and other entities where payment is received exclusively from the entity ordering the testing service."  [1Q10-Q at 12].  "Third-party" is defined as managed care organizations (*i.e.*, health insurers).  [*Id.*].

17

prices derived from the patient fee schedule. LabCorp's other customers pay actual market rates, based on "contractual negotiated fees" or "historical reimbursement experience" for health insurers that do not have a contract with LabCorp. [*See generally* 1Q10-Q at 12].

59. Notably, during 2017, "approximately 12.1% of LCD's revenue was reimbursed under the CLFS [clinical laboratory fee schedule] (12.3% in 2016)," which is the fee schedule pursuant to which Medicare reimbursement rates are derived. [10-K at 13].

### D. LABCORP'S INTERNAL COST STRUCTURE

60. In relation to the overall net revenue of approximately $10.206 billion for 2017, the net "cost of revenues," which includes "primarily laboratory, labor and distribution costs,"[6] was $6.742 billion, or 66.1% of net revenues. [10-K at 53]. Below are the net cost of revenue amounts for 2015 through 2017:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2017 | 2016 | 2015 |
| Net cost of revenues | $ 6,741.9 | $ 6,256.7 | $ 5,602.4 |
| Cost of revenues as a % of net revenues | 66.1% | 66.3% | 65.9% |

61. Based on the above, LabCorp's gross profit was approximately $3.46 billion, providing a gross profit margin (which reflects the percent of revenue after subtracting the cost of services) of approximately 33.9% for 2017.

---

[6] "Cost of revenue includes direct labor and related benefit charges, other direct costs, shipping and handling fees, and an allocation of facility charges and information technology costs." [10-K at F-11].

18

62.     LabCorp's selling, general and administrative expenses[7] for 2017 were equal to approximately $1.812 billion, or 17.8% of overall net revenue.  [10-K at 53]. Below are the comparable expense figures for 2015 through 2017.

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2017 | 2016 | 2015 |
| Selling, general and administrative expenses | $ 1,812.4 | $ 1,630.2 | $ 1,628.1 |
| SG&A as a % of net revenues | 17.8% | 17.3% | 19.1% |

63.     LabCorp's profit for 2017 was reported to be $1.274 billion, or 12.5% of net revenue, compared to $733.2 million and $438.7 million for 2016 and 2015, respectively.  [10-K at F-5].

64.     In its 10-K, LabCorp provided the following table that demonstrates the Company's growth in net revenues, gross profits, operating income, and net income for the years 2013 through 2017 [10-K at 50]:

|  | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
|  | (a) 2017 | (b) 2016 | (c) 2015 | (d) 2014 | (e) 2013 |
| Statement of Operations Data: | | | | | |
| Net revenues | $ 10,205.9 | $ 9,437.2 | $ 8,505.7 | $ 6,011.6 | $ 5,808.3 |
| Gross profit | 3,464.0 | 3,180.5 | 2,903.3 | 2,203.1 | 2,223.2 |
| Operating income (i) | 1,364.2 | 1,312.4 | 996.8 | 904.3 | 983.3 |
| Net earnings attributable to Laboratory Corporation of America Holdings (j) | 1,268.2 | 732.1 | 437.6 | 511.2 | 573.8 |

65.     Notably, when breaking down LabCorp's operating income by segment, the LCD segment was responsible for approximately $1.299 billion, or an operating margin

---

[7] "Selling, general and administrative expenses consist primarily of administrative payroll and related benefit charges, advertising and promotional expenses, administrative travel and an allocation of facility charges and information technology costs."  [10-K at F-11].

19

of 18.1% for 2017.  [10-K at 56].[8]  Below is a breakdown of the operating income and

operating margin for LabCorp's LCD segment versus its CDD segment for 2015 through

2017:

| Operating Results by Segment | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Years Ended December 31, | | |
| | | 2017 | | 2016 | | 2015 |
| LCD | $ | 1,298.6 | $ | 1,187.6 | $ | 1,053.7 |
| LCD operating margin | | 18.1% | | 18.0% | | 17.0% |
| CDD | $ | 206.2 | $ | 272.7 | $ | 73.5 |
| CDD operating margin | | 6.8% | | 9.6% | | 3.2% |
| General corporate expenses | $ | (140.6) | $ | (147.9) | $ | (130.4) |
| Total | $ | 1,364.2 | $ | 1,312.4 | $ | 996.8 |

66.    Indeed, the profitability of LabCorp is reflected in the pay of its Chief

Executive Officer, David P. King.  According to a Schedule 14A filed with the SEC on

April 6, 2018, Mr. King received total compensation of $11,646,254 in 2017, and total

compensation of $10,853,497 and $10,626,414 in 2016 and 2015, respectively.

According to *Bloomberg*, as of May 10, 2018, LabCorp had 102.3 million common

shares outstanding and a market cap of $17.6 billion.

E.    **LABCORP'S TENUOUS RELATIONSHIP WITH PATIENTS**

67.    According to LabCorp, "[m]ost testing services are billed to a party other

than the physician or other authorized person who ordered the test. A growing portion of

revenue is derived from patients in the form of deductibles, coinsurance, copayments, and

charges for non-covered tests."  [10-K at 12].  Further, LabCorp acknowledges that it

---

[8] LabCorp does not break down gross profit by business segment.

"typically performs the requested tests and returns the test results regardless of whether billing information is correct or complete." [10-K at 13].

68. These factors—clinical lab tests being performed pursuant to a physician's request, the specimen being taken at the physician's office, and performance of tests before determining the financially responsible party—combine to form an attenuated relationship between LabCorp and the patient, and leave the patient vulnerable to overcharges.

69. LabCorp states that patients "are taking a greater role over their own healthcare, with increased responsibility for the costs of their care." [10-K at 5]. LabCorp also recognizes the importance of price transparency before performing services, indicating that the Company is "supporting greater transparency about costs, providing estimates of anticipated out-of-pocket cost prior to specimen collection." [10-K at 5]. However, as indicated herein, this is not occurring in practice. Patients are not being provided pricing information until *after* services are performed and claim adjudication has occurred. Patients are being forced to pay exorbitant sums for clinical lab testing services when they are the party responsible for payment.

## F.  LIST PRICES FOR HEALTHCARE SERVICES, GENERALLY

70. "Fee schedule rate," "list price" and "chargemaster rate" are used interchangeably herein and form the basis for the amounts charged by healthcare service providers. [10-K at 64].

71. Within the healthcare industry, LabCorp and other healthcare service providers, such as hospitals and physicians, maintain fee schedules for their services,

21

referred to as "list prices" or, in the hospital setting, "chargemaster rates." The "defining feature [of a list price or chargemaster rate] is that it is 'devoid of any calculation related to cost' and is not based on market transactions." Barak D. Richman, JD, PhD; Nick Kitzman, JD; Arnold Milstein, MD, MPH; and Kevin A. Shulman, MD, *Battling the Chargemaster: A Simple Remedy to Balance Billing for Unavoidable Out-of-Network Care*, The American Journal of Managed Care, Vol. 23, No. 4, e100-e105, at e101 (April 2017). Indeed,

> [h]ospital accounting experts agree that hospital billing practices "encourage manipulation of the [chargemaster] to maximize revenue" and have created a "legal fiction" that now serves as the basis of billing uninsured and OON [out-of-network] patients. In determining the amount that providers accept from third-party payers, "[c]hargemaster rates, in reality, serve nothing more than the [hospital's] starting point for negotiations."

*Id.* at e101 (citations omitted).

72. Another article discussing healthcare billing practices similarly found that "list or chargemaster prices are exorbitant and unfair, because they reflect prices that are set to be discounted and not paid." George A. Nation III, *Healthcare and the Balance-Billing Problem: The Solution Is the Common Law of Contracts and Strengthening the Free Market for Healthcare*, 61 Vill. L. Rev. 153, 153 (2016) (citing cases). For example, "chargemaster rates that hospitals claim are usual and customary are instead exorbitant amounts, arbitrarily set by hospitals, as a starting point for negotiating huge discounts with insurers." *Id.* at 154. Additionally, the list prices "bear no relationship to the hospital's cost, and, if they are paid, yield truly enormous profits to the hospital." *Id.*

22

at 162.  As a result, "while hospitals claim that the chargemaster rates reflect their usual and customary *charge* for services, they certainly do not represent the usual price actually *paid* for the listed goods and services."  *Id.* at 158 n.28 (citation omitted and emphasis in original).  In fact, "no sane person properly informed would agree to pay them."  *Id.* at 187.  Accordingly, "chargemaster or list prices are not fair or reasonable."  *Id.* at 158 n.28.

73.    Another article reached the same conclusion that list prices "often have no basis in either the cost of the service or in genuinely negotiated prices (the ones secured by insurers)."  Mark A. Hall & Carl E. Schneider, *Patients as Consumers: Courts, Contracts, and the New Medical Marketplace*, 106 Mich. L. Rev. 643, 676 (2008).  Indeed, "doctors' and especially hospitals' prices are so complex and arbitrary that patients could not hope to understand them were they revealed."  *Id.* at 666.  As a result, "prices go beyond mere unreasonability and become unconscionable."  *Id.* at 676.

74.    Additionally, The New York Times released a report, dated May 8, 2013, summarizing findings from data released for the first time by CMS.  This data "show[ed] that hospitals charge Medicare wildly differing amounts — sometimes 10 to 20 times what Medicare typically reimburses — for the same procedure, raising questions about how hospitals determine prices and why they differ so widely."  Barry Meier, Jo Craven McGinty and Julie Creswell, *Hospital Billing Varies Wildly, Government Data Shows*, THE NEW YORK TIMES (May 8, 2013).  According to the article, neither Medicare nor private insurers pay the chargemaster rates; it is the uninsured and those with inadequate insurance that are forced to pay these rates.  As reported in The Times, "the people who

23

can afford it least — those with little or no insurance — are getting hit with extremely high hospitals bills that may bear little connection to the cost of treatment." *Id.*

75.     In his testimony before Congress on March 15, 2006, Gerard F. Anderson—a Professor in the Bloomberg School of Public Health and in the School of Medicine at Johns Hopkins University, as well as the Director of the Johns Hopkins Center for Hospital Finance and Management—explained:

> List prices are established by the hospitals and physicians without any market constraints. Too often list prices have no relationship to the prices that are actually being paid by insurers. The prices should reflect the market place and should not be dictated by only the hospitals and physicians.

What's the Cost?: Proposals to Provide Consumers with Better Information about Healthcare Service Costs, 109th Cong. 103, Serial No. 109-70 (March 15, 2006) (testimony of Gerard F. Anderson, Director, Johns Hopkins Center for Health Finance and Management) (hereinafter, "Anderson Testimony") at 100.

76.     Professor Anderson continued, "***Under the current system hospitals and physicians have the ability to post any price they choose. There is not a requirement that anyone ever pays that posted price and in fact the posted price is seldom paid.***" *Id.* at 105 (emphasis in original). This is because "***[t]he hospital or hospital system has complete discretion to set each and every charge on the charge master file.*** The hospitals often do not know how they set each charge on the charge master file." *Id.* at 106 (emphasis in original). Professor Anderson concluded that "***charges are not set by market forces or using a systematic methodology.***" *Id.*

24

77.     TIME magazine published an extensive article that presented striking examples of the unreasonableness of list prices.  In one particularly relevant example, an individual was charged $15,000 for "blood and other lab tests" that, "[h]ad [the individual] been old enough for Medicare, [the lab service provider] would have been paid a few hundred dollars for all those tests."  Steven Brill, *Bitter Pill: Why Medical Bills Are Killing Us*, TIME, Feb. 20, 2013.  In attempting to decipher how the list prices were derived, the reporter "quickly found" that,

> although every hospital has a chargemaster, officials treat it as if it were an eccentric uncle living in the attic. Whenever I asked, they deflected all conversation away from it.  They even argued that it is irrelevant.  I soon found that they have good reason to hope that outsiders pay no attention to the chargemaster or the process that produces it.  For there seems to be no process, no rationale, behind the core document that is the basis for hundreds of billions of dollars in health care bills.

*Id.*  As one hospital spokesman admitted, "[t]hose are not our real rates," and that the chargemaster list is simply "a list we use internally in certain cases, but most people never pay those prices. I doubt that [the CEO] has even seen the list in years."  *Id.*

78.     As aptly stated in a Seton Hall Legislative Journal article:

> The stories are neither new nor surprising to the American public at large. These are stories of the excessive billing practices by American hospitals of the nation's uninsured - typically the segment of our population least able to pay for medical care. These billing practices and subsequent collection actions can be directly linked to increasing rates of personal bankruptcies caused by medical debt.  They are also the source of the uninsured's reluctance to seek care due to the fear of facing bills so overwhelming that they cause financial ruin.

25

Tamara R. Coley, *Extreme Pricing of Hospital Care for the Uninsured*, 34 Seton Hall Legis. J. 275, 276 (2010).

79.     Adding insult to injury, patients are generally not privy to actual payment information, which is considered proprietary.  Healthcare service providers negotiate these rates with third-party payers, then conceal the rates resulting from those market-based negotiations.  The combination of these practices—inflated list prices and confidential payment amounts—results in the United States healthcare marketplace being uncharacteristically opaque.

## G.     LABCORP CHOOSES TO DO BUSINESS WITHOUT WRITTEN CUSTOMER AGREEMENTS

80.     LabCorp's specimens are typically collected for testing at the physician's office or, on some occasions, at LabCorp's facilities.  LabCorp customarily performs the lab testing services prior to processing the billing information and determining the anticipated price or financially responsible party.  Price and paying party information is determined during the claims adjudication process, which involves potential third-party payers (*e.g.*, an insurance company) determining the extent of its financial responsibility on behalf of a patient.  Coverage and price are determined during the claims adjudication process, although the price for third-party payers is generally derived from a negotiated fee schedule in place with the third-party payer for whom LabCorp is in-network.

81.     If the third-party payer decides to deny or reduce payment to LabCorp, this decision is typically based on the ground that lab testing services were either not covered

26

under the patient's health insurance plan, or the billed service level was not appropriate for the medical diagnosis or procedure codes included on the claim submission.

82. LabCorp does not seek to enter into agreements in advance with patients in the event the patient is financially responsible for making payment. As such, the amount such a patient is charged is not a negotiated or contractual rate, but LabCorp's arbitrary list price.

## H. DETERMINING THE ACTUAL MARKET RATE FOR CLINICAL LAB TESTING SERVICES

83. A market rate is defined as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts." *See* IRS Publication 561.

84. Accordingly, the market rate for clinical lab testing services can be determined by analyzing the amounts *paid* by third-party payers who reimburse service providers on a fee-for-service basis (which represent approximately 83% of LabCorp's United States clinical lab testing revenue), in contrast to the amounts *charged* for similar services, which are rarely paid and based on arbitrary, unilaterally imposed list prices.

85. There is substantial support for this conclusion. As Gerard Anderson testified before Congress: "***prices need to be reasonable. By reasonable I mean the prices must reflect what is being paid in the market place.***" *See* Anderson Testimony at 102 (emphasis in original). The "standard of comparison to see if the amount is reasonable," and therefore reflective of market prices, must be based upon "what insurers actually pay and what the [healthcare service providers] are willing to accept." *Id.* at 109.

27

Because "virtually no public or private insurer actually pays full charges," list prices are "an unrealistic standard for comparison." *Id.* "The amount ***charged*** is determined solely by one party in the transaction – the [healthcare service provider]. ***It is not a market transaction***. The amount ***paid*** that is determined by both parties in the transaction is a reasonable amount. These are the rates determined in a negotiation between insurers and hospitals." *Id.* (emphasis added).

86.     As one article concluded, "[t]he fair and reasonable value of medical expenses must be based on the usual amount actually paid to the provider, not by the amount billed by the provider." *See Healthcare and the Balance-Billing Problem supra* ¶72 at 188.  The paid amounts reflect market rates because "the prices chosen by health plans are probably best regarded as being determined by demand and supply," s*ee Patients as Consumers supra* ¶73 at 661 (citation omitted), not a unilaterally imposed arbitrary figure that lacks any relation to cost or market forces and is rarely paid in reality.

87.     Healthcare service providers such as LabCorp are generally paid by private third-party payers (*e.g.*, insurers or hospitals) or government payers (*i.e.*, Medicare or Medicaid).  The actual paid amounts are generally based on a negotiated rate or, in the case of government payers, a statutorily mandated rate.  Reasonable market rates can be calculated through expert analysis of the following:  (A) Medicare rates; (B) Medicaid rates; and (C) private third-party payer proprietary rates.  Plaintiffs intend to obtain the private third-party payer proprietary rates in discovery.

28

88.     Alternatively, reasonable rates can be determined by using the actual rates negotiated by a Plaintiff's healthcare insurer, adjusted by a reasonable multiple to compensate for the cost, risk, and delay of collection.

### 1.     Medicare Rates for Clinical Lab Testing Services are Based on Actual Third-Party Payer Rates

89.     Medicare reimburses clinical lab testing service providers based upon the rates included in the Clinical Laboratory Fee Schedule ("CLFS"), as published by CMS. The CLFS provides a reliable reference point for analyzing the reasonableness of list prices associated with clinical lab testing services, as well as determining the market rates thereof, because *the CLFS rates are based upon the actual paid amounts of third-party payers*.

90.     In June 2013, the United States Department of Health and Human Services ("HHS"), Office of Inspector General published a report, *Comparing Lab Test Payment Rates: Medicare Could Achieve Substantial Savings*, that analyzed payment data collected from 50 state Medicaid programs and three Federal Employees Health Benefits (FEHB) plans that pay for clinical lab testing services on a fee-for-service basis.  The data was collected for the period beginning on January 1, 2011, through March 31, 2011, and included 20 high-volume and/or high-expenditure lab tests.  Upon an analysis of the data received, the Office of Inspector General found that Medicare was paying between 18- and 30-percent more than other insurers were paying for the same clinical lab testing services.  HHS recommended the CMS "seek legislation that would allow it to establish

lower payment rates for lab tests ...." In other words, Medicare had been *overpaying* for clinical lab testing services.

91. Thereafter, Congress passed the Protecting Access to Medicare Act of 2014 ("PAMA"), Pub. L. No. 113-93, 128 Stat. 1053 (2014). Under Section 216 of PAMA, codified at 42 U.S.C. § 1395m-1, Congress directed the Secretary of HHS to update the methodology by which Medicare reimbursed medical lab service providers for clinical lab testing services. The process for updating Medicare's reimbursement structure included two parts: (1) collecting payment data from certain laboratories that participated in the Medicare program, and (2) relying upon the payment data collected to establish a new CLFS.

92. Prior to implementing PAMA, *e.g.*, for calendar year 2017, Medicare paid for lab services based on the local geographic area. The CLFS rates were established based on charge data obtained from laboratories in each geographic area, and reimbursement rates were equal to the lesser of (a) the amount billed by the lab service provider, (b) the local reimbursement rates included on the CLFS, or (c) a national limitation amount ("NLA"), which was equal to 74-percent of the median of all local fee schedule amounts that were used in deriving the NLA for any lab test for which the NLA was established before January 1, 2001, and 100-percent of the median of all local fee schedule amounts for any lab test for which the NLA was established after January 1, 2001. *See* CMS, *Clinical Laboratory Fee Schedule: Payment System Series*, ICN 006818 (September 2017). Notably, CMS's published CLFS included the local reimbursement

30

rate, national limit, and private third-party payer median payment amount for each laboratory test, identified by CPT code.

93. On June 23, 2016, the Secretary of HHS released its final rules governing the methodology by which Medicare would reimburse clinical lab testing service providers for lab tests beginning January 1, 2018. *See* 81 Fed. Reg. 41036. As described therein, the "Medicare payment amount for a test on the CLFS generally will be equal to the weighted median of the private payor rates determined for the test, based on the data that is collected during a data collection period and is reported to CMS during a data reporting period." *See Summary of Data Reporting for the Medicare Clinical Laboratory Fee Schedule (CLFS) Private Payor Rate-Based Payment Plan* (the "Medicare CLFS Update"), released by CMS on or around September 22, 2017. The data collection period ran from January 1, 2016, through June 30, 2016. The "data reporting period" ran from January 1, 2017, through March 31, 2017.

94. The Medicare CLFS Update stated that the CLFS rates would be based upon "applicable information" collected from "reporting entities." The "applicable information" included "(1) the Healthcare Common Procedure Code System (HCPCS) code for the test; (2) each private payer rate for the test described by that HCPCS code for which final payment has been made and (3) the associated volume of tests performed corresponding to each private payer rate."[9]

---

[9] Although CMS required reporting entities include the HCPCS test codes within the information it reports, the publicly available CLFS provides reimbursement rates based on CPT code for each clinical lab test.

31

95.     A "reporting entity" was defined as any medical laboratory that bills Medicare under its own National Provider Identifier (NPI) number, receives more than 50-percent of its Medicare revenues from the Physician Fee Schedule or CLFS, and receives at least $12,500 of its Medicare revenues under the CLFS.  *See* 42 CFR 414.502. Although the definition of reporting entity excludes hospital laboratories that do not operate under their own NPI and smaller laboratories that receive less than $12,500 of its Medicare revenues under the CLFS, CMS found that "because CLFS payments will be based on the weighted median of private payor rates, additional reporting may not be likely to change the weighted median private payor rate, irrespective of how many additional smaller laboratories are required to report, if, as our analysis suggests, the largest laboratories dominate the market and therefore most significantly affect the payment rate."  81 Fed. Reg. 41,078 (June 23, 2016).

96.     Notably, LabCorp has represented that it "believes that it generated more revenue from laboratory testing than any other [c]ompany in the world in 2017" [10-K at 4], indicating that the CLFS rates are "most significantly affect[ed]" by the amounts entities such as LabCorp are actually paid for providing clinical lab testing services.

97.     Data collection, data reporting, and payment rate updating is scheduled to occur every three years.

98.     Ultimately, for purposes of determining its 2018 CLFS reimbursement rates, CMS reported receipt of data from 1,942 "reporting entities in every state, the District of Columbia, and Puerto Rico," consisting of over 4.9 million records covering almost 248 million lab tests.  According to the Medicare CLFS Update, "CMS confirmed

that additional data reporting would not have made a significant impact on the preliminary payment rates."

### 2. Medicaid Rates are Based on State-Specific Determinations of Reasonable Rates

99.     Medicaid also provides a reliable reference point for analyzing the reasonableness of list prices associated with medical lab services.

100.    The United States Social Security Administration describes Medicaid as "a jointly funded, Federal-State health insurance program for low-income and needy people. It covers children, the aged, blind, and/or disabled and other people who are eligible to receive federally assisted income maintenance payments."

101.    As of January 2018, nearly 68 million people were covered by Medicaid.

102.    States establish and administer their own Medicaid programs.  However, federal law requires that states provide mandatory coverage in certain circumstances, including some clinical lab testing services.

103.    Each state uses its own method for deriving its reimbursement rates.  For example, some states, such as California, reimburse lab service providers based upon the payments received from other payers for clinical lab services in that state.  In regard to California, "[i]t is the intent of the [California] Legislature that the department develop reimbursement rates for clinical laboratory or laboratory services that are comparable to the payment amounts received from other payers for clinical laboratory or laboratory services."  Cal. Code, Welfare and Institution Code § 14105.22(2)(b)(1).

33

104.    The rates under the California Medicaid Program (also known as "Medi-Cal") generally fall ***below*** the federal Medicare rates listed in the CLFS.  This demonstrates the reasonableness of the Medicare rates, which would presumably be equal to the Medi-Cal rates (*i.e.*, the Medi-Cal rates would be as high as legally authorized) if they were not comparable to the payment amounts received from other payers for clinical laboratory services.

105.    Other states aim to reimburse clinical lab testing service providers based upon other factors.  For example, in Texas, lab tests are reimbursed at the lower of the provider's usual customary charge or the maximum fee determined by the Texas Health and Human Services Commission.  1 Tex. Admin. Code § 355.8610.  The maximum fee is calculated based upon an independent analysis of financial and statistical data reported to the state from lab service providers.  *See id.* at § 355.10(c)(2).  The Texas Medicaid rates, for the most part, fell in line with the 2017 Medicare national limit, although some reimbursement rates were significantly lower.

106.    Similar to the Medicare CLFS, Medicaid rates are generally available to the public.

### 3.    Private Third-Party Payer Rates are Considered Proprietary and Maintained as Closely Guarded Secrets

107.    As described above, private third-party payers typically pay significantly less than a healthcare service providers' list prices.  The clinical lab testing industry is no different.  As LabCorp has acknowledged in its 10-K, it typically accepts negotiated rates on a fee-for-service basis from its customers.  [*See* 10-K at 19].  However, only patients

34

are required to pay charges based on the "patient fee schedule," which consists of the arbitrarily inflated and unilaterally determined list price.

108.    Because the actual payment rates that result from negotiations with private third-party payers are considered proprietary and treated as highly confidential, the private third-party payer rates are unattainable absent discovery and subpoenas. However, the Medicare and certain Medicaid rates are derived from private third-party payer data, and therefore provide insight into the actual payment amounts received by LabCorp for its clinical lab testing services.

### 4.    Potential Models for Calculating the Market Rate for Clinical Lab Testing Services

109.    As the publicly available government payer data demonstrates, LabCorp's list prices are across the board unreasonable and, thus, not indicative of market rates.  *See* LabCorp's Unreasonable List prices *infra* ¶¶ 413-416.  The market rate for LabCorp's clinical lab testing services can be determined based on the actual payment amounts received by LabCorp from private third-party payers.  The payment rates are expected to be listed on internal fee schedules within LabCorp's possession, which were created as a result of negotiations between LabCorp and each third-party payer.  The volume of clinical lab tests performed at each rate is expected to be maintained within LabCorp's accounting files.

110.    Plaintiffs also anticipate relying upon an expert to analyze the private third-party payer and government payer data to develop a formula to calculate the market rate for any given clinical lab test.

35

# I. IN THE ABSENCE OF AN AGREEMENT, THE COURT SHOULD ESTABLISH THE REASONABLE PRICE OF LABCORP'S SERVICES

111.    None of Plaintiffs had express agreements (other than Carter) with LabCorp with respect to the cost of their clinical lab tests.  *See* ¶156.

112.    Each of the clinical lab tests at issue in this action were prescribed by a medical professional as medically necessary.

113.    Plaintiffs with insurance coverage reasonably assumed that because the clinical lab tests were medically necessary in their physician's opinion, the tests would be covered by insurance.  Indeed, physicians are responsible for dispensing medical advice and patients customarily accept that medical advice.  Imposing on physicians a burden of becoming experts on every insurance policy its patients may have, as well as the many different protocols under those insurance policies, and to access LabCorp's list of prices if the procedure is not covered by insurance, would impose a burden on the medical profession that is inconsistent with a physician's obligation to practice medicine.  *See infra* Section O.

114.    Members of the Class who were uninsured also relied upon their respective physician's determination that the clinical lab tests were medically necessary and, thus, needed to be performed.

115.    LabCorp conducts millions of clinical lab tests each year and regularly interacts with physicians and insurers on issues of insurance coverage for clinical lab tests.  LabCorp is in the best position to advise Plaintiffs whether their tests were likely to be covered by insurance and, if not, what rates Quest would charge.

36

116. For instance, LabCorp routinely provides patients on Medicare with information on coverage prior to performing services pursuant to Advance Beneficiary Notices, as mandated by Medicare. *See* ¶¶ 12, 128, 186 and 230; *see also* Carter discussion *infra* ¶156.

117. Nevertheless, no express agreement was entered into outlining the services that LabCorp would be performing. There was therefore no opportunity to negotiate or enter into an agreement as to price.

118. Restatement (Second) of Contracts, § 5 (entitled "Terms of Promise, Agreement or Contract"), states, in Comment b, that in the absence of an express agreement to an essential term of a contract (express or implied), that term may be "supplied by law":

> *Contract terms supplied by law*. Much contract law consists of rules which may be varied by agreement of the parties. Such rules are sometimes stated in terms of presumed intention, and they may be thought of as implied terms of an agreement. They often rest, however, on considerations of public policy rather than on manifestation of the intention of the parties. In the Restatement of this Subject, such rules are stated in terms of the operative facts which make them applicable.

119. Section 204 of the Restatement (Second) of Contracts (entitled "Supplying an Omitted Essential Term") adds that:

> When the parties to a bargain sufficiently defined to be a **contract** have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

120.   *Comment d to section 204* discusses the process of supplying a missing term:

> Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention. Both the meaning of the words used and the probability that a particular term would have been used if the question had been raised may be factors in determining what term is reasonable in the circumstances.  But where there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process. . . . Where there is a ***contract*** for the sale of goods but nothing is said as to price the price is a reasonable price at the time for delivery.

## J.   PLAINTIFFS' CLAIMS

### Sheryl Anderson (Alabama)

121.   On November 16, 2016, Anderson had blood drawn by Sunrise Dermatology in Mobile, Alabama for purposes of clinical lab testing.

122.   At that time, Anderson maintained BlueCross Select Silver health insurance through BlueCross BlueShield of Alabama.

123.   In November 2016, Quest was the exclusive service provider for the clinical lab tests prescribed by Sunrise Dermatology under Anderson's Select Silver insurance plan.  Anderson's BlueCross Select Silver insurance plan provided no coverage for lab tests performed by LabCorp.

124.   Sunrise Dermatology treats different patients with different insurance, including different BlueCross insurance coverage.  LabCorp is an authorized provider for certain BlueCross health insurance plans other than Select Silver.

38

125.   In November 2016, Sunrise Dermatology sent Anderson's blood sample to LabCorp for testing without Anderson's knowledge or awareness that LabCorp was not an authorized service provider under her insurance.

126.   LabCorp was provided by Sunrise Dermatology with Anderson's insurance information and either knew or was reckless in failing to know that Anderson's insurance did not cover clinical lab tests performed at LabCorp.

127.   Anderson did not execute any agreement, orally or in writing, with LabCorp that outlined the scope of services LabCorp would be performing, the relationship between LabCorp and Anderson, or the potential costs or charges related to the lab services Sunrise Dermatology requested LabCorp perform.

128.   LabCorp conducts millions of clinical lab tests a year and regularly interacts with physicians and insurers on issues of insurance coverage for lab tests. LabCorp was in the best position to advise Anderson that her LabCorp tests were not covered by her BlueCross insurance, and what rates LabCorp would charge for those tests.  LabCorp is required to provide patients on Medicare with that information on insurance coverage pursuant to ABN notices mandated by Medicare.

129.   Although there was no contract or agreement with Anderson, LabCorp nevertheless performed the clinical laboratory tests requested by Sunrise Dermatology.

130.   Thereafter, Anderson received an invoice from LabCorp dated December 16, 2016, for procedures performed on November 16, 2016, in which LabCorp demanded payment of $170 for three separate itemized tests.  The invoice did not identify either the CPT code for the tests or the medical diagnosis of Sunrise Dermatology.  Based on the

39

invoice, Anderson had no way to determine the CPT code or the fair market value of the tests.

131. Anderson did not receive a written explanation of benefits ("EOB") from BlueCross for the test, but rather had to obtain the EOB online.

132. The EOB identified the three CPT codes as 85025, 90076, and 80061, for which LabCorp had charged $31.00, $41.00, and $98.00, respectively. The EOB however did not reference Sunrise Dermatology's medical diagnosis.

133. Anderson called LabCorp after receiving the invoice and requested that LabCorp reduce its invoice to a reasonable rate. LabCorp refused.

134. Anderson discussed the $170 bill with her physician, and he said that other of his patients had similar problems with LabCorp and that he would stop sending specimens to LabCorp.

135. Under the 2016 CLFS, LabCorp would have accepted $43.22 for the same three lab services, or about 25.4% of its aggregate list prices, had the clinical lab tests been covered by Medicare. The chart below demonstrates the egregious discrepancy between what Anderson was charged and what Medicare would have paid for the exact same services:

| CPT Code | LabCorp's Chargemaster Rate | 2016 CLFS Maximum Amount |
|---|---|---|
| 85025 | $ 31.00 | $ 10.59 |
| 80053 | $ 41.00 | $ 14.39 |
| 80061 | $ 98.00 | $ 18.24 |
| **TOTALS** | **$ 170.00** | **$ 43.22** |

136.    The reimbursement rates under Medicare are consistent with the rates that BlueCross used when it covered clinical lab tests.  For example, BlueCross reimbursed LabCorp as complete payment for lab services performed on June 15, 2016 (CPT codes 87086, 87186, 87088, and 87077), $29.10 on a $156.00 claim (18.65%).  BlueCross reimbursed Springhill Hospitals as complete payment for lab services performed for Anderson on November 8, 2016 (CPT codes 80050, 80061, and 81003), $38.62 on a $365.84 claim (10.55%).

137.    In April 2017, Anderson received a threatening letter from LCA Collections (identified in the letter as an "in-house division" of LabCorp).

138.    LabCorp, to avoid the restrictions of the Fair Debt Collections Practices Act ("FDCPA") had that letter sent by an "in-house division" rather than a third-party collections agency.  The LCA Collections letter did not provide Anderson with the important procedural protections of a collection letter, including notifying the "debt collector in writing that [Anderson] … wishes the debt collector to cease further communications…."  See 15 U.S.C. § 805(c).

139.    Furthermore, LabCorp was precluded from using a debt collector because Anderson's alleged debt was not "expressly authorized by the agreement creating the debt or permitted by law."  See 15 U.S.C. §808(a).  Rather, Anderson's blood sample was sent to LabCorp for testing without Anderson's knowledge.  LabCorp and Anderson had not reached any express agreement in advance with respect to the fees.

140.    The LCA Collections letter sought to threaten Anderson and was titled in large font and all capital letters:

41

# FINAL NOTICE
## PROTECT YOUR CREDIT

141.    The letter further stated:

> Unless LabCorp receives full payment within 20 days, your account will be referred to an outside collections agency.  We will authorize the agency to report any delinquent balance to the credit bureaus.
>
> . . . You have had ample time to pay your bill or to file and recover from your insurance company.  YOUR PAYMENT IS DUE NOW . . .
>
> PROTECT YOUR CREDIT HISTORY AND ACT IMMEDIATELY.

142.    The letter would have violated 15 U.S.C. §807(4) if sent by a collection agency because, based on the investigation of counsel and the experiences of the plaintiffs in this lawsuit, LabCorp does not refer unpaid invoices to credit rating agencies, but rather only threatens to do so.

143.    LabCorp, on its website, reaffirms its policy of denying healthcare services to any patient who refuses to pay LabCorp's excessive invoices.  LabCorp's website threatens patients that:

> LabCorp reserves the right to refuse service if you have a past due balance. When you visit a LabCorp patient service center, please be aware that, as part of the sign-in process, you will be advised if you have an outstanding balance for previous testing services. You will be asked to pay the balance in full (or a minimum amount) before we collect a specimen or continue with the current service.[10]

---

[10] https://www.labcorp.com/content/will-labcorp-refuse-service-if-i-have-outstanding-balance.

42

144.    LabCorp subsequently referred Anderson's invoice to a third party

collection agency – American Medical Collection Agency.  On July 17, 2017, AMCA

sent Anderson a notice stating prominently in bold all cap letters – **"SERIOUSLY PAST**

**DUE."**

145.    The notice further stated:

> Your account continues to be subject to collection in full.
> Your payment of **$170.00** is due for services provided by
> **Laboratory Corporation of America.**  If we do not receive
> payment, we will escalate collection efforts that may include
> your account being reported to one or more national credit
> bureaus.

146.    On September 16, 2017, AMCA sent Anderson a second collection letter.

The second collection letter stated "our client has authorized this agency to make an

IMMEDIATE DEMAND for payment in full.  If said payment is not made within

twenty-one (21) days, your account will be reviewed for additional collection activity."

147.    For the same reasons expressed above, the AMCA letters violated the

FDCPA because the debt was not expressly authorized by agreement or permitted by law,

and the investigation of counsel indicates that unpaid invoices are not typically reported

to credit rating agencies.

**<u>Mary Carter (Maryland)</u>**

148.    At all relevant times, Carter maintained health insurance through Cigna.

149.    On May 27, 2015, Carter had blood drawn at a LabCorp facility.  LabCorp

then performed laboratory services on the blood samples.

43

150.   The blood tests were prescribed by Carter's physician, who considered the blood tests medically necessary.

151.   Cigna denied coverage, stating in an EOB that: "Your plan provides benefits only for covered expenses for treatment or diagnosis of an injury or illness."

152.   LabCorp billed Carter its egregious list prices, which totaled $711.00 for drawing blood and performing eight laboratory tests.

153.   Carter's invoice failed to provide the CPT code or LabCorp-specific code for any test purportedly performed.  Further, the explanation of benefits through Cigna failed to provide the CPT code.

154.   Had Cigna covered the costs of LabCorp's services, LabCorp would have been paid an amount substantially less for each individual test than its list price.

155.   For example, had Medicare covered Carter's laboratory testing, LabCorp would have accepted only $189.90 based on the 2016 CLFS, or 26.71% of its list price.[11] The chart below demonstrates the egregious discrepancy between what Carter was charged and what LabCorp would have accepted from Medicare for the exact same services:

---

[11] This figure is only estimated because of LabCorp's practice of withholding the CPT codes for the tests it performs, which is the method of identification by which Medicare provides its maximum payment amounts in the 2016 CLFS.

44

| CPT Code | LabCorp's Chargemaster Rate | 2016 CLFS Maximum Amount |
|---|---|---|
| 85025 | $ 31.00 | $ 10.59 |
| 80053 | $ 46.00 | $ 14.39 |
| 81001 | $ 31.00 | $ 4.32 |
| 80061 | $ 98.00 | $ 18.24 |
| 86762 | $ 70.00 | $ 19.61 |
| 86735 | $ 89.00 | $ 17.77 |
| 86765 | $ 94.00 | $ 17.55 |
| 86480 | $ 227.00 | $ 84.43 |
| Venipuncture | $ 25.00 | $ 3.00 |
| **TOTAL** | **$ 711.00** | **$ 189.90** |

156.    At the time she received services, Carter signed a Patient Credit Card Authorization that authorized LabCorp to charge her credit card up to $484 for her clinical lab testing.  The Authorization stated that Carter's "insurance company will be billed for applicable charges for today's services."  Carter was not informed how the $484 would break down on a test-by-test basis.

157.    Carter was nevertheless billed $711 for the eight clinical lab tests and blood draw, including a single test identified as "QuantiFERON In Tube" that cost $227.  The $484 was immediately charged to Carter's credit card, as authorized, leaving a remaining balance owed of $227.  This $227 fee was not specifically referenced in the credit card authorization form.

158.    As such, there was no express contract regarding the $227 rate, and Carter only owed a reasonable price for that clinical lab test.

45

159.    Among other things, on August 22, 2015, after Carter had already paid

$494 toward the invoice, LabCorp mailed Carter an LCA Collections letter stating in

large print:

## Immediate Payment Required

160.    The LCA letter further stated:

> Your account is past due.  Our records indicate your debt to
> LabCorp has not been satisfied and is seriously past due.

> At this time your account has not been placed with a Third
> Party Collection Agency.

> Failure to pay the past due amount will result in referral to a
> Third Party Collection Agency and potentially affect your
> credit score.

> LabCorp reserves the right to refuse laboratory services for
> failure to pay past due balances.

161.    If sent by a collection agency, the letter would have violated 15 U.S.C.

§807(4) because, based on the investigation of counsel and the experiences of the

plaintiffs in this lawsuit, LabCorp does not refer unpaid invoices to credit rating agencies,

but rather only threatens to do so.

162.    LabCorp sent Carter a further invoice dated September 28, 2015, stating

again in large (this time bold) print and threatening harm to Carter's credit rating:

## Cigna
## has processed your claim.
## Balance due is your responsibility.
## Protect your credit now.

163.    To the extent LabCorp disclosed to Carter its list prices of $484 for the

initial set of tests, Carter is not pursuing a claim premised on an implied contract here.

46

Carter, however, is proceeding on this claim for the subsequent $227 charge, where Carter was not informed in advance of the list rate and, therefore, did not contract to be charged this excessive amount. Further, Carter preserves the claim for appeal that the $484 charge was an excessive rate procured through an unfair and/or deceptive business practice in violation of the North Carolina Unfair and Deceptive Trade Practices Act and the Maryland Consumer Protection Act.

164.    Under protest, Carter paid LabCorp the full amount demanded to avoid continuing collection efforts and harm to her credit rating.

165.    LabCorp has been unjustly enriched by receiving an amount that far exceeds any reasonable value for the services provided without any contract allowing for LabCorp to receive such an excessive amount.

166.    Carter demands restitution on the $227 charge.

**Tena Davidson (Florida)**

167.    At all relevant times, Davidson maintained health insurance through UMR (a division of UnitedHealthcare).

168.    On June 9, 2017, Davidson had blood drawn by her physician at her doctor's office for purposes of lab testing. Medtox Laboratories Inc., a company which was acquired by LabCorp in 2012, performed the lab testing services on the blood samples.

169.    LabCorp and Davidson had not reached any agreement in advance with respect to the fees to be charged for any tests performed on her behalf.

47

170. In fact, Davidson did not know that the lab tests were being performed by LabCorp, as opposed to some other lab company.

171. LabCorp billed Davidson its egregious list price of $425.00 for a single lab test – a "Compliance Drug Analysis, Urine" test (CPT code 80307).

172. Davidson's invoice failed to provide the CPT code or LabCorp-specific code for this test.

173. Had UMR covered the costs of LabCorp's services, LabCorp would have been paid an amount substantially less than its list price. For example, under the 2017 CLFS, LabCorp would have accepted $79.81, or about 18.8% of its list price, had Medicare covered a CPT code 80307 test.

174. Davidson has not yet paid LabCorp for its lab services and, as a result, continues to be subjected to LabCorp's debt collection practices. Notably, LabCorp "reserves the right to refuse laboratory services for failure to pay for past services" on its invoice.

### **Robert Huffstutler (Alabama)**

175. On August 16, 2017, LabCorp performed lab services on behalf of Huffstutler.

176. Huffstutler maintained BlueCross Select Silver health insurance through BlueCross BlueShield of Alabama ("BlueCross").

177. Huffstutler has been a patient of Preferred Pain Associates (the "Pain Clinic") in Trussville, Alabama since at least January 2017. The Pain Clinic specializes in pain management.

48

178.   Huffstutler undergoes periodic urine tests to ensure that he is not taking any medication that interferes with the medication that is prescribed by the Pain Clinic. Huffstutler was informed by a representative of BlueCross in April 2018 that the test that he was administered by LabCorp on August 16, 2017, was pursuant to HCPCS G0481.

179.   In 2017, Huffstutler underwent urine tests monthly.  In 2018 he has undergone urine tests quarterly.

180.   The urine samples were taken at the offices of the Pain Clinic.

181.   In August 2017, Quest was the exclusive service provider for the lab tests prescribed by the Pain Clinic under Huffstutler's BlueCross Select Silver insurance plan. Huffstutler's BlueCross Select Silver insurance plan provided no coverage for lab tests performed by LabCorp.

182.   The Pain Clinic treats different patients with different insurance.  In August 2017, the Pain Clinic sent Huffstutler's urine sample to LabCorp for testing without Huffstutler's knowledge.  Previously, the Pain Clinic had sent Huffstutler's urine samples to a different lab company or had done them in house.

183.   Huffstutler was (1) not consulted, (2) not given an option to select a different laboratory, and (3) was not notified of the change.

184.   Huffstutler had no discussions with the Pain Clinic about any change to the testing facility.

185.   LabCorp was provided by the Pain Clinic with Huffstutler's insurance information and either knew or was reckless in failing to know that Huffstutler's insurance did not cover clinical lab tests performed at LabCorp.

49

186.    LabCorp conducts millions of clinical lab tests a year and regularly interacts with physicians and insurers on issues of insurance coverage for lab tests. LabCorp was in the best position to advise Huffstutler that his LabCorp tests were not covered by his BlueCross insurance, and what rates LabCorp would charge for those tests.  LabCorp routinely provides patients on Medicare with that information on insurance coverage pursuant to ABN notices mandated by Medicare.

187.    Huffstutler did not execute any agreement, orally or in writing, with LabCorp that outlined the scope of services LabCorp would be performing, the relationship between LabCorp and Huffstutler, or the potential costs or charges related to the lab services the Pain Clinic requested LabCorp perform.

188.    Although there was no contract or agreement with Huffstutler, LabCorp nevertheless performed the clinical laboratory tests requested by the Pain Clinic.

189.    Thereafter, Huffstutler received an invoice from LabCorp in which LabCorp demanded payment of $1,296 for nine separate itemized tests.  The invoice however did not identify either the HCPCS code for the tests (G0481) or the medical diagnosis of the Pain Clinic (Z798.91).  Huffstutler obtained that information only when he subsequently called BlueCross.  Based on the invoice, Huffstutler had no way to determine the HCPCS code for the tests or to determine the fair market value of the tests.

190.    Huffstutler did not receive a written EOB from BlueCross for the test, but rather had to obtain the EOB online.  The EOB obtained online did not identify either the HCPCS code or the medical diagnosis.

50

191.    Laboratory companies customarily bill patients under HCPCS code G0481 for one test, although the code reports test results for 8-14 drug classes.  LabCorp however billed Huffstutler $144 for each of the nine drug classes.

192.    Huffstutler subsequently obtained an explanation of benefits on his invoice from the AlabamaBlue.com website.  That EOB stated that:

> This contract does not provide coverage for this service unless it is performed by a provider in the select lab network. To receive coverage for most lab services a select lab network provider must perform the tests.

193.    According to information available on the internet, Medicare would have reimbursed LabCorp $159.90 in 2017 for HCPCS Code G0481 in its entirety (rather than $1,296 for the nine drug classes).[12]

194.    Huffstutler called LabCorp after receiving the invoice and requested that LabCorp reduce its invoice to a reasonable rate.  LabCorp refused.

195.    Huffstutler spoke with administrative personnel at the Pain Clinic who informed him that many of the Pain Clinic's customers were having problems with LabCorp's bills, and that LabCorp's bills were too high.  The administrative personnel recommended that Huffstutler not pay the LabCorp invoice.

196.    In April 2018, Huffstutler received a threatening letter from LCA Collections (identified in the letter as an "in-house division" of LabCorp).

---

[12] http://www.practisource.com/uncategorized/2017-clinical-toxicology-laboratory-fee-schedule-changes-the-good-and-the-bad/.  *See also* http://www.aegislabs.com/docs/fee-schedule.pdf ($156.59).

197.    LabCorp, in an effort to avoid the restrictions of the FDCPA had that letter sent by an "in-house division" rather than a third-party collections agency.  The LCA Collections letter did not provide Huffstutler with the important procedural protections of a collection letter, including notifying the "debt collector in writing that [Huffstutler] … wishes the debt collector to cease further communications…."  *See* 15 U.S.C. § 805(c).

198.    Furthermore, LabCorp was precluded from using a debt collector because Huffstutler's alleged debt was not "expressly authorized by the agreement creating the debt or permitted by law."  *See* 15 U.S.C. §808(a).  Rather, Huffstutler's urine sample was sent to LabCorp for testing without Huffstutler's knowledge.

199.    The LCA Collections letter sought to threaten Huffstutler and was titled in large font and all capital letters:

## FINAL NOTICE
## PROTECT YOUR CREDIT

200.    The letter further stated:

> Unless LabCorp receives full payment within 20 days, your account will be referred to an outside collections agency.  We will authorize the agency to report any delinquent balance to the credit bureaus.

> . . . You have had ample time to pay this bill or to file and recover from your insurance company.  YOUR PAYMENT IS DUE NOW . . .

> PROTECT YOUR CREDIT HISTORY AND ACT IMMEDIATELY.

52

201. The letter violated 15 U.S.C. §807(4) because, based on the investigation of counsel and the experiences of the plaintiffs in this lawsuit, LabCorp does not refer unpaid invoices to credit rating agencies, but rather only threatens to do so.

202. Huffstutler continues to be subjected to LabCorp's debt collection practices, including referral to the American Medical Collection Agency.

### Ramzi Khazen (Texas)

203. On June 16, 2017, Khazen had blood drawn at a Planned Parenthood facility for purposes of lab testing. At the time, Khazen maintained health insurance through Golden Rule (a UnitedHealthcare company).

204. Planned Parenthood sent the blood samples with Khazen's insurance information to LabCorp.

205. Khazen did not know that Planned Parenthood would not perform the blood tests in house or that it had sent the blood samples to LabCorp. LabCorp and Khazen had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by Golden Rule.

206. Khazen had similar tests covered under his prior insurance policies. Under those prior insurance policies, the lab companies had been reimbursed $50-60.

207. LabCorp performed the lab services on the blood samples on June 16, 2017.

208. LabCorp mailed Khazen an invoice dated July 24, 2017. The invoice described the blood tests and charged Khazen LabCorp's egregious list prices, totaling $459, for performing three lab tests. None of those tests were covered by Golden Rule. Khazen was shocked by the bill.

209.    Khazen's invoice also failed to provide the CPT code, LabCorp-specific code, or medical diagnosis for any of the tests that LabCorp performed to allow Khazen to compare LabCorp's charges to publicly available information.

210.    The information subsequently provided by Golden Rule to Khazen (based on the information Golden Rule was provided by LabCorp) similarly did not have the CPT codes.

211.    Shortly after receiving the invoice, Khazen called LabCorp. He was given no explanation for this exceedingly high bill other than that this was the rate that LabCorp chose to charge him on this day. Liberally spewing debt collection buzzwords, LabCorp told Khazen that it contracts with various collection agencies, who LabCorp implied would hurt his credit and harass him if he did not acquiesce. After speaking with a very aggressive supervisor, Khazen was offered only a very small discount that did not approach a fair value.

212.    As LabCorp suggested, Khazen called Golden Rule, who informed him that there was nothing that they could do. However, Golden Rule did tell him that they were aware of LabCorp's predatory practices. Khazen was told that LabCorp formerly charged people without insurance the standard costs of around $60, but recently, Golden Rule representatives were learning from their customers that LabCorp was preying on the uninsured and attempting to charge individuals exorbitant fees, knowing that individuals have little capacity to fight.

213.    Golden Rule sent Khazen the price that LabCorp charges them, which, tellingly, is only $69.01, 15% of the price that LabCorp was attempting to charge

54

Khazen. The chart below demonstrates the egregious discrepancy between what Khazen was charged and what LabCorp would have accepted from Golden Rule for the exact same services:

| Test Number | LabCorp's Chargemaster Rate | Insurer's Negotiated Rate |
|---|---|---|
| 1 | $ 168.00 | $ 17.04 |
| 2 | $ 45.00 | $ 2.97 |
| 3 | $ 123.00 | $ 24.50 |
| 4 | $ 123.00 | $ 24.50 |
| **TOTAL** | **$ 459.00** | **$ 69.01** |

214. Similarly, LabCorp offers services in Texas through other companies (e.g. stdcheck.com) or affiliates who refer patients to LabCorp's offices. Using other companies or affiliates intentionally obscures pricing, LabCorp's involvement, and the very low cost these tests incur on LabCorp so that patients who are not made aware of the price may be gouged once it is too late.

215. In other words, LabCorp is obviously aware that people would never pay their list prices if provided up front. Indeed, Planned Parenthood informed Khazen that when insurance is not submitted, and fees are discussed up front, LabCorp charges far less. LabCorp charges these outrageous prices only to unsuspecting victims who are charged after it is too late to refuse services, which anyone would do if they were informed of the cost up front.

216. In addition, subsequent to receiving LabCorp's invoice, Khazen called one of LabCorp's local Austin labs and asked for prices. Rather than giving him a price up front, they referred Khazen to LabCorp's pricing department. Khazen called and spoke

55

with a woman named Nancy, who asked where he was located.  Nancy did not ask whether Khazen had insurance.  She told Khazen that the price for the first test, for which Khazen was charged $246, is only $88 dollars. The charges for the remaining two tests were fractions of the price Khazen was charged ($84 v. $168 and $14 v. $45).  The original recording is available for inspection.

217.    This false advertising of prices and bait-and-switch pricing tactics is illegal in Texas (and many other states) under the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. §17.41 *et seq*, and carries substantial fines.  LabCorp's acts constitute false, misleading, and deceptive acts or practices under the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. §17.46 *et seq*, as well as common law consumer protections.

218.    Subsequently, Khazen wrote F. Samuel Eberts (LabCorp's Chief Legal Officer) a letter, dated August 23, 2017, recounting his experiences.  After Khazen's letter went unanswered, he decided to join this lawsuit.

219.    Khazen has not yet paid LabCorp for its lab services and, as a result, continues to be subjected to LabCorp's debt collection practices.

220.    Khazen has received a threatening letter from LCA Collections (identified in the letter as an "in-house division" of LabCorp).

221.    LabCorp, in an effort to avoid the restrictions of the FDCPA had that letter sent by an "in-house division" rather than a third-party collections agency.  The LCA Collections letter, if sent by a collections agency, would have violated the FDCPA. Among other things, Khazen's alleged debt was not "expressly authorized by the

56

agreement creating the debt or permitted by law." *See* 15 U.S.C. §808(a). Rather,

Khazen's blood sample was sent to LabCorp for testing without Khazen's knowledge.

222.    The LCA Collections letter sought to threaten Khazen and was titled in

large font and all capital letters:

## IMMEDIATE PAYMENT REQUIRED

223.    The letter further stated:

> Your account is past due.  Our records indicate your debt to LabCorp has not been satisfied and is seriously past due.

> At this time your account has not been placed with a Third Party Collection Agency.

> Failure to pay the past due amount will result in referral to a Third Party Collection Agency and potentially affect your credit score.

> LabCorp reserves the right to refuse laboratory services for failure to pay past due balances.

224.    The letter, if sent by a collection agency, would have violated 15 U.S.C.

§807(4) because based on the investigation of counsel and the experiences of the

plaintiffs in this lawsuit, LabCorp does not refer unpaid invoices to credit rating agencies,

but rather only threatens to do so.

### Chaim Marcus (New Jersey)

225.    Marcus maintains health insurance through QualCare.  The health insurance

covers his family, including his sons Aryeh and Yosef.  In May 2017, his sons'

pediatrician prescribe blood tests for his two sons.

226.    Under Marcus's prior insurance he had blood tests conducted at LabCorp and he was not aware in May 2017 that Quest was the exclusive testing service provider under his QualCare health insurance policy.  Qualcare provided no coverage for procedures conducted at a LabCorp facility.

227.    On May 27, 2017, Marcus visited a LabCorp testing center with his two children and provided LabCorp with his QualCare insurance card.

228.    LabCorp either knew or was reckless in failing to know that Marcus's insurance did not cover clinical lab tests performed at LabCorp.

229.    Marcus did not execute any agreement, orally or in writing, with LabCorp that outlined the scope of services LabCorp would be performing, the relationship between LabCorp and Marcus, or the potential costs or charges related to the lab services LabCorp was to perform.

230.    LabCorp conducts millions of clinical lab tests a year and regularly interacts with physicians and insurers on issues of insurance coverage for lab tests. LabCorp was in the best position to advise Marcus that the LabCorp tests were not covered by his QualCare insurance, and what rates LabCorp would charge for those tests. LabCorp routinely provides patients on Medicare with that information on insurance coverage pursuant to ABN notices mandated by Medicare.

231.    Thereafter, LabCorp sent Marcus two separate invoices both dated December 23, 2017, almost seven months after the services were performed, in which LabCorp demanded payment in the aggregate of $509.00 per child for six separate itemized tests.  The invoice did not identify either the CPT code for the tests or the

58

medical diagnosis of the pediatrician. Based on the invoice, Marcus had no way to determine the CPT code or the fair market value of the tests.

232. On January 16, 2018, Marcus wrote LabCorp as follows:

> When we arrived at LabCorp and gave them all of our QualCare information, NOBODY informed us that LabCorp is out of network with QualCare. That should be automatic when handling over insurance information! Had we been informed otherwise, we would certainly have gone to an in-network provider. It is completely astonishing that LabCorp did not inform us of this BEFORE the services were rendered. [Emphasis in original.]

233. In March 2018, Marcus received two threatening letters from LCA Collections (identified in the letter as an "in-house division" of LabCorp) – one for each child.

234. LabCorp, to avoid the restrictions of the FDCPA had that letter sent by an "in-house division" rather than a third-party collections agency.

235. The LCA Collections letter did not provide Marcus with the important procedural protections of a collection letter, including notifying the "debt collector in writing that [Marcus] … wishes the debt collector to cease further communications…." *See* 15 U.S.C. § 805(c).

236. The LCA Collections letter sought to threaten Marcus and was titled in large font:

## Delinquent Account Status

237. The letter further stated:

> Our records indicate that your account is now severely delinquent. This is a serious matter you should no longer ignore. You must act now to clear your delinquent status. There is no longer any excuse for failing to resolve your account. Your lack of response will only result in outside collection activities.

238.    The letter would have violated 15 U.S.C. §807(4) if sent by a collection agency. A collection agency may only seek to collect a debt that is "expressly authorized by [an] agreement creating the debt or permitted by law." *See* 15 U.S.C. §808(a). Marcus's purported debt was not "expressly authorized by [an] agreement creating the debt or permitted by law." *Id.* Rather, LabCorp and Marcus had not reached any express agreement in advance with respect to the fees to be charged for any tests not covered by QualCare.

### Lily Martyn (North Carolina)

239.    Martyn graduated from Duke University in May 2016. While a student, Martyn had health insurance. However, after she graduated, her insurance lapsed. Accordingly, in September 2016, Lily Martyn was uninsured.

240.    On September 19, 2016, Martyn had blood drawn at her doctor's office for purposes of lab testing. The lab services were subsequently performed by LabCorp. Martyn's physician considered the tests medically necessary.

241.    Martyn did not know that the lab tests were being performed by LabCorp, as opposed to some other lab company.

242.    LabCorp billed Martyn its inflated list prices rather than the market rate for its services, demanding payment of $4,366 for performing a series of lab tests.

60

243. Martyn's invoice included eleven individual line items with the corresponding list price. Martyn's invoice also included a twelfth line item labeled "ADDITIONAL TEST(S) NOT SHOWN," which totaled $1,132.00, or nearly 25.8% of the aggregate list prices, and the largest single line item on Martyn's invoice. This final, aggregate line item failed to disclose any information about the additional tests performed, and the basis for the aggregate charge.

244. An unexplained $25.00 adjustment was listed on Martyn's invoice, which reduced the aggregate list price from $4,391.00 to $4,366.00.

245. Martyn's invoice failed to provide the CPT code or LabCorp-specific code for any test purportedly performed.

246. Because Martyn was uninsured, she was responsible for the entire amount owed to LabCorp.

247. LabCorp would have received substantially less than $4,366.00 if a third-party payer (such as Medicare or a private insurer) were responsible for paying for Martyn's lab testing services. For example, LabCorp charged Martyn $232.00 for a "Vitamin D, 25-Hydroxy" test (CPT code 82306).[13] According to the 2016 CLFS, LabCorp would have accepted only $40.33, or about 17.4% of its list price, had Medicare been responsible for payment.

---

[13] Because LabCorp fails to provide a CPT code or LabCorp-specific identification code on its invoices, this CPT code is an estimate based upon the short description provided on LabCorp's invoice to Martyn.

248.   LabCorp and Martyn had not reached any written agreement in advance with respect to the fees to be charged for any of LabCorp's lab testing services.  Rather, the parties' conduct established an implied contract that she would pay reasonable prices for her lab tests.

249.   On February 4, 2017, Martyn's father, under protest, to avoid harm to Lily's credit rating, paid on her behalf the entire $4,366.00 LabCorp demanded.

250.   LabCorp has been unjustly enriched by receiving an amount that far exceeds any reasonable value for the services provided without any contract allowing for LabCorp to receive such an excessive amount.

251.   Martyn demands restitution.

**Jonah McCay (Alabama)**

252.   McCay has been a patient of the Pain Clinic in Trussville, Alabama since November 2016.  The Pain Clinic specializes in pain management.

253.   McCay, through his wife, Nancy McCay, maintains BlueCross Preferred Care health insurance through BlueCross BlueShield of Alabama ("BlueCross Alabama").

254.   During 2017, McCay had his urine tested monthly at the Pain Clinic.  Prior to August 2017, McCay was not billed by an outside lab company for this service.

255.   In August 2017, the Pain Clinic provided McCay's urine sample and insurance information to LabCorp.  McCay was not aware that his urine samples were being provided to LabCorp.

62

256.     McCay did not execute any agreement, orally or in writing, with LabCorp concerning the scope of services LabCorp would be performing, the relationship between LabCorp and McCay, or the potential costs related to the lab services the Pain Clinic requested LabCorp perform.

257.     Although there was no contract or agreement with McCay, LabCorp nevertheless performed the clinical lab tests requested by the Pain Clinic.

258.     Thereafter, McCay received an invoice, dated September 16, 2017, from LabCorp, in which LabCorp demanded payment of $772 for five separate clinical lab tests conducted on August 14, 2017.

259.     The invoice contained a "Description" of the five lab tests, the "Charges" for each test ($155, $155, $144, $318, and $158, respectively), and the total cost of the tests ($930).  The invoice also identified aggregated "Adjustments" of $106.49, aggregated "Insurance Paid" of $51.51, and a net invoice amount of $772.

260.     The "Adjustments" and "Insurance Paid" were not applied specifically to any of the five tests, but rather to the invoice overall.

261.     The invoice did not identify the codes for the tests or the medical diagnosis of the Pain Clinic.  Based on the invoice, McCay had no way to determine the appropriate code for the tests, the fair market value of the tests, whether BlueCross of Alabama had denied coverage for any or all of the tests, or to which tests the "Adjustments" or "Insurance Paid" were applied.

262.     Rather, McCay was required to access BlueCross of Alabama's website and download the EOB for the lab tests.  Only through accessing the website did McCay learn

63

that insurance had covered the $158 charge in full, which included a discount of $106.59, and resulted in a total payment of $51.51.

263. The EOB also identified the CPT code for the $158 charge (80307) and the HCPCS code for the remaining $772 in charge (G0480). The $106.49 discount was equivalent to approximately 67.5% (or roughly two-thirds) of the $158 charge. Thus, McCay's insurer paid just 32.5% of LabCorp's list price.

264. The EOB stated with respect to the balance of the invoice that "[m]aximum benefits related to this treatment or illness have been provided for this patient."

265. According to information available on the internet, Medicare would have reimbursed LabCorp $116.85 in 2017 for HCPCS code G0480 in its entirety (rather than $772 for the four drug classes).[14]

266. In fact, on December 28, 2016, TrueFit Medical Laboratory charged McCay under HCPCS code G0483 (a more complex test, involving 15-21 rather than 1-7 drug classes) $9,900 for laboratory testing and accepted $49.17 as reimbursement under McCay's health insurance.

267. On January 23, 2017, the Pain Clinic charged McCay under HCPCS code G0480 $200 for lab testing and accepted $59.96 as reimbursement under McCay's health insurance. The Pain Clinic consistently charged McCay $200 for the G0480 lab tests.

---

[14] http://www.practisource.com/uncategorized/2017-clinical-toxicology-laboratory-fee-schedule-changes-the-good-and-the-bad/. *See also* http://www.aegislabs.com/docs/fee-schedule.pdf.

268.     On September 11, 2017 and November 6, 2017, Southern Lab Partners, a comparable company to LabCorp in Alabama, charged McCay under HCPCS code G0483 $1,015.48 for lab testing and accepted reimbursement for its services of $51.96.

269.     McCay spoke to administrative personnel at the Pain Clinic and was told that all the Pain Clinic's clients had complained about the bills, the Pain Clinic had stopped using LabCorp, LabCorp was receiving negative publicity in the newspapers, and the bills were being contested by lawyers in a class action.  McCay was advised not to pay the remaining balance of the bill.

270.     In March 2017, McCay received a threatening letter from LCA Collections (identified in the letter as an "in-house division" of LabCorp).

271.     LabCorp, in an effort to avoid the restrictions of the FDCPA had that letter sent by an "in-house division" rather than a third-party collections agency.  The LCA Collections letter did not provide McCay with the important procedural protections of a collection letter.

272.     Among other things, McCay's alleged debt was not "expressly authorized by the agreement creating the debt or permitted by law."  *See* 15 U.S.C. §808(a).  Rather, McCay's urine sample was sent to LabCorp for testing without McCay's knowledge.

273.     The LCA Collections letter sought to threaten McCay and was titled in large font and all capital letters:

## FINAL NOTICE
## PROTECT YOUR CREDIT

274.     The letter further stated:

Unless LabCorp receives full payment within 20 days, your account will be referred to an outside collections agency. We will authorize the agency to report any delinquent balance to the credit bureaus.

. . . You have had ample time to pay this bill or to file and recover from your insurance company. YOUR PAYMENT IS DUE NOW . . .

PROTECT YOUR CREDIT HISTORY AND ACT IMMEDIATELY.

275.    The letter, if sent by a collection agency, would have violated 15 U.S.C. §807(4) because, based on the investigation of counsel and the experiences of the plaintiffs in this lawsuit, LabCorp does not refer unpaid invoices to credit rating agencies, but rather only threatens to do so.

276.    LabCorp and McCay had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by BlueCross.

277.    In fact, McCay did not know that the laboratory tests were being performed by LabCorp.

**Holden Sheriff (Tennessee)**

278.    At all relevant times, Sheriff maintained health insurance through Cigna.

279.    In 2016, Sheriff was under the care of Dr. Cornelia Graves of the Tennessee Maternal Fetal Medicine PLC. Dr. Graves prescribed a series of blood tests for Sheriff that Dr. Graves considered medically necessary.

280.    Sheriff had her blood drawn in her physician's office and her physician sent the blood specimens to LabCorp along with information on Sheriff's health insurance.

66

281. Sheriff had no communications with LabCorp and no agreement with LabCorp with respect to the costs of LabCorp's services.

282. On January 4, 2017, LabCorp sent Sheriff a $2,988.00 invoice for clinical lab testing conducted by LabCorp on November 22, 2016. That invoice included eight separate individual line items, listing LabCorp's rate for each line, and computing the aggregate total to be $2,988.00. The invoice stated that the lab tests were performed by LabCorp Burlington, located at 1447 York Court, Burlington, North Carolina 27215.

283. The LabCorp invoice did not include either the CPT code or the medical diagnoses relating to the lab tests. Based on the information provided by LabCorp, there was no way for Sheriff to determine whether the rates for LabCorp's services were reasonable.

284. On December 11, 2016, prior to receipt of the invoice, Cigna sent Sheriff an explanation of benefits that denied coverage entirely because "[e]xpenses for genetic testing are not covered under this Plan." The Cigna invoice provided neither CPT codes nor the medical diagnosis.

285. Thereafter, on January 22, 2017, after the receipt of the initial LabCorp invoice, Cigna provided a second explanation of benefits in which Cigna covered a portion of the lab tests.

286. On February 8, 2017, LabCorp sent Sheriff a second invoice including the same eight individual line items. In the second invoice, an adjustment of $1,144.08, and a Cigna payment of $800.13, were applied to the bill, leaving a $1,043.79 balance that LabCorp sought to collect from Sheriff. The second invoice also represented that the lab

67

tests were performed by LabCorp Burlington, located at 1447 York Court, Burlington, North Carolina 27215.

287. The second invoice provided neither the CPT code nor the medical diagnosis. Without the CPT code and medical diagnosis there was no way to determine whether LabCorp's charges were reasonable or whether the tests were covered by insurance. Sheriff's husband (Fred) was only able to obtain the CPT codes by calling Cigna.

288. Sheriff learned that the eight line items in the invoices were the result of LabCorp misleadingly grouping multiple tests into single line items. In fact, it was eighteen tests that were performed and billed to Cigna. Of those eighteen tests, Cigna covered fifteen. The fifteen covered tests had an aggregate list price of $1,944.21, yet Cigna paid only $800.13 for these tests. LabCorp then billed Sheriff the aggregate list price of $1,043.79 for the three uncovered tests (CPT codes 81240, 81291, 81241).

289. It is impossible to derive from the invoice which procedures Cigna denied coverage for, and which ones Sheriff was charged the excessive list prices. *See* Exhibit A. LabCorp's practice of grouping procedures together and aggregating insurance discounts and payments, and charging excessive list prices, is unfair and deceptive by making it impossible for all except the most sophisticated and determined consumers to understand their invoices.

290. Had Cigna covered the cost of the three additional tests, the amount actually paid to LabCorp would have been substantially lower than $1,043.79. For

68

example, according to the CLFS, Cigna would have received only $209.73 from Medicare for the same three tests.

291.    Additionally, the second invoice only disclosed the aggregate amounts of the adjustment and insurance payment, rather than identifying the allocation of these items on a test-by-test basis, although adjustments were made, and Cigna paid LabCorp, on a test-by-test basis.

292.    Moreover, the invoices failed to provide Sheriff with any information necessary to properly determine what testing was completed, and what basis LabCorp had for demanding $2,988.00 in the first instance. Indeed, both LabCorp invoices included only eight line items, although LabCorp was billing her and Cigna for eighteen individual tests. This action prevented Sheriff from being fully informed as to what services she was being billed for.

293.    Nonetheless, because Cigna denied coverage for the three tests, LabCorp insisted on billing Sheriff the entire list price of $1,043.79, rather than the fair market value of the services provided.

294.    LabCorp and Sheriff had not reached agreement in advance with respect to the fees to be charged for the excluded test.

295.    Sheriff has continued to protest LabCorp's bill, and has therefore not yet made payment on it.

**Victoria Smith (Alabama)**

296.    On August 14, 2017, LabCorp performed lab services on behalf of Smith.

69

297. Smith maintained BlueCross Select Silver health insurance through BlueCross BlueShield of Alabama.

298. Smith has been a patient of the Pain Clinic in Trussville, Alabama since January 12, 2015. The Pain Clinic specializes in pain management.

299. Smith undergoes periodic urine tests prescribed by the Pain Clinic that the Pain Clinic considers medically necessary.

300. Prior to August 14, 2017, Smith was never charged for these urine tests by an outside laboratory.

301. In August 2017, Quest was the exclusive clinical lab testing service provider under Smith's BlueCross Select Silver insurance plan.

302. Smith's BlueCross Select Silver insurance plan provided no coverage for lab tests performed by LabCorp.

303. The Pain Clinic treats different patients with different insurance. In August 2017, the Pain Clinic sent Smith's urine sample to LabCorp for testing without Smith's knowledge or permission. Previously, the Pain Clinic had sent Smith's urine samples to a different lab company or had done them in-house.

304. Smith was (1) not consulted, (2) not given an option to select a different laboratory, and (3) was not notified of the change.

305. Smith had no discussions with the Pain Clinic about any change to the testing facility.

70

306. LabCorp was provided by the Pain Clinic with Smith's insurance information and either knew or was reckless in failing to know that Smith's insurance did not cover lab tests performed at LabCorp.

307. LabCorp conducts millions of clinical lab tests a year and regularly interacts with physicians and insurers on issues of insurance coverage for lab tests. LabCorp was in the best position to advise Smith that her LabCorp tests were not covered by her BlueCross Alabama insurance, and what rates LabCorp would charge for those tests.

308. Smith did not enter into a written agreement with LabCorp concerning the services LabCorp would be performing.

309. The parties' conduct established an implied contract that if any of her lab tests were not covered by BlueCross Alabama, then she would pay reasonable prices for those tests.

310. Thereafter, Smith received an invoice, dated October 16, 2017, from LabCorp that demanded payment of $900 for six separate itemized tests. The invoice however did not identify the HCPCS or CPT codes for the tests or the medical diagnosis of the Pain Clinic. Based on the invoice, Smith had no way to determine the HCPCS or CPT code for the tests or the fair market value of the tests.

311. Smith did not receive a written explanation of benefits from BlueCross for the test, but rather had to obtain the EOB online. The EOB identified the HCPCS (G0480) and CPT (83070) codes for the tests.

71

312. Lab testing service providers customarily bill patients under HCPCS code G0480 as one test, although the code reports test results for 1-7 drug classes. LabCorp, however, billed Smith $155 each for two of the tests, and $144 each for three of the tests – a total of $742 for the HCPCS code G0480 test, plus $158 for the 83070 test.

313. The BlueCross EOB stated that:

> This contract does not provide coverage for this service unless it is performed by a provider in the select lab network. To receive coverage for most lab services a select lab network provider must perform the tests.

314. According to information available on the internet, Medicare would have reimbursed LabCorp $116.85 in 2017 for HCPCS code G0480 in its entirety (rather than $772 for the four drug classes).[15] Medicare would have reimbursed LabCorp $79.81 in 2017 for CPT code 80307.

315. Smith called LabCorp after receiving the invoice and requested that LabCorp reduce its invoice to a reasonable rate. LabCorp refused.

316. Smith was told by administrators at the Pain Clinic that many patients had complained about the LabCorp bills and that the Pain Clinic was not using LabCorp any longer. Smith was advised by the Pain Clinic not to pay the bill because the amount was excessive.

---

[15] http://www.practisource.com/uncategorized/2017-clinical-toxicology-laboratory-fee-schedule-changes-the-good-and-the-bad/. *See also* http://www.aegislabs.com/docs/fee-schedule.pdf.

317.     In April 2018, Smith received a threatening letter from LCA Collections (identified in the letter as an "in-house division" of LabCorp).

318.     LabCorp sent Smith an LCA Collections letter dated January 1, 2018, which stated prominently in large print: "Immediate Payment Required."

319.     The letter further stated:

> Our records indicate your debt to LabCorp has not been satisfied and is seriously past due. It is not our wish to have this matter handled as a collection issue. However, if this bill is not satisfied immediately, it will be listed as a severely delinquent account and further collection activities will proceed. Your payment is expected today…. LabCorp reserves the right to refuse laboratory services for failure to pay for past services.

320.     LabCorp, in an effort to avoid the restrictions of the FDCPA, had that letter sent by an "in-house division" rather than a third-party collections agency. The LCA Collections letter did not provide Smith with the important procedural protections of a collection letter.

321.     Among other things, a collection agency would be prohibited from sending a collection letter to Smith because the alleged debt was not "expressly authorized by the agreement creating the debt or permitted by law." *See* 15 U.S.C. §808(a). Rather, Smith's urine sample was sent to LabCorp for testing without Smith's knowledge.

**Michelle Sullivan (California)**

322.     At all relevant times, Sullivan maintained health insurance through Independence Blue Cross ("Independence").

73

323.    In October 2016, Sullivan was under the care of a physician (Rahil Bandukwala), who prescribed a series of blood tests that he considered medically necessary. Dr. Bandukwala gave Sullivan a prescription for her blood tests and Sullivan had the blood drawn and the tests conducted at a LabCorp facility on October 4, 2016. Sullivan had no reason to believe that the blood tests were not medically necessary.

324.    Sullivan had clinical lab tests performed for years by LabCorp and, to her best recollection, never had insurance deny a claim.

325.    Although there was no express contract with Sullivan as to the price of services, LabCorp performed the clinical lab tests requested by Dr. Bandukwala.

326.    The parties' conduct established an implied contract that if any of the lab tests were not covered by insurance, then she would pay reasonable prices for those tests.

327.    On November 26, 2016, LabCorp sent Sullivan an invoice for lab testing conducted by LabCorp on October 4, 2016. The invoice included thirteen separate tests as individual line items, listing the list price for each test, and computing the aggregate total of $992.25. The invoice also included an "Adjustments" column, which deducted a total of $746.75 from the aggregate list price (although not apportioned by line item), and an "Insurance Paid" column that provided an aggregate total of $113.50 (again, not broken down by line item). The remaining $132.00 was billed to Sullivan in full.

328.    The invoice did not identify the CPT code for the thirteen tests or the code for Dr. Bandukwala's medical diagnosis.

329.    On October 12, 2016, prior to receipt of the invoice, Independence posted on its website an EOB that described which of the thirteen tests were covered under her

74

insurance plan. Of the thirteen tests listed on the invoice, twelve were covered. Independence declined coverage of the thirteenth test, listed on the invoice as a "Vitamin D, 25-Hydroxy" test (CPT code 82306) with a list price of $132.00. The EOB stated that Independence does not "cover this service or item when provided for the diagnosis reported."

330.    Of the twelve tests that Independence did cover, the aggregated list prices totaled $860.25. The aggregated list prices for the twelve tests were discounted by a total of $746.75, and Horizon paid only $113.50 in total, a mere 13.2% of the prices listed for the twelve tests.

331.    The invoice disclosed only the aggregate amounts of the adjustment and insurance payment, rather than identifying the allocation of these items on a test-by-test basis, although adjustments were made, and Independence paid LabCorp, on a test-by-test basis.

332.    Had Independence covered the cost for the Vitamin D test, the amount actually paid to LabCorp would have been substantially lower than $132.00. Indeed, under the 2016 CLFS, the maximum payment by Medicare for a CPT code 82306 test would be $40.33.

333.    Because Independence declined coverage, LabCorp insisted on billing Sullivan the entire rate of $132.00, rather than the fair market value of the services provided.

334.    Sullivan unsuccessfully appealed Independence's denial of her claim and unsuccessfully sought to have LabCorp reduce its bill.

335.    Sullivan subsequently received a second invoice dated December 31, 2016, marked in all caps and large print "PAST DUE NOTICE."

336.    Thereafter, Sullivan received a notice from LCA Collections, marked in large print – "Immediate Payment Required." LabCorp, in an effort to avoid the restrictions of the FDCPA, had that letter sent by an "in-house division" rather than a third-party collections agency. The LCA Collections letter, if sent by a collections agency, would have violated the FDCPA. Among other things, Sullivan's alleged debt was not "expressly authorized by the agreement creating the debt or permitted by law." *See* 15 U.S.C. §808(a).

337.    The LCA Collections letter sought to threaten Sullivan and was titled in large font and all capital letters:

## IMMEDIATE PAYMENT REQUIRED

338.    The letter further stated:

> Your account is past due. Our records indicate your debt to LabCorp has not been satisfied and is seriously past due.
>
> At this time your account has not been placed with a Third Party Collection Agency.
>
> Failure to pay the past due amount will result in referral to a Third Party Collection Agency and potentially affect your credit score.
>
> LabCorp reserves the right to refuse laboratory services for failure to pay past due balances.

339.    The letter, if sent by a collection agency, would have violated 15 U.S.C. §807(4) because, based on the investigation of counsel and the experiences of the

76

plaintiffs in this lawsuit, LabCorp does not refer unpaid invoices to credit rating agencies, but rather only threatens to do so.

340. LabCorp sent Sullivan a second LCA Collections letter dated February 11, 2017, similarly titled in large print: "Immediate Payment Required." The letter further stated:

> Our records indicate your debt to LabCorp has not been satisfied and is seriously past due. It is not our wish to have this matter handled as a collection issue. However, if this bill is not satisfied immediately, it will be listed as a severely delinquent account and further collection activities will proceed. Your payment is expected today….. LabCorp reserves the right to refuse laboratory services for failure to pay for past services.

341. Under protest, Sullivan paid the entire amount LabCorp demanded.

342. LabCorp has been unjustly enriched by receiving an amount that far exceeds any reasonable value for the services provided (and not covered by Independence) without any contract allowing for LabCorp to receive such an excessive amount.

343. Sullivan demands restitution.

**Shontelle Thomas (Tennessee)**

344. Thomas was uninsured at all relevant times.

345. On June 29, 2017, Thomas had blood drawn at her clinic for purposes of lab testing. LabCorp performed the lab testing services on the blood samples.

346. LabCorp and Thomas had not reached any agreement in advance with respect to the fees to be charged for any of LabCorp's lab testing services.

77

347.    In fact, Thomas did not know that the laboratory tests were being performed by LabCorp, as opposed to some other lab company.

348.    The parties' conduct established an implied contract that Thomas would pay reasonable prices for those tests.

349.    LabCorp billed Thomas its inflated list prices rather than reasonable market prices for its services.  In three separate invoices, LabCorp demanded payment of $1,676.59 for performing a series of lab tests.

350.    The first invoice Thomas received, dated July 1, 2017, demanded she pay $1,116.00 for an "ANA Comprehensive Panel" test, and $25 for drawing blood.  The ANA Comprehensive Panel consists of one CPT code 86225 test, and eight CPT code 86235 tests.

351.    The second invoice Thomas received demanded she pay $46.00 for a "Rheumatoid Arthritis Factor" test (CPT code 86431).

352.    The third invoice Thomas received charged $624.00 for a "Pap IG, Ct-Nq, HPV-hr" and "Change IG Pap to LB Pap" tests.  Without any explanation, the third invoice included a downward adjustment of $109.41.  As a result, LabCorp demanded Thomas pay $514.49.  The CPT codes for the tests included in Thomas's third invoice are 87491, 87591, 87624, 88175, and 88142.

353.    None of Thomas's invoices provided a CPT code or LabCorp-specific code for any test purportedly performed.  Thomas was only able to derive the CPT codes by conducting internet searches using the descriptions of the lab tests on her invoices.

354.    Because Thomas was uninsured, she was responsible for the entire amount owed to LabCorp.

355.    LabCorp would have received substantially less than its list prices for the same lab testing services had a third-party payer been responsible for Thomas's invoices. For example, under the 2017 CLFS, LabCorp would have accepted only $215.65 for the ANA Comprehensive Panel test, or approximately 19.3% of LabCorp's list price.

356.    Additionally, LabCorp would have been reimbursed only $7.78 for the Rheumatoid Arthritis Factor test, or approximately 16.91% of its list price, and $208.55 for the Pap IG, Ct-Nq, HPV-hr and Change IG Pap to LB Pap tests.  In all, LabCorp would have been reimbursed only $431.98 for the three invoices, or approximately 25.77% of LabCorp's aggregated list prices.

357.    The chart below demonstrates the egregious discrepancy between what Thomas was charged and what LabCorp would have accepted from Medicare for the exact same services:

| CPT Code | LabCorp's Chargemaster Rate | 2016 CLFS Maximum Amount |
|---|---|---|
| 87491 | $            - | $         48.14 |
| 87591 | $            - | $         48.14 |
| 87624 | $            - | $         48.14 |
| 88175 | $            - | $         36.34 |
| 88142 | $            - | $         27.79 |
| *Total of Above 5 Lines* | *$       514.59* | *$       208.55* |
| 86431 | $       46.00 | $           7.78 |
| 86225 | $            - | $         18.85 |
| 86235 (x8) | $            - | $       196.80 |
| *Total of Above 2 Lines* | *$    1,116.00* | *$       215.65* |
| **TOTALS** | **$    1,676.59** | **$       431.98** |

358.    Thomas has not yet paid LabCorp for its lab testing services and, as a result, has been subjected to LabCorp's debt collection practices.

359.    Additionally, LabCorp billed Thomas in the aggregate, without a breakdown of adjustments provided under Thomas's third invoice.  For example, Thomas's third invoice included the list prices for two line items, which included a total of five CPT code tests, but only the aggregate "Adjustment" amount that had been applied.  The failure to disclose the actual number of tests performed and the amount being charged for each CPT code test concealed the fact that Thomas was actually being charged an excessive rate, while third-party payers paid substantially reduced rates, *i.e.*, reasonable market rates, for the tests it did cover.

**Joseph Watson (Alabama)**

360.    At all relevant times, Watson maintained health insurance through BlueCross BlueShield of Alabama.

80

361.     On February 8, 2017, Watson had blood drawn at his doctor's office for purposes of lab testing.  Watson's physician prescribed the blood tests as medically necessary.  LabCorp performed the lab testing services on the blood samples.  Watson did not direct that the blood samples be sent to LabCorp.  Rather, his physician determined to send the blood samples to LabCorp.

362.     LabCorp and Watson had not reached any written agreement in advance with respect to the fees to be charged for any tests not covered by BlueCross.  Rather, the parties' conduct established an implied contract that if Watson's insurer denied coverage, then Watson would pay reasonable prices for his lab tests.

363.     Watson's insurer, BlueCross, denied coverage of the claim because LabCorp was out-of-network.

364.     By invoice dated June 2, 2017, LabCorp billed Watson its egregious list prices, totaling $712.00, for drawing blood and performing nine lab tests on February 8, 2017.

365.     LabCorp's invoice failed to provide the CPT code or LabCorp-specific code for any test purportedly performed.  LabCorp's invoice also failed to identify his physician's medical diagnosis.

366.     Had BlueCross covered the costs of LabCorp's services, LabCorp would have been paid an amount substantially less for each individual test than its list price.

367.     For example, had Medicare covered Watson's lab testing, LabCorp would have accepted only $147.58 based on the 2017 CLFS, or 20.7% of its list prices.  The

81

chart below demonstrates the egregious discrepancy between what Watson was charged and what LabCorp would have accepted from Medicare for the exact same services:

| CPT Code | LabCorp's Chargemaster Rate | 2017 CLFS Maximum Amount |
|---|---|---|
| 85025 | $ 31.00 | $ 10.66 |
| 80053 | $ 46.00 | $ 14.49 |
| 84443 | $ 94.00 | $ 23.05 |
| 80061 | $ 93.00 | $ 15.60 |
| 84403 | $ 155.00 | $ 35.41 |
| 83090 | $ 186.00 | $ 23.14 |
| 84153 | $ 107.00 | $ 25.23 |
| **TOTAL** | **$ 712.00** | **$ 147.58** |

368. On July 7, 2017, LabCorp sent Watson a second invoice marked "Past Due Notice."

369. LabCorp sent Watson a third notice dated July 26, 2017 from LCA Collections.

370. LabCorp, in an effort to avoid the restrictions of the FDCPA, had that letter sent by an "in-house division" rather than a third-party collections agency. The LCA Collections letters, if sent by a collections agency, would have violated the FDCPA. Among other things, Watson's alleged debt was not "expressly authorized by the agreement creating the debt or permitted by law." See 15 U.S.C. §808(a). Rather, Watson's blood sample was sent to LabCorp for testing without Watson's knowledge.

371. Further, the letter failed to apprise Watson of his rights to deny liability for the alleged debt and to bar LCA Collections from further communications concerning the debt. See 15 U.S.C. §§805 and 809.

82

372.    The LCA Collections letter threatened Watson and was titled in large font:

## Immediate Payment Required

373.    The LCA letter further stated:

> Your account is past due. Our records indicate your debt to LabCorp has not been satisfied and is seriously past due. At this time your account has not been placed with a Third Party Collection Agency. Failure to pay the past due amount will result in referral to a Third Party Collection Agency and potentially affect your credit score. LabCorp reserves the right to refuse laboratory services for failure to pay past due balances.

374.    The letter, if sent by a collection agency, would have violated 15 U.S.C. §807(4) because, based on the investigation of counsel and the experiences of the plaintiffs in this lawsuit, LabCorp does not refer unpaid invoices to credit rating agencies, but rather only threatens to do so.

375.    Under protest, Watson paid LabCorp the full amount demanded to avoid continuing collection efforts and harm to his credit rating.

376.    LabCorp has been unjustly enriched by receiving an amount that far exceeds any reasonable value for the services provided without any contract allowing for LabCorp to receive such an excessive amount.

377.    Watson demands restitution.

### Michael Wilson (Alabama)

378.    Wilson has been a patient the Pain Clinic in Trussville, Alabama since June 2017. The Pain Clinic specializes in pain management.

83

379.    Wilson, through his wife, Debra H. Wilson, maintains BlueCross Preferred Care health insurance through BlueCross BlueShield of Alabama.

380.    During 2017, Wilson had his urine tested monthly at the Pain Clinic.  Prior to August 2017, Wilson was not billed by an outside lab company for this service.

381.    In August 2017, the Pain Clinic provided Wilson's urine sample and insurance information to LabCorp.  Wilson was not aware that his urine samples were being provided to LabCorp.

382.    Wilson did not execute any agreement, orally or in writing, with LabCorp concerning the scope of services LabCorp would be performing, the relationship between LabCorp and Wilson, or the potential costs related to the lab services the Pain Clinic requested LabCorp perform.

383.    Although there was no contract or agreement with Wilson, LabCorp performed the clinical lab tests requested by the Pain Clinic.

384.    Thereafter, Wilson received an invoice, dated September 22, 2017, from LabCorp, in which LabCorp demanded payment of $1,188 for eight separate clinical lab tests conducted on August 7, 2017.

385.    The invoice contained a "Description" of the eight clinical lab tests, and the "Charges" for each test (two charges for $155, five charges for $144, and one charge for $158).

386.    The invoice did not identify the codes for the tests or the medical diagnosis of the Pain Clinic.  Based on the invoice, Wilson had no way to determine the appropriate

84

code for the tests, the reasonable market price for the tests, or whether BlueCross of Alabama had denied coverage for any or all of the tests.

387.    Wilson was required to access BlueCross of Alabama's website and download the EOB for the diagnostic procedures.  Only through accessing the website did Wilson learn that the first seven tests were coded with HCPCS code G0481 and the remaining test was coded CPT code 80307.

388.    The EOB stated that, with respect to the invoice, "[m]aximum benefits related to this treatment or illness have been provided for this patient."

389.    According to information available on the internet, Medicare would have reimbursed LabCorp only $159.90 in 2017 for HCPCS Code G0481 in its entirety (rather than $1,296 for the nine drug classes).[16]

390.    Further, LabCorp accepted payment of $51.51 from other patients of the Pain Clinic (Jonah McCay) who had insurance, and LabCorp wrote off the balance of $106.49 for McCay as an "allowance."  The $106.49 allowance was equivalent to approximately 67.4% of the $158 charge.  Thus, LabCorp discounted the $158 charge to McCay by 32.6%.

391.    After receiving the invoice, Wilson spoke to Dr. Luc Frenette at the Pain Clinic.  Frenette told Wilson that LabCorp's charges were "absurd" and that the Pain Clinic would stop using them.  Frenette told Wilson that the same thing was happening

_____

[16] http://www.practisource.com/uncategorized/2017-clinical-toxicology-laboratory-fee-schedule-changes-the-good-and-the-bad/.  *See also* http://www.aegislabs.com/docs/fee-schedule.pdf ($156.59).

throughout Alabama, that LabCorp's bills were high and that medical professionals had stopped using them.

392.   Wilson called LabCorp after receiving the invoice and was unable to speak to a live person.  Rather, Wilson was placed into a "queue" where he was able to say that he disputed the bill.

393.   Wilson received a second invoice from LabCorp dated December 18, 2017. That invoice stated in large bold letters:

**Alabama Blue Shield
has processed your claim.
Balance due is your responsibility.
Protect your credit now.**

394.   Still later, Wilson received a threatening letter from LCA Collections (identified in the letter as an "in-house division" of LabCorp).

395.   LabCorp, in an effort to avoid the restrictions of the FDCPA, had that letter sent by an "in-house division" rather than a third-party collections agency.  The LCA Collections letter, if sent by a collections agency, would have violated the FDCPA. Among other things, Wilson's alleged debt was not "expressly authorized by the agreement creating the debt or permitted by law."  *See* 15 U.S.C. §808(a).  Rather, Wilson's blood sample was sent to LabCorp for testing without Wilson's knowledge.

396.   The LCA Collections letter sought to threaten Wilson and was titled in large font and bold, underlined letters:

**<u>Immediate Payment Required</u>**

397.   The letter further stated:

> Our records indicate your debt to LabCorp has not been satisfied and is seriously past due. It is not our wish to have this matter handled as a collection issue. However, if this bill is not satisfied immediately, it will be listed as a severely delinquent account and further collection activities will proceed. Your payment is expected today.
>
> LabCorp reserves the right to refuse laboratory services for failure to pay for past services.

398. The letter, if sent by a collection agency, would have violated 15 U.S.C. §807(4) because, based on the investigation of counsel and the experiences of the plaintiffs in this lawsuit, LabCorp does not refer unpaid invoices to credit rating agencies, but rather only threatens to do so.

### Non-Plaintiff Zina Brenner (New Jersey)

399. Brenner was named as a class representative plaintiff in *Anderson v. Laboratory Corporation of America Holdings,* Case No. 1:17-cv-911 (M.D.N.C.), which is being consolidated with this action by the filing of a consolidated amended complaint.

400. Brenner's claim is set forth at ¶¶88-98 of the Complaint in *Anderson* and concerned Brenner's September 8, 2016 lab tests, and LabCorp's October 24, 2016 invoice billing her $273 for a Vitamin D, 25-Hydroxy lab test.

401. On August 7, 2017, Brenner received notification from CMS (Medicare) that she "is not liable for the denied service." Brenner joined *Anderson* initially because she was unable to get clarification from LabCorp or LabCorp's counsel whether the October 24, 2016 invoice remained outstanding.

402. Subsequent to filing *Anderson,* Brenner obtained clarification that her invoice is no longer outstanding.

87

403.    Accordingly, Brenner withdraws as a Plaintiff in this action.

## K.    CONFIDENTIAL WITNESS ALLEGATIONS

404.    Confidential Witness No. 1 ("CW1") is a former LabCorp employee.  For nearly 15 years, from September 2001 until August 2016, CW1 worked for LabCorp in a variety of positions, including as District Manager, Specialty Sales Representative, and a Business Development Executive for the North Central Region.

405.    While employed by LabCorp, CW1's primary responsibility was encouraging oncologists and pathologists to use LabCorp's diagnostic services for their patients.  CW1 was the primary point of contact between LabCorp and those physicians.  CW1's primary region was the State of Ohio.

406.    According to CW1, LabCorp has multiple sets of fee structures.  LabCorp has fee structures for third-party payers, such as insurance companies (*e.g.*, Blue Cross, Aetna, UnitedHealth), that were substantially below the fee structures for "self-pay patients," *i.e.*, persons who either did not have insurance, or whose insurance failed to cover the LabCorp lab testing.  CW1 explained that the negotiated rates for third-party payers are highly guarded.

407.    CW1 frequently (at least once a month) received communications from his/her clients (the physicians) complaining about the fees charged by LabCorp to self-pay patients.  For example, CW1 recalls that LabCorp would charge a self-pay patient $5,500 for a flow cytometry test, whereas it would accept payment of $800 from a third-party payer for the same test, and as little as $400 dollars from hospital clients who wished to be billed directly, while cost was below $200.

88

408.    Another example, according to CW1, is a CBC (complete blood count) plus routine chemistry profile that would cost LabCorp about $1 to run, and would be billed at $18 to an insurer such as UnitedHealth, but would be billed at approximately $300 to a self-pay patient.

409.    LabCorp's practices with respect to overbilling self-pay patients sometimes made it difficult for CW1 to maintain good relationships with his clients.  As such, CW1 would speak frequently within LabCorp about these matters.  One such conversation concerning the rates charged to self-pay patients was the week of August 15, 2016, with Roger McCombs, a VP in the North Central division of LabCorp.  CW1 was told by Mr. McCombs and others that it was LabCorp's policy to charge the list price fee (the highest fee schedule) to self-pay patients.  According to CW1, overbilling self-pay patients was "embedded in the culture of the company."

410.    According to CW1, when an insured person is referred for testing, price is never questioned by either the physician or the patient.  The uninsured are vulnerable to price gouging as they are grouped in with the insured while being processed for testing.  Thus, they are, by default, charged the list price.

411.    Moreover, CW1 also emphasized that it would be unreasonable for a patient to ask about pricing when blood is being taken in the physician's office or one of LabCorp's draw stations because the phlebotomist (individual who draws blood) would have no idea or access to pricing information.

412.    CW1 had first person knowledge of these allegations.  S/he was provided the opportunity to review these allegations and consented to their use in this Complaint

89

## L. LABCORP'S UNREASONABLE LIST PRICES

413. Observing the difference between the 2017 and 2018 CLFS rates and LabCorp's list prices demonstrates the inherent unreasonableness of LabCorp's list prices. This comparison provides a reliable proxy for demonstrating unreasonableness because (a) the 2017 and 2018 Medicare CLFS rates are derived from actual paid amounts received from third-party payers by the largest clinical lab test service providers, such as LabCorp, and (b) the actual private third-party payer payment rates are considered proprietary information and are therefore unattainable outside of discovery.

414. Specifically, for the clinical lab tests that Plaintiffs received, comparing the list price to the 2017 Medicare national limit yielded an average markup of 418.8% (4.19 times the national limit), and a median markup of 417.5% (4.18 times the national limit). Comparing the list prices to the 2017 third-party payer median payment amount, as disclosed by CMS, yielded an average markup of 291.2% (2.91 times the median rate), and a median markup of 285.8% (2.86 times the median rate). Lastly, comparing the list prices to the 2018 CLFS rate yielded an average markup of 467.9% (4.68 times the 2018 rate), and a median markup of 475.0% (4.75 times the 2018 rate). Below provides a test-by-test breakdown of the implied markup when comparing LabCorp's list prices with the 2017 Medicare national limit, 2017 Medicare third-party payer (TPP) median payment amount, and 2018 Medicare CLFS rate:

| CPT Code | LabCorp's List Price | 2017 Medicare Rates | | | | 2018 Medicare Rate | Markup |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | National Limit | Markup | TPP Median | Markup | | |
| Sheryl Anderson | | | | | | | |
| 80053 | $41.00 | $14.49 | 183.0% | $19.59 | 109.3% | $13.04 | 214.4% |

| CPT Code | LabCorp's | 2017 Medicare Rates | | | 2018 | Markup |
|---|---|---|---|---|---|---|
| 80061 | $98.00 | $18.37 | 433.5% | - | - | $16.53 | 492.9% |
| 85025 | $31.00 | $10.66 | 190.8% | $14.41 | 115.1% | $9.59 | 223.3% |
| **Tena Davidson** | | | | | | |
| 80307 | $425.00 | $79.81 | 432.5% | $107.85 | 294.1% | $71.83 | 491.7% |
| **Robert Huffstutler** | | | | | | |
| G0481 | $1,296.00 | $160.99 | 705.0% | $217.56 | 495.7% | $156.59 | 727.6% |
| **Jonah McCay** | | | | | | |
| G0480 | $772.00 | $117.65 | 556.2% | $158.98 | 385.6% | $114.43 | 574.6% |
| 80307 | $158.00 | $79.81 | 98.0% | $107.85 | 46.5% | $71.83 | 120.0% |
| **Holden Sheriff** | | | | | | |
| 80053 | $46.00 | $14.49 | 217.5% | $19.59 | 134.8% | $13.04 | 252.8% |
| 81240 | $260.41 | $67.50 | 285.8% | $67.50 | 285.8% | $65.69 | 296.4% |
| 81241 | $360.05 | $83.82 | 329.6% | $83.82 | 329.6% | $75.44 | 377.3% |
| 81291 | $423.33 | $59.88 | 607.0% | $59.88 | 607.0% | $65.34 | 547.9% |
| 82306 | $232.00 | $40.61 | 471.3% | $54.88 | 322.7% | $36.55 | 534.7% |
| 84443 | $94.00 | $23.05 | 307.8% | $31.15 | 201.8% | $20.75 | 353.0% |
| 85027 | $31.00 | $8.87 | 249.5% | $11.99 | 158.5% | $7.98 | 288.5% |
| 85300 | $91.63 | $16.26 | 463.5% | $16.26 | 463.5% | $14.63 | 526.3% |
| 85303 | $107.02 | $18.98 | 463.9% | $25.65 | 317.2% | $17.08 | 526.6% |
| 85306 | $118.47 | $21.02 | 463.6% | $28.41 | 317.0% | $18.92 | 526.2% |
| 85613 | $74.04 | $13.14 | 463.5% | $17.75 | 317.1% | $11.83 | 525.9% |
| 85670 | $44.66 | $7.91 | 464.6% | $10.69 | 317.8% | $7.12 | 527.2% |
| 85732 | $50.10 | $8.87 | 464.8% | $11.99 | 317.8% | $7.98 | 527.8% |
| 86038 | $86.00 | $16.58 | 418.7% | $22.41 | 283.8% | $14.92 | 476.4% |
| 86146 | $165.00 | $34.91 | 372.6% | $47.17 | 249.8% | $31.42 | 425.1% |
| 86147 | $392.12 | $34.91 | 1023.2% | $47.17 | 731.3% | $31.42 | 1148.0% |
| 86235 | $248.00 | $24.60 | 908.1% | $33.24 | 646.1% | $22.14 | 1020.1% |
| **Michelle Sullivan** | | | | | | |
| 36415 | $30.00 | $3.00 | 900.0% | - | - | $3.00 | 900.0% |
| 80053 | $60.00 | $14.49 | 314.1% | $19.59 | 206.3% | $13.04 | 360.1% |
| 80061 | $67.25 | $18.37 | 266.1% | - | - | $16.53 | 306.8% |
| 82306 | $132.00 | $40.61 | 225.0% | $54.88 | 140.5% | $36.55 | 261.1% |
| 82607 | $106.00 | $20.68 | 412.6% | $27.94 | 279.4% | $18.61 | 469.6% |
| 83036 | $78.00 | $13.32 | 485.6% | $18.00 | 333.3% | $11.99 | 550.5% |
| 84439 | $59.00 | $12.37 | 377.0% | $16.72 | 252.9% | $11.13 | 430.1% |
| 84443 | $66.00 | $23.05 | 186.3% | $31.15 | 111.9% | $20.75 | 218.1% |
| 84481 | $94.00 | $23.24 | 304.5% | $31.40 | 199.4% | $20.92 | 349.3% |
| 84550 | $41.00 | $6.20 | 561.3% | $8.38 | 389.3% | $5.58 | 634.8% |
| 86038 | $105.00 | $16.58 | 533.3% | $22.41 | 368.5% | $14.92 | 603.8% |
| 86200 | $108.00 | $17.76 | 508.1% | $24.00 | 350.0% | $15.98 | 575.8% |

| CPT Code | LabCorp's | 2017 Medicare Rates | | | | 2018 | Markup |
|---|---|---|---|---|---|---|---|
| 86431 | $46.00 | $7.78 | 491.3% | $10.51 | 337.7% | $7.00 | 557.1% |
| **Shontelle Thomas** | | | | | | | |
| 87491 | ? | $48.14 | | $65.06 | | $43.33 | |
| 87591 | ? | $48.14 | | $65.06 | | $43.33 | |
| 87624 | ? | $48.14 | | $65.06 | | $43.33 | |
| 88142 | ? | $27.79 | | $27.79 | | $25.01 | |
| 88175 | ? | $36.34 | | $36.34 | | $32.71 | |
| **Total of Above 5 Lines** | **$514.59** | **$208.55** | 146.7% | **$259.31** | 98.4% | **$187.71** | 174.1% |
| 86431 | $46.00 | $7.78 | 491.3% | $10.51 | 337.7% | $7.00 | 557.1% |
| 86225 | ? | $18.85 | | $25.47 | | $16.97 | |
| 86235 (x8) | ? | $196.80 | | $265.92 | | $177.12 | |
| **Total of Above 2 Lines** | **$1,116.00** | **$215.65** | 417.5% | **$291.39** | 283.0% | **$194.09** | 475.0% |
| **Joseph Watson** | | | | | | | |
| 80053 | $46.00 | $14.49 | 217.5% | $19.59 | 134.8% | $13.04 | 252.8% |
| 80061 | $93.00 | $18.37 | 406.3% | - | - | $16.53 | 462.6% |
| 83090 | $186.00 | $23.14 | 703.8% | $31.27 | 494.8% | $20.83 | 792.9% |
| 84153 | $107.00 | $25.23 | 324.1% | $34.10 | 213.8% | $22.71 | 371.2% |
| 84403 | $155.00 | $35.41 | 337.7% | $47.89 | 223.7% | $31.87 | 386.4% |
| 84443 | $94.00 | $23.05 | 307.8% | $31.15 | 201.8% | $20.75 | 353.0% |
| 85025 | $31.00 | $10.66 | 190.8% | $14.41 | 115.1% | $9.59 | 223.3% |

415.    As discussed above in Section H(2), ¶¶ 103-105, California and Texas conduct their own independent analyses for purposes of calculating the rates paid under their respective Medicaid programs.  Comparing LabCorp's list prices to California's and Texas's 2018 Medicaid rates further demonstrates the unreasonableness of LabCorp's list prices.  For example, the markup on California's Medi-Cal rate when compared to LabCorp's list prices for the tests each Plaintiff received yields an average markup of 706.8% (7.07 times the Medi-Cal rate), with a  median of 645.9% (6.46 times the Medi-Cal rate).  Conducting the same analysis using the 2018 Texas Medicaid rates yields an average markup of 498.7% (4.99 times the Texas Medicaid rate), with a median of

418.1% (4.18 times the Texas Medicaid rate).  Below is the data on a test-by-test basis,

excluding any tests where there was no data under either the Medi-Cal or Texas Medicaid

programs.

| CPT Code | LabCorp's List Price | 2018 Medi-Cal Rates | Markup on Cal Rate | 2018 TX Medicaid Rates | Markup on Texas Rate |
|---|---|---|---|---|---|
| **Sheryl Anderson** | | | | | |
| 80053 | $41.00 | $9.28 | 341.8% | $14.49 | 183.0% |
| 80061 | $98.00 | $11.54 | 749.2% | $18.37 | 433.5% |
| 85025 | $31.00 | $6.75 | 359.3% | $10.66 | 190.8% |
| **Tena Davidson** | | | | | |
| 80307 | $425.00 | $63.85 | 565.6% | $61.02 | 596.5% |
| **Robert Huffstutler** | | | | | |
| G0481 | $1,296.00 | $98.39 | 1217.2% | $160.99 | 705.0% |
| **Jonah McCay** | | | | | |
| G0480 | $772.00 | $63.95 | 1107.2% | $117.65 | 556.2% |
| 80307 | $158.00 | $63.85 | 147.5% | $61.02 | 158.9% |
| **Holden Sheriff** | | | | | |
| 80053 | $46.00 | $9.28 | 395.7% | $14.49 | 217.5% |
| 81240 | $260.41 | - | | $67.50 | 285.8% |
| 81241 | $360.05 | - | | $83.82 | 329.6% |
| 81291 | $423.33 | - | | $59.88 | 607.0% |
| 82306 | $232.00 | $24.79 | 835.9% | $37.28 | 522.3% |
| 84443 | $94.00 | $14.76 | 536.9% | $23.05 | 307.8% |
| 85027 | $31.00 | $5.71 | 442.9% | $8.87 | 249.5% |
| 85300 | $91.63 | $10.47 | 775.2% | $16.26 | 463.5% |
| 85303 | $107.02 | $15.06 | 610.6% | $18.98 | 463.9% |
| 85306 | $118.47 | $16.68 | 610.3% | $18.93 | 525.8% |
| 85613 | $74.04 | $8.45 | 776.2% | $9.60 | 671.3% |
| 85670 | $44.66 | $4.99 | 795.0% | $7.91 | 464.6% |
| 85732 | $50.10 | $7.05 | 610.6% | $8.87 | 464.8% |
| 86038 | $86.00 | $10.63 | 709.0% | $16.58 | 418.7% |
| 86146 | $165.00 | $20.47 | 706.1% | $10.76 | 1433.5% |
| 86147 | $392.12 | $20.02 | 1858.6% | $10.76 | 3544.2% |
| 86235 | $248.00 | $14.59 | 1599.8% | $24.60 | 908.1% |
| **Michelle Sullivan** | | | | | |
| 80053 | $60.00 | $9.28 | 546.6% | $14.49 | 314.1% |
| 80061 | $67.25 | $11.54 | 482.8% | $18.37 | 266.1% |
| 82306 | $132.00 | $24.79 | 432.5% | $37.28 | 254.1% |

| CPT Code | LabCorp's | 2018 | Markup | 2018 TX | Markup |
|---|---|---|---|---|---|
| 82607 | $106.00 | $13.33 | 695.2% | $20.68 | 412.6% |
| 83036 | $78.00 | $8.54 | 813.3% | $13.32 | 485.6% |
| 84439 | $59.00 | $7.91 | 645.9% | $12.37 | 377.0% |
| 84443 | $66.00 | $14.76 | 347.2% | $23.05 | 186.3% |
| 84481 | $94.00 | $14.97 | 527.9% | $23.24 | 304.5% |
| 84550 | $41.00 | $4.01 | 922.4% | $6.20 | 561.3% |
| 86038 | $105.00 | $10.63 | 887.8% | $16.58 | 533.3% |
| 86200 | $108.00 | $7.10 | 1421.1% | $17.76 | 508.1% |
| 86431 | $46.00 | $5.02 | 816.3% | $7.78 | 491.3% |
| **Shontelle Thomas** | | | | | |
| 87491 | ? | $31.07 | | $48.14 | |
| 87591 | ? | $31.07 | | $48.14 | |
| 87624 | ? | $35.05 | | $48.14 | |
| 88142 | ? | $18.31 | | $27.79 | |
| 88175 | ? | $23.50 | | $36.34 | |
| **Total of Above 5 Lines** | **$514.59** | **$139.00** | **270.2%** | **$208.55** | **146.7%** |
| 86431 | $46.00 | $5.02 | 816.3% | $7.78 | 491.3% |
| 86225 | ? | $12.25 | | $18.85 | |
| 86235 (x8) | ? | $116.72 | | $196.80 | |
| **Total of Above 2 Lines** | **$1,116.00** | **$128.97** | **765.3%** | **$215.65** | **417.5%** |
| **Joseph Watson** | | | | | |
| 80053 | $46.00 | $9.28 | 395.7% | $14.49 | 217.5% |
| 80061 | $93.00 | $11.54 | 705.9% | $18.37 | 406.3% |
| 83090 | $186.00 | $15.18 | 1125.3% | $23.14 | 703.8% |
| 84153 | $107.00 | $16.47 | 549.7% | $25.23 | 324.1% |
| 84403 | $155.00 | $22.80 | 579.8% | $35.41 | 337.7% |
| 84443 | $94.00 | $14.76 | 536.9% | $23.05 | 307.8% |
| 85025 | $31.00 | $6.75 | 359.3% | $10.66 | 190.8% |

416.    Additionally, the actual payment rates certain private third-party payers (insurance companies) would have paid LabCorp for specific clinical lab tests for certain Plaintiffs (Khazen, McCay, and Sullivan) were discernable from the respective Plaintiff's EOBs or through contact with the third-party payer. Comparing the observed negotiated rate data to LabCorp's list prices further demonstrates that LabCorp's list prices are

94

grossly excessive.  *First*, the observed rates LabCorp negotiated with private third-party payers were nearly always **below** the 2017 Medicare national limit and 2018 Medicare CLFS rates.  *Second*, the average markup when comparing LabCorp's list prices to the negotiated rates was 723.4% (7.23 times the negotiated rate), with a median of 698.8% (or 6.99 times the negotiated rate).   Below provides a test-by-test breakdown of the implied markup when comparing LabCorp's list prices with the observed negotiated rates, as well as comparison of the negotiated rates to the 2017 Medicare national limit and 2018 Medicare CLFS rates:

| CPT Code | LabCorp's List Price | 2017 Medicare Rates | | 2018 Medicare Rate | Observed Negotiated Rate | Markup on Negotiated Rate | Markup on Negotiated Rate |
| | | National Limit | TPP Median | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Ramzi Khazen | | | | | | | |
| ? | $168.00 | - | - | - | $17.04 | 885.9% | 8.86 |
| ? | $45.00 | - | - | - | $2.97 | 1415.2% | 14.15 |
| ? | $123.00 | - | - | - | $24.50 | 402.0% | 4.02 |
| ? | $123.00 | - | - | - | $24.50 | 402.0% | 4.02 |
| Jonah McCay | | | | | | | |
| 80307 | $158.00 | $79.81 | $107.85 | $71.83 | $51.51 | 206.7% | 2.07 |
| Michelle Sullivan | | | | | | | |
| 36415 | $30.00 | $3.00 | - | $3.00 | $1.93 | 1454.4% | 14.54 |
| 80053 | $60.00 | $14.49 | $19.59 | $13.04 | $9.31 | 544.5% | 5.44 |
| 80061 | $67.25 | $18.37 | - | $16.53 | $11.79 | 470.4% | 4.70 |
| 82607 | $106.00 | $20.68 | $27.94 | $18.61 | $13.27 | 698.8% | 6.99 |
| 83036 | $78.00 | $13.32 | $18.00 | $11.99 | $8.54 | 813.3% | 8.13 |
| 84439 | $59.00 | $12.37 | $16.72 | $11.13 | $7.94 | 643.1% | 6.43 |
| 84443 | $66.00 | $23.05 | $31.15 | $20.75 | $14.79 | 346.2% | 3.46 |
| 84481 | $94.00 | $23.24 | $31.40 | $20.92 | $14.91 | 530.4% | 5.30 |
| 84550 | $41.00 | $6.20 | $8.38 | $5.58 | $3.98 | 930.2% | 9.30 |
| 86038 | $105.00 | $16.58 | $22.41 | $14.92 | $10.64 | 886.8% | 8.87 |
| 86200 | $108.00 | $17.76 | $24.00 | $15.98 | $11.40 | 847.4% | 8.47 |
| 86431 | $46.00 | $7.78 | $10.51 | $7.00 | $5.00 | 820.0% | 8.20 |

95

**M.**    **LABCORP'S MANIPULATIVE BILLING PRACTICES**

417.    In addition to charging excessive prices, LabCorp has a number of business practices that trick and harass customers into paying excessive prices, such as failing to provide CPT and other test codes and medical diagnoses codes, aggregating insurance discounts and payments, and sending out threatening collection letters.

418.    The New York Times' Tina Rosenberg criticized health providers' cryptic billing practices, pointing out that "[u]nlike everything else we buy, when we purchase a medical treatment, surgery or diagnostic test, we buy blind.  We do not know the cost of health procedures before we buy.  When we do get the bill, we have no idea what the charges are based on and have no way to evaluate them."  Tina Rosenberg, *Revealing a Health Care Secret: The Price*, THE NEW YORK TIMES (July 31, 2013).

**1.    LabCorp Fails to Provide Test Codes or Medical Diagnoses Necessary to Assess the Charges for Diagnostic Services**

419.    LabCorp also makes it as difficult as possible for patients to understand their bills.   Clinical lab tests are identified by either CPT code or HSCPC code.  While third-party payers reimburse LabCorp based on either of these codes, neither is disclosed to the patient on their invoice.

420.    LabCorp also fails to disclose the medical diagnoses codes, although such codes are also relevant to a third-party payers' determination whether a claim is covered.

421.    Test codes and medical diagnoses are critical for patients to determine whether medical diagnoses were coded in error (which frequently happens, for example,

when Vitamin D testing is not covered by insurance). Also, test codes are critical for patients to make assessments of excessive charges.

422. In fact, this information is customarily provided to customers by LabCorp's main competitor (Quest Diagnostics, Inc.).

### 2. Aggregating Insurance Discounts and Payments Deceives Patients Into Believing that Their Diagnostic Testing is Fully Covered by Insurance

423. The invoices include only the date of service, a brief description of each service performed, the list price for each service, and then blank entries per lab test for adjustments, payments made by Medicare or Medicaid, insurer payments, patient payments (such as copays), and the balance for which the patient is responsible. However, LabCorp's invoices group third-party payer discounts and payments so that a patient cannot determine from the invoice which individual tests were covered or not covered by insurance.

424. These is no justification for not disaggregating insurance discounts and payments. Reimbursement from third-party payers is typically conducted on a fee-for-service basis, which provides LabCorp with payment on a test-by-test basis.

425. Commonly, insurance disclaims coverage because the physician made a coding error in identifying the medical diagnosis or because LabCorp is charging for a service that has already been covered by a different clinical lab test. Disaggregating data allows the consumer to identify the procedures that insurance did not cover and to correct any errors in coverage. It is no justification that a patient may be able to discern this information by calling LabCorp or reviewing an EOB. The invoice itself demands

97

payment and therefore should provide sufficient information to inform the recipient as to whether the invoice is accurate.

426.    In combination with the omission of testing codes and medical diagnoses codes, the above facts create a strong inference that LabCorp is intentionally omitting material information on its invoices to induce self-pay patients to pay egregiously inflated amounts for its services.

### 3.    LabCorp Sends Out Threatening Letters Demanding Payment

427.    LabCorp moreover sends out invoices and letters to customers threatening harm to their credit ratings and being foreclosed from future LabCorp services.  These threats are particularly troubling to those patients whose physicians or insurers require exclusive use of LabCorp's services.

428.    LabCorp, to avoid the restrictions of the FDCPA, created an "in-house division" to act as a collection agency – "LCA Collections."[17]  LCA Collections sends letters that do not provide patients with the important procedural protections of a collection letter, including notifying the "debt collector in writing that the consumer . . . wishes the debt collector to cease further communications . . . ."  *See* 15 U.S.C. § 805(c).

429.    Furthermore, LabCorp was precluded from using a debt collector because plaintiffs' alleged debt was not "expressly authorized by the agreement creating the debt

---

[17] The FDCPA does not apply to internal efforts to collect debts, only to efforts of third-party collection agencies.

or permitted by law." *See* 15 U.S.C. §808(a). There is no express agreement between LabCorp and patients creating a debt.

430. The LCA Collections letters harass patients. For example, notices received by Plaintiffs were titled in large font and all capital letters: **FINAL NOTICE PROTECT YOUR CREDIT** and **IMMEDIATE PAYMENT REQUIRED.** The LCA letters threaten to ruin your credit and foreclose you from LabCorp's services if you don't pay your excessive bill.

431. Similarly, LabCorp sells accounts to an outside collection agency, American Medical Collections Agency (AMCA), to mail similar harassing letters threatening to ruin credit ratings and foreclose customers from medical services unless they pay their excessive bills.

### N. OTHER COMPLAINTS ABOUT LABCORP'S BILLING PRACTICES

432. Many consumers have voiced complaints on public forums against LabCorp that are similar to the Plaintiffs' allegations:[18]

    a. Patient in Pennsylvania, posted on June 14, 2017

> I am sick and tired of getting ripped off!!! For drawing blood... Which takes less than 5 minutes... They charged my insurance 546.00 dollars!! If that's not bad enough my insurance paid 474.90... So I am left with a bill of 71.10 to pay out of my pocket!! Why is this happening?? For years I went to quest diagnosis and never got charged... Whe[n] they took blood in the dr office. Never got charged!! This is a scam!! I hate labcorp!!! It just sickens me to see me and

---

[18] *Available at*, https://www.complaintsboard.com/labcorp-b119709 (last visited on Sept. 25, 2017).

others being ripped off... And they have bad customer service in hatfield pa 18969!! One person was taking blood... Probley to save money for themselves!! Again labcorp rips people off!!

b. Patient in Maryland, posted on May 27, 2017

The receptionist checked my GHI card and said it was accepted. She called me to the back of the clinic and stuck a needle in my arm drawing 12 vials of blood. The doctor told me she only needed two. Later they sent me a bill for 1600 dollars saying GHI didnt accept. The receptionist forced service through lies telling me i was covered by my insurance. Also i did not even know how much these blood tests cost. She was supposed to check my insurance and make sure they cover. Prices should be disclosed to the patient too. She didn't do either of these. I paid $600 toward the bill. I cannot pay anymore. I feel they were negligent and tricked me into this service.

c. Patient in New Jersey, posted on December 24, 2016

I received a LabCorp bill for Vitamin D, 25 Hydroxy lab test for $273.00. I was told at the time of my test it is coded correctly and Medicare will pay for it. The test was done on September 8, 2016[.]  It's funny how [their] other $510.00 charges in the same blood test were paid by Medicare for $36.71.   Now I found the excel net fee schedule form LabCorp and I see that the net fee they charge providers is $18.94. Why should I have to be charged almost 15 times more. In any other industry that's called racketeering. I would pay the reasonable $18.94 but LabCorp will not answer my emails.  My doctor says her prescription is correct whatever that means. LabCorp will not respond to my customer service emails thus I guess they are waiting for the bill to go to their in house collection people. I will demand a hearing. Realistically I would love to go to Washington and produce all these documents at a hearing on the ridiculous charges from medical providers that only those that cannot afford it pay.

d. Patient in North Carolina, posted on December 8, 2011

100

I had health insurance with Horizon Blue Cross Blue Shield of New Jersey (Horizon). In network outpatient lab work was provided by Laboratory Corporation of America Holdings (Labcorp). Due to the limitations of the policy, there was a limit of $500.00 per year for this benefit. During October 2010, I visited my primary doctor, blood was drawn and sent to Labcorp. Horizon was billed for four (4) tests - two (2) were paid in full, one paid partially and the last was not paid. The Explanation of Benefits sent to me did not show the remaining balance for out-patient testing. For the partially paid test, Horizon was billed at $104.00, allowed amount $20.21, paid $1.85. The last test was billed at $66.00, allowed amount $11.68, not paid. When this first started, I offered to pay the unpaid contract amounts of $30.04 - not accepted. I see no reason why I should pay more than five times the contract amount for a test. Also, I have not worked since January 2008 and can't afford to pay $66.00.

433.    Additional complaints provide:[19]

a.    C. of TX on March 9, 2018

This company commits insurance fraud. I have a review out with the Texas Department of Insurance for this exact reason. They take your panel of labwork and separate them each into their own charge, which is considered "unbundling" and is a form of insurance fraud. I also don't understand their rating on BBB if all reviews are negative. Anyway, do not conduct business with these people. They don't even care that I am called them out on their practices. They continue to send me $1500 bills after already paying a separate bill for $250 on the same date of service. All for one annual lab panel. Ridiculous. They don't even try to get the insurance your correct information to pay the claim. Insurance denies because of medical necessity but they should work on behalf of their client to get these things paid for.

---

[19] *Available at*, https://www.bbb.org/greensboro/business-reviews/laboratories-medical/laboratory-corporation-of-america-in-burlington-nc-1656/reviews-and-complaints (last visited on May 10, 2018).

b. L. on February 19, 2018

WOW! I had to change doctors so my Doctor did a "wellness" check up. My insurance covers the visit so I did not think it was a big deal. In the "wellness" checkup they had me go to a nurse in the office to draw blood. Next thing I know is I get an Invoice from Lab Corp to pay $638.00. Payable upon receipt. So Lab Corp has no obligation to inform patient the tests and the cost for each test? This is the biggest rip off and abuse I had ever seen in all my years when it comes to medical billing. Scam

c. R. of NY on January 15, 2018

My in network doctor submitted a sample to them but they were out of network. I was never told nor did I agree to pay for this. There is a NYS Surprise Bill Law which they have broke and refuse to put this claim as noncollectable as OON.

d. A. on December 11, 2017

LabCorp shouldn't be in business. After ripping me off for simple blood test, now I refuse to take any test with them, I ask my Dr's to refer me to another lab. They send me a bill for $2000 expecting me to pay it over night. I've been paying it off but they sent me to collection. They SHOULDN'T BE IN BUSINESS. PLEASE DO NOT USE THEM.

e. H. on November 8, 2017

LabCorp charges ridiculously high prices for simple labs. Their customer service representatives are completely unsympathetic to the financial difficulties they cause customers. Too many customers have to waste so much time just to get simple actions completed. I hope to never deal with this company again. I wish they would remove the word America from their name as they do not represent it well.... 6 is the number of art classes I would have to teach to be able to pay for a blood draw that took less than 2 minutes. How is this legal? I'm quite confused at the BBB ratings given to this company. 31 negative reviews, 0 neutral and 0 positive yet they get a 100% Customer Review Rating? 414 complaints and they still get an A?

102

a. Posted on September 13, 2017

My doctor's office requested several lab tests for recent health problems I have. I am required to use Lab Corp by my insurance company. I went to Lab Corp and gave them my insurance card, ID, and a copy of the doctor's orders. They input my information and coverage to the system and presented me... with an estimated financial responsibility sheet which indicated all services as "Covered Services" and gave a rough amount as $71.04, there is a section on the form for "non-covered services" which is blank. I authorized the testing and gave my credit card information for the balance of $71.04. About a month after services were performed I received a bill from Lab Corp for $390, of which they had already debited $71.04 from my account. One of the tests was billed/charged as $390 as a non-covered service. I called Lab Corp to make a complaint and ask what they could offer me as resolution and I was told that the best they could offer was a 20% discount, leaving my total bill at $312. I also inquired as to why they would provide me with a financial responsibility estimate and list that this test was a covered service when in fact there estimate of $33.40 for the test and the fact that it was a covered test was completely inaccurate. There was no explanation for that and they simply indicated that the statement provided was an "estimate" and it was not guaranteed to be 100% accurate. In this case the "estimate" was false and completely misleading and caused me to authorize a $390 test that I would never have agreed to otherwise if it had been properly disclosed to me.

b. Posted on August 5, 2017

RE: Invoice ******** Doctor ordered 3 lab tests. Collected in Dr Office. My insurance has paid two or the three at negotiated rates. Labcorp has accepted those payments The 3rd test Procedure Code 80307 was denied by the insurance company as "medically unnecessary" As plan administrator and... benefits manager for my corporation's five health plans, I'm familiar with billing practices and insurance payments. So when we received a bill from Labcorp for $204.33 for ** *****, I felt that is we exceptionally high and somewhat unethical. The CMS approved rate for the ** ***** is only $61.02. I called the ************* in an attempt to discuss

103

it and setup payment but was told that the best that Labcorp could do was to waive 15% of a bill which which is over 333% more than the negotiated rate. I even offered to pay the 135% of the negotiated rate which is 'reasonable and customary' in the industry. I feel that it is a bit suspect, given that the collection was made in the doctor's office and sent to Labcorp for processing. The Doctor's business office was closed at the end of the appointment so the patient didn't have a chance to even find out if the test would be covered.

c. Posted on March 10, 2017

10 Nov 2015 Dr ****** gave me a request for blood tests as part of my annual physical. A copy of that request is forwarded. Lab Corp sent a bill for $1,365.00 for blood tests not on Dr. ******'s request. Blood tests our insurance would not cover. I provided Lab Corp with a copy of Dr. ******'s... request and asked Lab Corp to resubmit to our insurance. I continued to speak with Lab Corp but they continue to send me the bill for $1,365. and have not submitted the correct request from Dr. ****** to our insurance for coverage.

d. Posted on January 23, 2017

I recently had a drug screen done as part of my medical training. I, having health insurance, elected to first attempt to bill the service to my insurance to help offset the cost. My insurance later rejected the charge as a non-covered service. Lab Corp then sends me a bill for $381 [] for... the service. Fellow colleagues who paid cash for the exact same lab done at the exact same providers office were only billed $90. This represent a 236% increase. After calling Labcorp they say this is their "cash pay" discount. Labcorp does not make it known they charge more for services billed to insurance so there is no way for the consumer to know if attempting to utilize their health insurance is even worthwhile. Secondly a 236% or $291 increased charged simply because a customer has an insurance is deceitful at best and at worse abusive and fraudulent. Again, a $291 markup to simply reject an insurance claim is absurd.

e. Posted on December 29, 2016

104

Date of Service 1-5-2016. Lab Corp submitted to ******** 2 wrong diagnosis along with services of $334.00 of which a previous Lab had a charge of $58. Lab Corp submitted to ******** diagnosis codes of ****** (other Malaise) & ***** (other hyperlipidemia). ******** denied coverage for the charges of... $334.00 as the above are not covered diagnosis. ******** did pay for charges of $58.62 in 2014 for the same 3 tests.

f.  Posted on November 7, 2016

LabCorp has billed me $567 for lab work that has a fair market value of $179, evidenced by internet offers that use LabCorp for the bloodwork.  On 6/2/16 I had bloodwork performed at LabCorp in Fairhope, AL, as a prerequisite for an internship at a hospital. This bloodwork was not covered by BCBS even though my doctor believed it would be. I have received several bills and collections threats, concerning invoice number XXXXXXXX. This invoice is for $567. A quick internet search finds that the bloodwork I received would cost $179 at the same location, if purchased online. The online price does not require any form of membership. LabCorp's price gouging is unconscionable and potentially illegal. I have offered in writing and on a recorded call to pay the FMV of the services received.

g.  Posted on October 17, 2016

LabCorp invoices consumer 7 times the amount they will accept from ********** for the same exact test if ********** denies it vs approves it. I asked my Dr. office for an annual physical - which was supposedly free under my health plan with **********. The Dr. office asked me to come in on 6/15... for blood/urine tests - a week before my physical on 6/22. I learned later the Dr. office sent these tests out to LabCorp. Out of several tests run on 6/15, one of them (Procedure Code: **************************) was denied by ** because they decided it's Not Covered under preventative care. But on 6/22 the Dr. didn't like one of my numbers on that test & had me take it again. Weeks later I was informed that ** Denied my coverage for the 6/15 test & I was billed the full list price of $72 by LabCorp. ** said the claim from 6/22 was covered because it was for medical

105

reasons... So they discounted that $72 bill from LabCorp by $61.85 (86% discount) to make it only $10.15, of which I paid my 20% copay of $2.03. How is it possible that LabCorp will accept $10.15 for the same exact test (code *****) on 6/22 but expect me, the consumer, to pay 7X the rate of $72 when they did the test on 6/15. This is outrageous! I tried calling LabCorp initially to get a lower rate, but they said that's just how it is... I also tried appealing to my Dr's office, and **, and my employer's HealthAdvocate to get some help changing the bill to a rational amount. But everyone just says that's how insurance works... Finally, today I called LabCorp back because they're about to sent the $72 invoice to a 3rd party collection agent & hurt my credit score. Supposedly, the most their customer service is authorized to discount a bill is 5%. So I paid the $68.40 so it won't go to collections. But this is still outrageous that they will nail the consumer with 7X the amount they will accept from ** for the SAME EXACT PROCEDURE done one week apart. This seems like an unfair & deceptive trade practice! I never agreed to pay LabCorp anything in June & didn't even know they were who the Dr office farmed these tests out to. I just asked my Dr for an annual physical. But now they have the power to charge me $72 for a test that they normally get paid $10.15 for. What is to stop them from charging $720 for a $10 test the next time, or $7,200?

h.  Posted on August 23, 2016

Excessive charges for one blood test. In August of 2015 I went to my doctor to get my thyroid checked, he was covered by my insurance. He said he would need a blood sample and that the lab was in his office. I did as instructed by my doctor and had my blood drawn. On this date of August 27,2016... (one year later) I received an invoice from Labcorp stating that I owe $521.00 for my one blood draw for one test. I could not believe that one test cost $521.00 and that I received a bill a year later. I am a student and I barely can afford my cost of living. I called to see if they could settle with $150.00 because that is all I had in my savings and the employee on the phone said that she could only give me a discount off the bill but it still would be over $400.00. I believe this company is price gouging patients. I have insurance but they still won't settle on my co-pay. I was not

> told by Labcorp that I would have to pay $521.00 for my test,
> if I knew that I would of went somewhere else for the test.
> This company is not honest and I would like for them to settle
> for my co-pay.

434. Plaintiffs' counsel continues to be contacted by class members expressing interest in joining this action as named plaintiffs. Plaintiffs reserve the right to propose subsequent amendments to add plaintiffs, including plaintiffs from different states, to the complaint.

## O. IT IS AN UNREASONABLE BURDEN ON THE PHYSICIAN OR PATIENT TO DETERMINE INSURANCE COVERAGE OR THE MARKET RATE OF CLINICAL LAB TESTS

435. Given the nature of the healthcare marketplace, it would be impractical for a patient to determine what the reasonable value for healthcare services are when a physician refers them to have clinical lab testing performed.

*436.* *First*, as described above, the healthcare marketplace is opaque, leaving patients (and even physicians) in the dark as to market rates for certain healthcare services. The vast majority of payments received by healthcare service providers are deemed proprietary, but are substantially below the list prices. The very small percentage of patients that may get stuck with the financial responsibility for healthcare services, such as clinical lab testing, have no way of knowing what the actual market rate is or should be, and are thus forced to accept whatever the lab service provider indicates is the market rate.

437. Patients have no duty under the law to take on the responsibility of becoming a healthcare financial analyst. Patients are armed only with their personal financial information and lack specialized knowledge as to their medical wellbeing or the

107

available healthcare options. To require a patient to make medical judgments based only on an arbitrary dollar figure is an inequitable result.

438. Indeed, Patients are unable to comprehend what prescribed medical services actually entail or the costs associated therewith. In his testimony before Congress, Professor Anderson provided the following example:

> Imagine going into a grocery store or a department store and not understanding: (1) what most of the products you are purchasing actually do, (2) what is actually on the bill, and (3) having no idea what you are going to buy when you enter the store. In this case you would not be a good comparative shopper even if you knew the prices. ***You need to understand what you are buying before you make the purchase.***
>
> In health care there is often an additional factor. Imagine that you are not even the person picking out the goods in the grocery store or the department store. ***Imagine that someone else is making the decisions about what to buy for you***. Health professionals, most commonly doctors, make most of the decisions when you go to the doctor's office or the hospital. For many clinical conditions this will always be the case.

Anderson Testimony at 103 (emphasis in original).

439. Ultimately, the service provider (*e.g.*, LabCorp) is in the best position to access pricing information. As published in an Emory Law Journal article:

> the provider clearly has better access to pricing information than the patient.[] Providers know what codes they will use to bill for their services.[] And providers are the ones that have either set the rates (uninsured patients), negotiated the rates (privately insured patients), or been informed of the rates (publicly insured patients). While patients do have some options—for instance, they can call their insurance companies and get a sense of cost for various procedures—providers are undoubtedly better situated to do so.[] Providers are the

108

> repeat players, here, with far better and less costly access to
> information than patients do.

Wendy Netter Epstein, *Price Transparency and Incomplete Contracts in Health Care*, 67

Emory L.J. 1, 46 (2017) ("Epstein Article") (internal citations omitted).

440.   ***Second***, patients, who are not sophisticated as to health-related care, are

entitled to trust their physician's recommendations and referrals.  Indeed, patients and

physicians have a special doctor-patient relationship that confers fiduciary duties upon

the physician to act in the best interest of the patient.  There is no requirement among

these duties that the physician consider insurance coverage or pricing when making

medical determinations.  In fact, "[m]edical ethics has traditionally held that the

physician should not withhold beneficial treatments because of cost."  Epstein Article, 67

Emory L.J. at 13 n.65 (quoting Kevin R. Riggs & Peter A. Ubel, *Overcoming Barriers to*

*Discussing Out-of-Pocket Costs with Patients*, 174 JAMA INTERNAL MED. 849, 849

(2014)).

441.   According to the American Medical Association ("AMA"), the largest

association of physicians—both Medical Doctors and Osteopathic Doctors—and medical

students in the United States, "[t]he medical profession has long subscribed to a body of

ethical statements developed primarily ***for the benefit of the patient***.  As a member of

this profession, ***a physician must recognize responsibility to patients first and foremost***,

as well as to society, to other health professionals, and to self."  (Emphasis added).

109

442.   The AMA Principles of Medical Ethics include nine tenets.  Notably absent, as is relevant to this litigation, is any requirement to consider insurance coverage or pricing:

> I.     A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.
>
> II.    A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.
>
> III.   A physician shall respect the law and also recognize a responsibility to seek changes in those requirements which are contrary to the best interests of the patient.
>
> IV.    A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.
>
> V.     A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.
>
> VI.    A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care.
>
> VII.   A physician shall recognize a responsibility to participate in activities contributing to the improvement of the community and the betterment of public health.
>
> VIII.  A physician shall, while caring for a patient, regard responsibility to the patient as paramount.

IX.     A physician shall support access to medical care for all people.

443.    To ensure patients are fully informed, the AMA's Code of Medical Ethics Opinion 11.2.4 requires full disclosure as to material facts, such as potential financial conflicts of interest, *i.e.*, "the existence of payment models, financial incentives; and formularies, guidelines or other tools that influence treatment recommendations and care." No requirement for the consideration of insurance coverage or pricing is included.

444.    Moving beyond ethical considerations and into a legal realm, "the physician-patient relationship creates special responsibilities for doctors." Thomas L. Hafemeister and Selina Spinos in *Lean on Me: A Physician's Fiduciary Duty to Disclose an Emergent Medical Risk to the Patient*, 86 WASH. U. L. REV. 1167, 1186 (2009). In *Lean on Me*, the authors describe the foundation underlying this special relationship between physicians and their patients:

> Because physicians have superior medical knowledge and skill and are the gatekeepers to medical services, patients are dependent on them.[] Patients lack the knowledge or skill to assess their own health conditions. Instead, they must depend on their physicians to provide critical information about their medical well-being. Patients rely on doctors to assist and direct them in choosing necessary medical treatment.

> *               *               *

> This dependence is enhanced by the anxiety that patients typically feel about their health, the vulnerability that they experience from a sickness or injury, and the challenge of finding a new doctor if a patient concludes that the present doctor is providing inadequate services.[] Because patients are so vulnerable and dependent on their physicians, the law imposes a 'trust' on doctors--a fiduciary responsibility stemming from the dependence and vulnerability of the

111

patient, and from the disparity between a patient's and a physician's knowledge and ability to act.[]

*Id.* at 1186-87 (citations omitted).

445.    This special relationship transforms the physician into a fiduciary, whose duty of loyalty demands the physician place the interests of the patient above their own. "Because patients generally seek the services of a physician when they are sick, injured, or concerned about their health, because doctors have unique access to a patient's medical information and superior insight into a patient's medical condition, and because physicians control patients' ability to obtain needed medical treatment, patients are highly dependent on their physicians ***and should be able to rely on their physicians to protect and promote their well-being***.[]" *Id.* at 1188 (citation omitted and emphasis added).

446.    As Mark A. Hall & Carl E. Schneider described in *Patients as Consumers supra* (¶73), "Patients rarely abandon doctors, reject doctors' recommendations, or demand second opinions." *Id.* at 652.  In fact, "[d]octor and patient develop information about and confidence in each other, information and confidence that must laboriously be re-created when the patient changes doctors." *Id.* at 652-53.  Therefore, "[t]he patient should . . . be able to trust that the physician will act in the best interests of the patient thereby protecting the sanctity of the physician-patient relationship.[]" *Id.* at 668 (citation omitted).

447.    In sum, for a patient to be presumed to know whether insurance would cover clinical lab testing and, if not, the list price for the lab tests, they must fully comprehend the purpose and alternatives to the medical services being recommended,

112

and the actual market rates paid for those services. Since neither are practically available to the patient, any such analysis would be futile.

448. As published in the Epstein Article, "Patients suffer from both an imbalance of information and an imbalance of power." 67 Emory L.J. at 3. "Many health services would be both easy and inexpensive to price *ex ante*. For instance, a hospital should easily be able to price a standard x-ray, even with the minor complication that different insurers have negotiated different rates . . . . Information asymmetry is high. Providers have far superior access to price information than patients, particularly in a world where health pricing varies tremendously in unpredictable ways and where it is so dependent on understanding a complex numerical code for medical procedures.[]" *Id.* at 7.

## CLASS ALLEGATIONS

449. Plaintiffs bring this action on behalf of themselves and on behalf of a national Class, defined above as all LabCorp patients in the United States who, without any express contract with LabCorp that establishes the amount of fees to be paid to LabCorp, were charged fees for clinical lab testing services performed by LabCorp that were in excess of the reasonable market rates for the same services. Excluded from the Class is LabCorp, its parent(s), subsidiaries, affiliates, officers, directors, employees, partners, and co-ventures.

450. Plaintiffs also brings this action on behalf of the following Sub-Classes:

a. all LabCorp patients in the United States who, without any express contract with LabCorp that establishes the amount of fees to be paid to LabCorp, were

113

charged fees and paid LabCorp for clinical lab testing services at rates in excess of the reasonable market rates for the same services  (the Payor Sub-Class);

b.   All persons residing in the State of North Carolina who, without any express contract with LabCorp that establishes the amount of fees to be paid to LabCorp, were charged fees for clinical lab testing services performed by LabCorp that were in excess of the reasonable market rates for the same services (the "North Carolina Sub-Class");

c.   All persons residing in the State of Alabama who, without any express contract with LabCorp that establishes the amount of fees to be paid to LabCorp, were charged fees for clinical lab testing services performed by LabCorp that were in excess of the reasonable market rates for the same services (the "Alabama Sub-Class");

d.   All persons residing in the State of California who, without any express contract with LabCorp that establishes the amount of fees to be paid to LabCorp, were charged fees for clinical lab testing services performed by LabCorp that were in excess of the reasonable market rates for the same services (the "California Sub-Class");

e.   All persons residing in the State of Florida who, without any express contract with LabCorp that establishes the amount of fees to be paid to LabCorp, were charged fees for clinical lab testing services performed by LabCorp that were in excess of the reasonable market rates for the same services (the "Florida Sub-Class");

114

f.   All persons residing in the State of Maryland who, without any express contract with LabCorp that establishes the amount of fees to be paid to LabCorp, were charged fees for clinical lab testing services performed by LabCorp that were in excess of the reasonable market rates for the same services (the "Maryland Sub-Class");

g.   All persons residing in the State of New Jersey who, without any express contract with LabCorp that establishes the amount of fees to be paid to LabCorp, were charged fees for clinical lab testing services performed by LabCorp that were in excess of the reasonable market rates for the same services (the "New Jersey Sub-Class");

h.   All persons residing in the State of Tennessee who, without any express contract with LabCorp that establishes the amount of fees to be paid to LabCorp, were charged fees for clinical lab testing services performed by LabCorp that were in excess of the reasonable market rates for the same services (the "Tennessee Sub-Class"); and

i.   All persons residing in the State of Texas who, without any express contract with LabCorp that establishes the amount of fees to be paid to LabCorp, were charged fees for clinical lab testing services performed by LabCorp that were in excess of the reasonable market rates for the same services (the "Texas Sub-Class").

451.   This action is brought as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3).

115

The Class and Sub-Classes (collectively referred to as the "Class") satisfy the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

452.     **Numerosity**.  The members of the Class are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members can be determined only by appropriate discovery, Plaintiffs believe that there are thousands of Class members residing throughout the United States.  LabCorp claims to have over 115 million patient encounters each year, and typically processes more than 2.5 million patient specimens per week.

453.     Because of the geographic dispersion of Class members, there is judicial economy arising from the avoidance of a multiplicity of actions in trying this matter as a class action.

454.     **Commonality**.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.   Whether a contract implied-in-law or a contract implied-in-fact exists between LabCorp and each member of the Class;

b.   Whether LabCorp is entitled to receive compensation from each Class member in an amount only equal to the reasonable value of the clinical lab testing services performed;

c.   Whether LabCorp's list prices, as derived from its patient fee schedule, are a reasonable value for its clinical lab testing services;

116

d.   Whether the Payor Sub-Class is entitled to restitution for having paid LabCorp amounts above the reasonable value for its clinical lab testing services;

e.   The proper measure of restitutionary damages to be paid to members of the Payor Sub-Class;

f.   Whether Plaintiffs and the Class are entitled to injunctive or other equitable relief to remedy LabCorp's continuing violations of law as alleged herein; and

g.   Whether LabCorp violated the consumer protection laws of North Carolina, Alabama, California, Florida, Maryland, New Jersey, Tennessee, and Texas.

455.   **Typicality**.  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs have no interests that are adverse or antagonistic to those of the Class.  Plaintiffs' interests are to obtain relief for themselves and the Class for the harm arising out of the violations of law set forth herein.

456.   **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in complex and consumer class action litigation.

457.   **Superiority**.  A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by the members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Plaintiffs and members of the Class to individually seek redress for the wrongful conduct alleged.

458. In addition, as alleged herein, LabCorp has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

459. The Class and Sub-Classes are readily definable, and prosecution of this Action as a class action will reduce the possibility of repetitious litigation.

460. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
### Declaratory Judgment Based on Principles of Implied Contract
### (On behalf of Plaintiffs and the Class)

461. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

462. Plaintiffs seek relief under the North Carolina Declaratory Judgment Act, N.C. Gen. Stat. § 1-253, *et seq.* This act allows parties to sue for a judicial declaration in order to declare and settle the rights and obligations of the parties.

463. As alleged above, LabCorp performed clinical lab testing services on behalf of each Plaintiff and Class member pursuant to the prescription and referral of a physician.

464. Plaintiffs and the Class accepted the clinical lab testing services performed by LabCorp.

465. As indicated by the invoices sent to Plaintiffs and the Class, LabCorp had an expectation of being compensated for its clinical lab testing services.

118

466. However, there was no express agreement and there was no mutual agreement or intent to promise between LabCorp and any Plaintiff or member of the Class prior or subsequent to the performance of the clinical lab testing services at issue herein. As a result, no express contract was created.

467. Plaintiffs therefore seek a declaratory judgment that a contract implied-in-law (also referred to as a *quasi*-contract or constructive contract) or a contract implied-in-fact with an omitted essential term (price) exists between LabCorp and each Plaintiff and Class member.

468. Plaintiffs also seek a declaratory judgment that LabCorp's rights under a contract implied-in-law or a contract implied-in-fact with an omitted essential term entitle LabCorp only to compensation equal to the reasonable value of the clinical lab testing services at the time they were rendered, and that Plaintiffs and the Class are therefore obligated only to compensate LabCorp for the reasonable value of the services performed.

469. Moreover, as alleged in detail above, LabCorp demanded Plaintiffs and the Class pay an amount equal to the list price, as derived from LabCorp's internal patient fee schedule. However, the list prices as derived from LabCorp's internal patient fee schedule are significantly higher than the amount LabCorp is typically paid for the same clinical lab testing services.

470. Plaintiffs and the Class therefore seek a declaratory judgment that LabCorp's list prices are not a reasonable value for the clinical lab testing services rendered because of the reasons alleged herein, including but not limited to the

119

substantially lower amounts third-party payers (including private and government payers) typically pay for the same services.

471.    Plaintiffs and the Class are entitled under N.C. Gen. Stat. § 1-253 to a declaratory judgment declaring their rights and obligations regardless of whether further relief is or could be claimed pursuant to the below Causes of Action.

472.    This claim is asserted on behalf of a national Class under North Carolina law.  North Carolina law properly applies because this Action was brought within the state of North Carolina, and the law for contracts implied-in-law (whether referred to as *quasi*-contract or constructive contract) and contracts implied-in-fact among the various states do not conflict with North Carolina law.  North Carolina law is applicable to the national Class.

## COUNT II
### Breach of Implied Contract or Unjust Enrichment
### (On behalf of Plaintiffs Carter, Martyn, Sullivan, Watson and the Payor Sub-Class)

473.    Plaintiffs  Mary Carter, Lily Martyn, Michelle Sullivan, and Joseph Watson (the "Plaintiff Payors") repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

474.    The Plaintiff Payors and Payor Sub-Class members have each paid LabCorp its list prices for clinical lab testing services performed.

475.    There was no express agreement and there was no mutual agreement as to price between LabCorp and any Plaintiff Payor or Payor Sub-Class member prior or subsequent to the performance of the clinical lab testing services.

120

476. As a result, the relationship between LabCorp and the Payor Sub-Class members is subject to a contract implied-in-law (also referred to as a *quasi*-contract or constructive contract) or a contract implied-in-fact with an omitted essential term (the price of services). Pursuant to a contract implied-in-law or a contract implied-in-fact with an omitted essential term, LabCorp is entitled only to compensation equal to the reasonable value of the clinical lab testing services at the time they were rendered.

477. However, due to the nature of the healthcare marketplace, as alleged herein, including but not limited to the concealment of actual payment rates by LabCorp, the Plaintiff Payors and Payor Sub-Class members were prevented from determining the actual market rates (or the reasonable value) for the clinical lab testing services performed and from negotiating with LabCorp (a party with significantly more sophistication and bargaining power).

478. Accordingly, LabCorp invoiced, demanded, and received payment in amounts equal to its list prices, as derived from its internal patient fee schedule, from the Plaintiff Payors and Payor Sub-Class members. As alleged above, LabCorp's list prices are significantly higher than the amount LabCorp is typically paid for the same clinical lab testing services.

479. Plaintiff Payors and Payor Sub-Class members made payment to stop LabCorp's collection efforts from continuing and to protect their credit ratings, or mistakenly believed that the list prices were reasonable rates due to their lack of sophistication and the opacity of the marketplace.

121

480.    If a contract implied-in-fact with an omitted essential term (price of services) is found to exist between the Plaintiff Payors/Payor Sub-Class members and LabCorp, that contract has been breached by LabCorp's demand and receipt of its egregious list prices for the performance of clinical lab testing services.  As a result, the Plaintiff Payors and Payor Sub-Class members are entitled to restitution equal to the amount paid that exceeds the reasonable value of the clinical lab testing services rendered.

481.    Alternatively, if a contract implied-in-law is found to exist, LabCorp has been unjustly enriched to the detriment of the Plaintiff Payors and Payor Sub-Class members by demanding and receiving payment in an amount that grossly exceeds the reasonable value of the services rendered.  It would be inequitable to allow LabCorp to retain the excess payment amounts.  LabCorp should therefore be ordered to disgorge the amounts paid by the Plaintiff Payors and Payor Sub-Class members that exceeds the reasonable value of the clinical lab testing services rendered.

482.    This claim is asserted on behalf of a national Payor Sub-Class under North Carolina law.  North Carolina law properly applies because this Action was brought within the state of North Carolina, and the law for implied contracts (whether in-law or in-fact), unjust enrichment, restitution and disgorgement among the various states do not conflict with North Carolina law.  North Carolina law is applicable to the national Payor Sub-Class.

## COUNT III
## Violations of the North Carolina Unfair and Deceptive Trade Practices Act
## N.C. Gen. Stat. §§ 75-1, et seq.
## (On behalf of Plaintiffs and the Class or
## Lily Martyn and the North Carolina Sub-Class)

483.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

484.    LabCorp's laboratory testing services are "in or affecting commerce" under N.C. Gen. Stat. § 75-1.1(a).

485.    The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") declares unlawful any "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

486.    As alleged herein, LabCorp has engaged in unfair or deceptive acts or practices affecting commerce in connection with its improper billing and debt collection for laboratory testing and other services, including the practice of overbilling individual consumers well above fair market value and failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed. These acts and practices are substantially injurious to customers and violate the UDTPA.

487.    Each invoice sent by LabCorp that overbills each Plaintiff and Class member, or Martyn and each North Carolina Sub-Class member, establishes a separate offense of the UDTPA pursuant to N.C. Gen. Stat. § 75-8.

488.    Plaintiffs and the other Class members, or Martyn and the North Carolina Sub-Class, have been and continue to be injured as a direct and proximate result of LabCorp's violations of the UDTPA.

123

489. Plaintiffs and the other Class members, or Martyn and the North Carolina Sub-Class, either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value rate.

490. The laws of North Carolina are applicable to the claims on behalf of a nationwide class raised in this Count.

491. LabCorp's unfair and deceptive acts and practices, as described above (*i.e.*, its improper billing and collection practices), were performed from within the state of North Carolina, and caused injury to each member of the Class.

492. North Carolina has the most significant relationship to the deceptive acts and practices complained of herein, and has a substantial interest in regulating the deceptive conduct of LabCorp from within its borders.

493. Plaintiffs are entitled to pursue a claim on behalf of the Class, or Martyn is entitled to pursue a claim on behalf of the North Carolina Sub-Class, against LabCorp seeking actual damages and treble damages pursuant to N.C. Gen. Stat. § 75-16, which provides:

> [i]f any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

124

494. Plaintiffs and the Class, or Martyn and the North Carolina Sub-Class, are also entitled to seek attorney's fees for bringing this action to remedy LabCorp's violations of the UDTPA, under N.C. Gen. Stat. § 75-16.1.

**COUNT IV**
**Violations of the Alabama Deceptive Trade Practices Act,**
**Ala. Code §§ 8-19-1, et seq.**
**(On behalf of Plaintiffs Anderson, Huffstutler, McCay, Smith, Watson, Wilson**
**and the Alabama Sub-Class)**

495. Plaintiffs Sheryl Anderson, Robert Huffstutler, Jonah McCay, Victoria Smith, Joseph Watson, and Michael Wilson repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

496. LabCorp is a "person" as defined in the Alabama Deceptive Trade Practices Act ("ADTPA"). Ala. Code § 8-19-3(5).

497. LabCorp's laboratory testing constitutes a "service," and thus "trade or commerce," under the ADTPA. Ala. Code § 8-19-3(7)-(8).

498. The ADTPA prohibits "deceptive acts or practices in the conduct of any trade or commerce," which includes "[m]aking a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions" and "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5(11) & (27).

499. As alleged herein and above, LabCorp has engaged in false, misleading, deceptive, and unconscionable acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including the practice of overbilling individual consumers well above fair market value and failing to disclose

125

CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed. These acts and practices violate the ADTPA.

500. Anderson, Huffstutler, McCay, Watson, Wilson and the other Alabama Sub-Class members have been and continue to be injured as a direct and proximate result of LabCorp's violations of the ADTPA.

501. Anderson, Huffstutler, McCay, Watson, Wilson and the other Alabama Sub-Class members either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value.

502. Anderson, Huffstutler, McCay, Watson, and Wilson are entitled to pursue a claim on behalf of the Alabama Sub-Class against LabCorp under Ala. Code § 8-19-10 for statutory damages, treble damages, and attorney's fees and costs to remedy LabCorp's violations of the ADTPA.

### COUNT V
**Violations of the California Consumers Legal Remedies Act,
Cal. Civ. Code §§ 1750, *et seq*.
(On behalf of Plaintiff Sullivan and the California Sub-Class)**

503. Plaintiff Michelle Sullivan herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

504. LabCorp is a "person" as defined in Cal. Civ. Code § 1761(c).

505. LabCorp's laboratory testing services constitute "services" under Cal. Civ. Code § 1761(b).

126

506.    The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in … services to any consumer," which occurs when, among other instances, a person is "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions" or "[i]nserting an unconscionable provision in the contract."  Cal. Civ. Code § 1770(a).

507.    As alleged herein, LabCorp has engaged in unfair or deceptive acts or practices by billing individuals at the unreasonably excessive list prices when lab tests are not covered by a third-party payer.  LabCorp also impermissibly aggregates the billing-related adjustments and third-party payment amounts on its invoices.  These acts and practices violate the CLRA.

508.    Sullivan and the other California Sub-Class members have been and continue to be injured as a direct and proximate result of LabCorp's violations of the CLRA.

509.    Sullivan and the other California Sub-Class members either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value rate.

510.    Sullivan is entitled to pursue a claim against LabCorp on behalf of the California Sub-Class to enjoin LabCorp from continuing its unfair or deceptive acts or practices under Cal. Civ. Code § 1781 and § 1780, as well as to pursue costs and

127

attorney's fees for bringing this action to remedy LabCorp's violations of the CLRA pursuant to § 1780(e).

**COUNT VI**
**Violations of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
**(On behalf of Plaintiff Sullivan and the California Sub-Class)**

511.     Plaintiff Michelle Sullivan herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

512.     LabCorp is a "person" as defined in Cal. Bus. & Prof. Code § 17201.

513.     Under the California Unfair Competition Law ("UCL"), "unfair competition" is defined broadly to mean and include "any unlawful, unfair or fraudulent business act or practice…."  Cal. Bus. & Prof. Code § 17200.

514.     As alleged herein, LabCorp has engaged in an unlawful, unfair or fraudulent business act or practice by billing individuals at the unreasonably excessive list prices when lab tests are not covered by a third-party payer.  LabCorp also impermissibly aggregates the billing-related adjustments and third-party payment amounts on its invoices.  These acts and practices violate the UCL.

515.     Sullivan and the other California Sub-Class members have been and continue to be injured as a direct and proximate result of LabCorp's violations of the UCL.

516.     Sullivan and the other California Sub-Class members either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive

128

rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value rate.

517.    Sullivan is entitled to pursue a claim against LabCorp on behalf of the California Sub-Class pursuant to Cal. Bus. Prof. Code §§ 17203, 17204, 17205, and/or 17206 for damages, restitution, and equitable relief to remedy LabCorp's violations of the UCL, and to move under Cal. Code Civ. Proc. § 1021.5 for costs and attorney's fees for any significant benefit conferred upon the general public or a large class of persons in relation to enjoining LabCorp from continuing to violate the UCL.

**COUNT VII**
**Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. Ann. §§501.201, *et seq.***
**(On behalf of Plaintiff Davidson and the Florida Sub-Class)**

518.    Plaintiff Tena Davidson herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

519.    LabCorp's lab services constitute "trade or commerce" as defined in Fla. Stat. Ann. §501.203(8).

520.    The Florida Deceptive and Unfair Trade Practices Act ("DUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. Ann. §501.204(1).

521.    As alleged herein and above, LabCorp has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other

129

services, including the practice of overbilling individual consumers well above reasonable fair market value rates and failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed. These acts and practices violate the DUTPA.

522. Davidson and the other Florida Sub-Class members have been and continue to be injured as a direct and proximate result of LabCorp's violations of the DUTPA.

523. Davidson and the other Florida Sub-Class members either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value.

524. Davidson is entitled to pursue a claim on behalf of the Florida Sub-Class against LabCorp pursuant to Fla. Stat. Ann. §§501.2105 and 501.211 for damages, equitable relief, and attorney's fees and costs to remedy LabCorp's violations of the DUTPA.

## COUNT VIII
### Violations of the Maryland Consumer Protection Act,
### Md. Code Ann., Com. Law §§13-101, *et seq.*
### (On behalf of Plaintiff Carter and the Maryland Sub-Class)

525. Plaintiff Mary Carter herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

526. LabCorp is a "person" as defined in the Maryland Consumer Protection Act ("MD-CPA"). Md. Code Ann., Com. Law §13-101(h).

527. The MD-CPA prohibits "any unfair or deceptive trade practice," which includes "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers," "[f]ailure to state a material fact if the failure deceives or tends to deceive," and "[f]alse or misleading representation of fact which concerns…[t]he reason for the existence or amount of a price reduction." Md. Code Ann., Com. Law §§13-301, 303.

528. As alleged herein and above, LabCorp has engaged in an unfair or deceptive trade practice in connection with its improper billing and debt collection for laboratory testing and other services, including the practice of overbilling individual consumers well above reasonable fair market value rates and failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed. These acts and practices violate the MD-CPA.

529. Plaintiff Carter and the other Maryland Sub-Class members have been and continue to be injured as a direct and proximate result of LabCorp's violations of the MD-CPA.

530. Plaintiff Carter and the other Maryland Sub-Class members either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value.

131

531.     Plaintiff Carter is entitled to pursue a claim on behalf of the Maryland Sub-Class against LabCorp under Md. Code Ann., Com. Law §13-408 for damages and attorney's fees and costs to remedy LabCorp's violations of the MD-CPA.

**COUNT IX**
**Violations of the New Jersey Consumer Fraud Act,**
**N.J. Stat. Ann. §56:8-1,** *et seq.*
**(On behalf of Plaintiff Marcus and the New Jersey Sub-Class)**

532.     Plaintiff Chaim Marcus repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

533.     LabCorp is a "person" as defined in the New Jersey Consumer Fraud Act ("NJCFA").  N.J.S.A. §56:8-1(d).

534.     The NJCFA states in pertinent part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practices....

> N.J.S.A. §56:8-2.

535.     As alleged herein and above, LabCorp has engaged in unconscionable commercial practices, deception, and fraud in connection with its improper billing and debt collection for laboratory testing and other services, including the practice of overbilling individual consumers well above reasonable fair market value rates and

132

failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed. These acts and practices violate the NJCFA.

536. Marcus and the other New Jersey Sub-Class members have been and continue to be injured as a direct and proximate result of LabCorp's violations of the NJCFA.

537. Marcus and the other New Jersey Sub-Class members either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value.

538. Marcus and the New Jersey Sub-Class are entitled to pursue a claim against LabCorp pursuant to N.J.S.A. §§56:8-2.11, 56:8-2.12 and/or 56:8-19 for damages, treble damages, equitable relief, and attorney's fees and costs to remedy LabCorp's violations of the NJCFA.

### COUNT X
**Violations of the Tennessee Consumer Protection Act of 1977,**
**Tenn. Code §§ 47-18-101,** *et seq.*
**(On behalf of Plaintiff Sheriff, Thomas and the Tennessee Sub-Class)**

539. Plaintiffs Holden Sheriff and Shontelle Thomas herein repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

540. LabCorp is a "person" as defined in the Tennessee Consumer Protection Act of 1977 ("TN-CPA"). Tenn. Code § 47-18-103(13).

541. LabCorp's laboratory testing services constitute "trade" or "commerce" under the TN-CPA. Tenn. Code § 47-18-103(19).

133

542. The TN-CPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," which includes "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions." Tenn. Code § 47-18-104(11).

543. As alleged herein and above, LabCorp has engaged in an unfair or deceptive act or practice in connection with its improper billing and debt collection for laboratory testing and other services, including the practice of overbilling individual consumers well above reasonable fair market value rates and failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed. These acts and practices violate the TN-CPA.

544. Sheriff, Thomas and the other Tennessee Sub-Class members have been and continue to be injured as a direct and proximate result of LabCorp's violations of the TN-CPA.

545. Sheriff, Thomas and the other Tennessee Sub-Class members either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value.

546. Sheriff and Thomas are entitled to pursue a claim on behalf of the Tennessee Sub-Class against LabCorp under Tenn. Code § 47-18-109 for actual damages, treble damages, equitable relief, and attorney's fees and costs to remedy LabCorp's violations of the TN-CPA.

## COUNT XI
### Violations of the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq.* (On behalf of Plaintiff Khazen and the Texas Sub-Class)

547. Plaintiff Ramzi Khazen herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

548. LabCorp is a "person" as defined in the Texas Deceptive Trade Practices-Consumer Protection Act ("DTP-CPA"). Tex. Bus. & Com. Code § 17.45(3).

549. LabCorp's laboratory testing services constitute "trade" or "commerce" under the DTP-CPA. Tex. Bus. & Com. Code § 17.45(6).

550. The DTP-CPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," which includes, *inter alia*, "making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions," and "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." Tex. Bus. & Com. Code § 17.46.

551. Additionally, a cause of action exists under the DTP-CPA for "any unconscionable action or course of action by any person" that causes "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50(a)(3).

552. As alleged herein and above, LabCorp has engaged in false, misleading, and/or deceptive acts or practices, as well as an unconscionable action or course of action, in connection with its improper billing and debt collection for laboratory testing

135

and other services, including the practice of overbilling individual consumers well above reasonable fair market value rates and failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed. These acts and practices violate the DTP-CPA.

553. Khazen and the other Texas Sub-Class members have been and continue to be injured as a direct and proximate result of LabCorp's violations of the DTP-CPA.

554. Khazen and the other Texas Sub-Class members either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value.

555. Khazen is entitled to pursue a claim on behalf of the Texas Sub-Class against LabCorp under Tex. Bus. & Com. Code § 17.50 for actual damages, treble damages, equitable relief, and attorney's fees and costs to remedy LabCorp's violations of the DTP-CPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against LabCorp as follows:

A. Certifying the nationwide Class and the Payor Sub-Class pursuant to Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as representatives of the Class, and designating their counsel as counsel for the Class;

B. Awarding Plaintiffs and the Class declaratory judgment as requested herein;

C. Awarding Payor Plaintiffs and the Payor Sub-Class restitutionary damages

136

or ordering LabCorp to disgorge into a common fund or a constructive trust all monies paid by Plaintiffs and the Payor Sub-Class in excess of the reasonable value for the clinical lab testing services performed;

D. Awarding Plaintiffs, the Class, and the Sub-Classes statutory and exemplary damages where permitted;

E. Permanently enjoining LabCorp from continuing to engage in the unlawful and inequitable conduct alleged herein;

F. Granting Plaintiffs, the Class, and the Sub-Classes the costs of prosecuting this action and reasonable attorneys' fees; and

G. Granting such other relief as this Court may deem just and proper under the circumstances.

137

## JURY DEMAND

Plaintiffs, the Class, and the Payor Sub-Class demand a trial by jury on all issues so triable.

Dated:  August 10, 2018

ELLIS & WINTERS LLP

By:  */s/* Jonathan D. Sasser
Jonathan D. Sasser
N.C. State Bar No. 10028
Jeremy M. Falcone
N.C. State Bar No. 36182
P.O. Box 33550
Raleigh, North Carolina 27636
Telephone Number: (919) 865-7000
Facsimile Number: (919) 865-7010
jon.sasser@elliswinters.com
jfalcone@elliswinters.com

*Liaison Counsel for Plaintiffs*

OF COUNSEL:

Robert C. Finkel
Sean M. Zaroogian
WOLF POPPER LLP
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone Number: (212) 759-4600
Facsimile Number: (212) 486-2093
rfinkel@wolfpopper.com
szaroogian@wolfpopper.com

*Counsel for Plaintiffs*

138

## CERTIFICATE OF SERVICE

I hereby certify that on the _10_ day of August, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jonathan D. Sasser
Jonathan D. Sasser