**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION**

| | |
|---|---|
| MICHELLE SULLIVAN and HOLDEN SHERIFF, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>        Defendant. | Case No. 1:17-cv-193-TDS-JLW |

**DEFENDANT LABORATORY CORPORATION OF AMERICA HOLDINGS'
BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS'
AMENDED COMPLAINT AND STRIKE CLASS ALLEGATIONS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION .......................................................................................... 1

NATURE OF THE MATTER ........................................................................ 2

STATEMENT OF FACTS ............................................................................. 2

QUESTIONS PRESENTED .......................................................................... 5

ARGUMENT ................................................................................................. 5

    I.    NEITHER LABCORP'S PRICES NOR ITS ALLEGED BILLING PRACTICES GIVES RISE TO A COGNIZABLE CLAIM ........................................... 6

        A.    Standard of Review .......................................................... 6

        B.    Plaintiffs' New Implied-in-Fact Contract Theory Fails ................... 6

            1.    Plaintiffs Do Not Plead An Implied-In-Fact Contract ........... 9

            2.    Any Implied-In-Fact Contract Would Include The List Price For Any Services ...................................................... 11

            3.    Plaintiffs Ignore This Court's Holding That LabCorp Has No Duty To Disclose Its Prices Before Rendering Services .......................................................................... 13

        C.    Plaintiffs' Statutory Claims Remain Deficient ............................... 15

    II.    PLAINTIFFS STILL CANNOT PROCEED AS A CLASS ................................. 18

        A.    Plaintiffs Have Done Nothing To Fix The Problems Inherent In The Putative Class ...................................................... 18

        B.    Plaintiffs' New Theory Raises Still More Individual Issues .......... 21

CONCLUSION ............................................................................................. 23

Case 1:17-cv-00193-TDS-JLW   Document 46   Filed 09/10/18   Page 2 of 30

## TABLE OF AUTHORITIES

Page(s)

CASES

*Allen v. Clarian Health Partners, Inc.*,
980 N.E.2d 306 (Ind. 2012) ...................................................................... 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................. 6

*Banner Health v. Med. Sav. Ins. Co.*,
163 P.3d 1096 (Ariz. Ct. App. 2007) ........................................................ 12

*Booe v. Shadrick*,
322 N.C. 567, 369 S.E.2d 554 (1988) ....................................................... 7

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) .............................................................. 16, 22

*Colomar v. Mercy Hosp., Inc.*,
242 F.R.D. 671 (S.D. Fla. 2007) .............................................................. 20

*Concrete Co. v. Lumber Co.*,
256 N.C. 709, 124 S.E.2d 905 (1962) ....................................................... 7

*Creech v. Melnik*,
347 N.C. 520, 495 S.E.2d 907 (1998) ....................................................... 7

*DiCarlo v. St. Mary Hosp.*,
530 F.3d 255 (3d Cir. 2008) ...................................................................... 13

*Gen. Tel. Co. v. Falcon*,
457 U.S. 147 (1982) .................................................................................. 23

*Hale v. Sharp Healthcare*,
180 Cal. Rptr. 3d 825 (Cal. Ct. App. 2014) ......................................... 19, 21

*Harrison v. Wal-Mart Stores, Inc.*,
170 N.C. App. 545, 613 S.E.2d 322 (2005) .............................................. 23

*Hefner v. Mission Hosp., Inc.*,
2014 WL 7591860 (N.C. Super. Ct. Dec. 8, 2014) ................................... 21

*Hercules Inc. v. United States*,
516 U.S. 417 (1996) .................................................................................. 7

PPAB 4432018v1

**Page(s)**

*Highland Paving Co. v. First Bank*,
   227 N.C. App. 36, 742 S.E.2d 287 (2013) ..................................................................... 7

*Kiousis v. Kiousis*,
   130 N.C. App. 569, 503 S.E.2d 437 (1998) .................................................................. 7

*Kreger v. Gen. Steel Corp.*,
   2010 WL 2902773 (E.D. La. July 19, 2010) ............................................................... 22

*Leslie v. Quest Diagnostics, Inc.*,
   2018 WL 1535235 (D.N.J. Mar. 29, 2018) .................................................................. 10

*Mahan v. Lab. Co. of Am.*,
   2011 WL 836674 (S.D. Ala. Mar. 9, 2011) ................................................................. 17

*Maldonado v. Oschner Clinic Found.*,
   493 F.3d 521 (5th Cir. 2007) ....................................................................................... 21

*Nationwide Mut. Ins. Co. v. Chantos*,
   293 N.C. 431, 238 S.E.2d 597 (1977) .......................................................................... 7

*Obando v. Lab. Co. of Am.*,
   2010 WL 8510159 (S.D. Fla. May 4, 2010) ................................................................ 17

*Root v. Allstate Ins. Co.*,
   272 N.C. 580, 158 S.E.2d 829 (1968) ....................................................................... 7, 9

*Snyder v. Freeman*,
   300 N.C. 204, 266 S.E.2d 593 (1980) ..................................................................... 10, 21

*Stack v. Abbott Labs., Inc.*,
   979 F. Supp. 2d 658 (M.D.N.C. 2013) ......................................................................... 6

*Thompson-Arthur Paving Co. v. Lincoln Battleground Assocs., Ltd.*,
   95 N.C. App. 270, 382 S.E.2d 817 (1989) .................................................................... 6

*Whitfield v. Gilchrist*,
   348 N.C. 39, 497 S.E.2d 412 (1998) ............................................................................ 7

**OTHER AUTHORITIES**

*Restatement (Second) of Contracts* § 4 ............................................................................ 11

PPAB 4432018v1

# INTRODUCTION

Plaintiffs' claims remain irrevocably flawed. In dismissing the original complaint, this Court wrote that "it is difficult to imagine how any other putative class member will be able to articulate a similar claim that would avoid the fatal deficiencies of the current complaint." (Doc. 32 at 34.) Plaintiffs' second attempt proves the truth of that statement.

Plaintiffs, who all had laboratory tests performed by LabCorp, still do not claim that LabCorp charged them for tests they did not receive or induced them to use LabCorp's services by providing deceptive prices. Their claims still reduce to the same basic premise as the first complaint: Plaintiffs think LabCorp's list prices are simply too high, and they still ask this Court to reset the prices of thousands of tests provided across the country to millions of patients for an indefinite period of time. The only difference is that Plaintiffs, having previously denied that any contract governed their transactions with LabCorp, now flip-flop and try to contort the law of implied-in-fact contracts to give them the extraordinary relief they seek. That attempt, like the original complaint, fails.

What is more, the amended complaint does nothing to fix the inherent defects in the proposed nationwide class. Plaintiffs' new theory of liability still requires the Court to examine thousands of tests, offered at different times in different places, to determine the supposed "fair market value" of each of those tests. In fact, the amended complaint makes class treatment even more unmanageable, requiring the Court to parse the conduct of each class member and oversee third-party discovery of dozens of competitors' prices.

The Court should strike the class allegations and dismiss the case with prejudice.

PPAB 4432018v1

## NATURE OF THE MATTER

Plaintiffs Michelle Sullivan and Holden Sheriff filed the first complaint on March 8, 2017, which this Court ultimately dismissed without prejudice. (*See* Doc. 32 at 34.) They sought leave to amend the complaint along with twelve additional Plaintiffs consisting mostly of the named plaintiffs in the parallel placeholder action, *Anderson et al. v. Laboratory Corporation of America Holdings*, Case No. 1:17-cv-1093-TDS-JLW. (*See* Doc. 35.) LabCorp did not oppose the motion on procedural grounds only, as the amended complaint consolidated the *Sullivan* and *Anderson* actions. (*See* Doc. 38.) This Court granted leave to amend on August 7, 2018. (*See* Doc. 41.) LabCorp now moves to dismiss the amended complaint and strike the class allegations.

## STATEMENT OF FACTS

Despite the pages of new allegations and the presence of twelve new Plaintiffs, the amended complaint changes little in terms of the relevant facts. LabCorp remains a "world leading life sciences company" that provides clinical laboratory testing services to millions of patients every year. (Doc. 42 ("Compl.") ¶ 43.) Like other health care providers, LabCorp sets retail (or list) prices for its services, which are the undiscounted rates LabCorp charges for the tests it performs. (*Id.* ¶ 6.) LabCorp sometimes negotiates lower rates it will accept as payment, such as the rates it negotiates with third-party payers like several of Plaintiffs' insurers. (*Id.*) Notably, "Plaintiffs are not disputing LabCorp's right to charge its patients higher prices than it typically receives." (*Id.* ¶ 10.)

PPAB 4432018v1

Plaintiffs each used LabCorp's services between 2015 and 2017, though their individual circumstances vary greatly. (*See id.* ¶¶ 121–398.)[1] Each allegedly received different numbers and types of tests provided by LabCorp: For example, Plaintiff Sullivan had thirteen tests run, including a "Vitamin D, 25-Hydroxy" test; Plaintiff Sheriff received eighteen individual tests; and Plaintiff Thomas received a number of tests including an "ANA Comprehensive Panel." (*Id.* ¶¶ 259, 288, 327–29, 350–52.)

Plaintiffs also came to LabCorp through different routes. Some, like Carter and Marcus, went directly to a LabCorp facility to have their samples taken. (*See* Compl. ¶¶ 149, 227.) Carter even signed a form authorizing LabCorp to charge her credit card for the services she received. (*Id.* ¶ 156.) Others, like Davidson and Martyn, had their samples sent to LabCorp by their physicians' offices, allegedly without knowing LabCorp would be the company performing the testing. (*Id.* ¶¶ 168–70, 240–41.) Still others, such as Anderson and Sheriff, also had samples sent to LabCorp by their physicians, but their knowledge of LabCorp's involvement is either unclear or unmentioned. (*Id.* ¶¶ 125, 280–81.) And many of the new Plaintiffs had urine samples taken at a single pain clinic in Alabama, which sent the samples to LabCorp. (*Id.* ¶¶ 180–82, 255, 303, 381.) Each pain clinic Plaintiff claims to have had no knowledge of LabCorp before receiving testing services. (*Id.* ¶¶ 183, 255, 304, 382.)

---

[1] The exception is Plaintiff Marcus, whose sons received tests. (Compl. ¶ 225.) For purposes of this motion only, LabCorp assumes Mr. Marcus is a proper party.

PPAB 4432018v1

LabCorp then billed each Plaintiff its list price for the tests performed.  (*Id.* ¶¶ 130, 152, 171, 208, 231, 242, 258, 282, 310, 349, 364.)  Plaintiffs carried different (or no) insurance during the time in question.  (*Id.* ¶¶ 122, 148, 167, 176, 203, 225, 239, 253, 278, 297, 322, 344, 360.)  Presumably according to their policies, each insurer denied coverage for one or more tests.  (*See, e.g.*, *id.* ¶ 123 ("Anderson's BlueCross Select Silver insurance plan provided no coverage for lab tests performed by LabCorp."); *id.* ¶ 151 ("Cigna denied coverage, stating in an EOB that: 'Your plan provides benefits only for covered expenses for treatment or diagnosis of an injury or illness.'").)

LabCorp's invoices accurately recorded the amounts paid for by insurance, as well as the amounts Plaintiffs owed for the tests provided.  (*See, e.g.*, *id.* ¶ 259.)  Plaintiffs admit the invoices they received from LabCorp listed the price for each test, the total cost of the services, the total amount of adjustments (if any), the total amount paid by insurance (if any), and the remaining amount owed by Plaintiffs.  (*See id.*)  According to the amended complaint, Carter, Martyn, Sullivan, and Watson have paid their invoices in full, while Davidson, Huffstutler, Sheriff, and Thomas have not paid at all.  (*Id.* ¶¶ 164, 174, 202, 249, 341, 358.)  The complaint does not explain the payment status of Anderson, Khazen, Marcus, McCay, Smith, or Wilson.

The remaining allegations are either the same or irrelevant.[2]  Plaintiffs still do not allege that LabCorp charged them for services they did not receive, or that LabCorp

---

[2] That includes the allegations of Plaintiffs' "Confidential Witness," which simply echo allegations that already appeared elsewhere in the original and amended complaints.

PPAB 4432018v1

induced them to choose its services with misleading promises or concealed the prices of its tests in any way. Yet Plaintiffs still insist LabCorp's list prices for tests are higher than their notion of the "fair market value" of those services (though they concede that LabCorp's list prices are lawful when charged to some consumers—just not them, or so they allege). (*Id.* ¶ 486.) As before, none of the Plaintiffs alleges a "fair market value" amount for any particular test received, or even a "fair market value" amount for the total panel of tests performed. Nor do Plaintiffs explain how to determine that "market value," instead promising that an "expert" will figure it out later. (*See id.* ¶ 87.) Plaintiffs alternatively offer the same method this Court has already rejected of simply "using the actual rates negotiated by a Plaintiff's healthcare insurer." (*Id.* ¶ 88; *see* Doc. 32 at 20.)

## QUESTIONS PRESENTED

1. Whether the amended complaint should be dismissed where Plaintiffs fail to state a claim upon which relief may be granted.

2. Whether the class allegations should be stricken where Plaintiffs still cannot facially satisfy Federal Rule of Civil Procedure 23.

## ARGUMENT

The amended complaint's new theory, which purportedly relies on the doctrine of implied-in-fact contracts, is incoherent and does nothing to avoid the fatal deficiencies of the original complaint. At base, Plaintiffs still ask this Court to act as the arbiter of what constitutes a "reasonable" price in the laboratory services industry. This Court rightfully rejected Plaintiffs' first invitation to do so, and it should do so again now. Accordingly, this Court should dismiss the amended complaint and put this case to rest.

PPAB 4432018v1

## I.     NEITHER LABCORP'S PRICES NOR ITS ALLEGED BILLING PRACTICES GIVES RISE TO A COGNIZABLE CLAIM.

### A.     Standard of Review.

As this Court is aware, "[u]nder Federal Rule of Civil Procedure 12(b)(6), 'a complaint must contain sufficient factual matter … to state a claim to relief that is plausible on its face.'"  *Stack v. Abbott Labs., Inc.*, 979 F. Supp. 2d 658, 663 (M.D.N.C. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  If, as here, a complaint's factual allegations do not provide a legal basis for relief, it must be dismissed.

### B.     Plaintiffs' New Implied-in-Fact Contract Theory Fails.

Because this Court has already held that Plaintiffs cannot state a claim using the law of quasi-contract, *see* Doc. 32 at 14–21, Plaintiffs now reverse course and try to shoehorn the very same claims this Court already dismissed into the law of implied-in-fact contracts.  The result is a hodgepodge that cherry-picks from the law of implied-in-fact contracts and quasi-contract as it suits Plaintiffs' claims.

Unlike the amended complaint, North Carolina law carefully distinguishes contracts implied in fact from contracts implied in law (also called quasi-contracts).[3]  An implied-in-fact contract is a valid, enforceable agreement between two parties, the terms of which have not been expressed in words but which are instead established by the parties' conduct.  *See Thompson-Arthur Paving Co. v. Lincoln Battleground Assocs.,*

_____

[3] LabCorp does not concede that Plaintiffs may bring their claims under North Carolina law.  For purposes of this motion only, LabCorp assumes, as this Court did in its first dismissal order, that North Carolina law applies.  (*See* Doc. 32 at 15.)

PPAB 4432018v1

*Ltd.*, 95 N.C. App. 270, 280–81, 382 S.E.2d 817, 823–24 (1989).  "Except for the method of proving the fact of mutual assent, there is no difference in the legal effect of express contracts and contracts implied in fact."  *Creech v. Melnik*, 347 N.C. 520, 526–27, 495 S.E.2d 907, 911–12 (1998).  An implied-in-fact contract is a "real" contract just the same as any express contract.  *Kiousis v. Kiousis*, 130 N.C. App. 569, 573, 503 S.E.2d 437, 440 (1998).  And so, like an express contract, an implied-in-fact contract must be "founded upon a meeting of the minds."  *Hercules Inc. v. United States*, 516 U.S. 417, 424 (1996); *see also Root v. Allstate Ins. Co.*, 272 N.C. 580, 585–86, 158 S.E.2d 829, 834 (1968).

By contrast, "[a] quasi contract or a contract implied in law ***is not a contract***." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988) (emphasis added). Rather, it is imposed by law in the ***absence*** of an enforceable contract to prevent unjust enrichment.  *Id.*  Unlike "real" contracts, quasi-contracts require neither a meeting of the minds nor expressions of mutual assent.  *See Nationwide Mut. Ins. Co. v. Chantos*, 293 N.C. 431, 443, 238 S.E.2d 597, 605 (1977).  And where a real contract exists (whether express or implied in fact), "the contract governs the claim and the law will not imply a contract."  *Concrete Co. v. Lumber Co.*, 256 N.C. 709, 710, 124 S.E.2d 905, 907 (1962). Accordingly, the traditional quasi-contract remedies of unjust enrichment and quantum meruit are unavailable where a valid contract exists.  *See Whitfield v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 414 (1998); *Highland Paving Co. v. First Bank*, 227 N.C. App. 36, 44, 742 S.E.2d 287, 293 (2013).

PPAB 4432018v1

The amended complaint blurs the line between these distinct bodies of law. While Plaintiffs previously disclaimed the existence of a valid contract between themselves and LabCorp, *see, e.g.*, Doc. 26 at 62, they now ask the Court to conclude that each Plaintiff formed an implied-in-fact contract with LabCorp. (*See, e.g.*, Compl. ¶¶ 467–68.) And each implied-in-fact contract, Plaintiffs claim, contains an open price term because there was no written agreement as to price, such that the Court should supply a "reasonable" price. (*See id.* ¶ 468.) In other words, Plaintiffs ultimately seek to use the same quantum meruit measure this Court already rejected. (*See* Doc. 32 at 14–21.) Plaintiffs admit that LabCorp ***can*** charge its list prices to patients, but maintain that to do so it ***must*** affirmatively disclose those prices before performing services, whether or not the patient asked what the prices would be. (*See* Compl. ¶ 10.)

There are three problems with this theory. First, Plaintiffs fail to plead the existence of an implied-in-fact contract. Second, even assuming a contract existed, it would include LabCorp's list price for the services rendered, not an open price term. And third, contrary to Plaintiffs' suggestion—and as this Court has already held— LabCorp had no duty to inform Plaintiffs of that list price before providing services. At base, the facts alleged allow for only two possibilities: Either an implied-in-fact contract exists for the list price that Plaintiffs now seek to avoid, or no contract exists and Plaintiffs must appeal to principles of quasi-contract, which this Court has already held they cannot do. Either way, Plaintiffs lose.

PPAB 4432018v1

### 1. Plaintiffs Do Not Plead An Implied-In-Fact Contract.

The amended complaint fails first and foremost because Plaintiffs fail to plead the existence of an implied-in-fact contract. Plaintiffs affirmatively claim "there [wa]s no meeting of the minds as to price" in their transactions with LabCorp, *see* Compl. ¶ 12, but North Carolina law ***requires*** a meeting of the minds for formation of a valid and enforceable agreement, *see Root*, 272 N.C. at 585–86, 158 S.E.2d at 834 ("A contract, express or implied, executed or executory, results from the concurrence of minds of two or more persons, and its legal consequences are not dependent upon the impressions or understandings of one alone of the parties to it.").

This allegation betrays Plaintiffs' misunderstanding of the difference between real contracts and quasi-contracts, and echoes the argument originally offered by Plaintiffs' counsel in defense of Plaintiffs' since-rejected quasi-contract claims: "You know, there's no contract. There's no meeting of the minds. The only understanding that the Plaintiff has is that they're going to get charged the insured rate." (*See* Doc. 26 at 39.) But under North Carolina contract law, "[i]t is not what either [party] thinks, but what ***both agree***." *Root*, 272 N.C. at 586, 158 S.E.2d at 834 (emphasis added). Here, there is no allegation that LabCorp agreed (or even understood Plaintiffs to assume) that Plaintiffs would be charged anything other than LabCorp's list price. Indeed, while LabCorp disagrees with Plaintiffs' characterization of its collection efforts, these allegations establish that LabCorp believed it was entitled to the full list price. (*See* Compl. ¶ 11.) Absent a meeting of the minds, Plaintiffs cannot plead the existence of an implied-in-fact contract.

PPAB 4432018v1

*See Leslie v. Quest Diagnostics, Inc.*, 2018 WL 1535235, at *6 (D.N.J. Mar. 29, 2018) (rejecting breach-of-contract claims because "Plaintiffs' Complaint does not contain any facts to support their allegations that Quest promised, through an implied contract, to bill Plaintiffs 'for the reasonable fair market value of Quest's services'"). And without a contract, Plaintiffs are left to rely on quasi-contract principles, which this Court has already rejected. (*See* Doc. 32 at 14–21.) *See also Leslie*, 2018 WL 1535235, at *6–7 (rejecting quasi-contract claims based on *quantum meruit* and unjust enrichment).

This failing extends to Plaintiffs' allegations regarding the parties' conduct. When determining the existence of mutual assent to form an implied-in-fact contract, "one looks not to some express agreement, but to the actions of the parties showing an implied offer and acceptance." *Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980). Yet here, Plaintiffs stress the ***lack*** of interaction between themselves and LabCorp, devoting a section to what they call "LabCorp's tenuous relationship with patients." (*See* Compl. ¶¶ 67–69.)

Plaintiffs' individualized allegations further illustrate the point, as many Plaintiffs disclaim having ***any*** knowledge of or interaction with LabCorp whatsoever prior to performance of the services. (*See, e.g.*, Compl. ¶ 170.) This is particularly true of the Plaintiffs at the Alabama pain clinic, which according to Plaintiffs sent their samples to LabCorp without their knowledge. (*See, e.g.*, *id.* ¶¶ 182–83.) Simply put, even setting aside the alleged absence of a meeting of the minds as to price, Plaintiffs allege no basis to conclude the parties by their conduct implied an offer and acceptance. In the absence

- 10 -

of properly pleading a "real" contract, Plaintiffs have done nothing more than restate their prior, quasi-contract theory of liability. As Plaintiffs acknowledge, this Court's prior holding forecloses reliance on a principles of quasi-contract here because "there is no claim for unjust enrichment where a plaintiff received the service she paid for and the defendant did not solicit or induce her into accepting it." (Doc. 32 at 19.) The amended complaint thus fails to cure the deficiency of Plaintiffs' rejected quasi-contract theory.

### 2. Any Implied-In-Fact Contract Would Include The List Price For Any Services.

Even if Plaintiffs properly pled the existence of an implied-in-fact contract between themselves and LabCorp, Plaintiffs wrongly assume that contract lacked a definite price term. In their motion for leave to file the amended complaint, Plaintiffs suggested that "the issues in dispute here can be determined based on principles of implied contract under the Restatement (Second) of Contracts, § 4." (Doc. 37 at 10.) That section includes an illustration that fits the facts here:

> A telephones to his grocer, "Send me a ten-pound bag of flour." The grocer sends it. A has thereby promised to pay the grocer's current price therefor.

*Restatement (Second) of Contracts* § 4 cmt. a, illus. 1. Plaintiffs suggest this illustration is inapt because it "did not establish a methodology for determining what the 'current price' is—an issue keenly in dispute here between the parties." (Doc. 37 at 10–11.)

But the "current price" is not in dispute at all. Indeed, Plaintiffs freely admit that LabCorp maintains a "list price" for its services, which is the price "patients are responsible for" when services are not covered by third-party payers. (*See* Compl. ¶ 50.)

PPAB 4432018v1

They also acknowledge that the lower rates Plaintiffs would prefer to pay are paid not by other similarly situated patients, but by "third-party payers" like insurance companies (*Id.* ¶ 5.)  Finally, Plaintiffs concede that they "are not disputing LabCorp's right to charge its patients higher prices than it typically receives" from those third-party payers. (*Id.* ¶ 10.)  In short, Plaintiffs offer nothing to suggest that, even assuming an implied-in-fact contract exists, it is for anything other than LabCorp's list price.[4]

Indeed, other courts considering similar claims in the health care context have found that the existence of list prices in the form of a provider's "chargemaster" establishes the price for the service.  *See, e.g.*, *Banner Health v. Med. Sav. Ins. Co.*, 163 P.3d 1096, 1101 (Ariz. Ct. App. 2007) (citing *Restatement*'s "grocer" illustration in holding that hospital's chargemaster rates "are the current prices for which the hospitals offer their services to members of the public" and explaining "that a hospital could choose to accept a reduced amount in satisfaction of the full billed charges—as, for example, when a hospital has a contract without an insurer or has agreed to provide services under a government program—does not mean that there is a missing price term"); *Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 310 (Ind. 2012) (citing "grocer" illustration in rejecting similar open price term argument and explaining that

---

[4] Plaintiffs' counsel implied as much at oral argument by suggesting price was a matter for the Court only because no contract existed.  (*See* Doc. 26 at 62 ("The last point I'll make, though, is I think Your Honor is right.  I'm sure Your Honor is right.  There's no contract here.  So it's up to the legal system to determine what the rates should be.").)

"[i]n the context of a contract for the provision of and payment for medical services, a hospital's chargemaster rates serve as the basis for its pricing").

These courts and others have refused to intervene to fill in a new more favorable price just like Plaintiffs seek here.[5]  Like this Court, these decisions recognize that courts are "ill-equipped to determine what reasonable hospital costs are, or to make a policy determination on behalf of the legislative branch."  *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 259–66 (3d Cir. 2008) ("What Plaintiff is asking the Court to do here is, put simply, to solve the problems of the American health care system, problems that the political branches of both the federal and state governments and the efforts of the private sector have, thus far, been unable to resolve.").  (*See also* Doc. 26 at 36 ("[T]hat may be the problem with the health care system, which I am not going to solve during the lawsuit, I will guarantee you that much.").)  Accordingly, this Court should once again decline Plaintiffs' invitation to act as a pricing control board for the laboratory services industry.

### 3.    Plaintiffs Ignore This Court's Holding That LabCorp Has No Duty To Disclose Its Prices Before Rendering Services.

Finally, Plaintiffs try to avoid this conclusion by suggesting that "LabCorp ***must*** secure patients' consent in advance of demanding payment of higher amounts" and that "[a]bsent a written agreement to pay list prices, LabCorp's charges ***must*** be limited to reasonable prices."  (Compl. ¶ 10.)  This allegation is the linchpin of the amended

---

[5] While these cases involved a written form signed by uninsured patients before receiving hospital services, they are no less relevant here; as set forth above, the same principles govern written and implied-in-fact contract under North Carolina law.

complaint's new theory, as "Plaintiffs are not [otherwise] disputing LabCorp's right to charge its patients higher prices than it typically receives." (*Id.*) Yet it flies in the face of this Court's previous holding that "***LabCorp was under no duty to volunteer its prices to patients*** who ordered testing through their physicians ***before performing laboratory testing***." (Doc. 32 at 11 (emphasis added).)

Plaintiffs offer no new authority to disturb or undermine that holding, as none exists. (*See id.* at 10–11 (observing that "[n]o party has cited a North Carolina decision supporting the proposition that a service provider must disclose its price to a customer before rendering its service" and that "[t]he court's own review has found no such case, either").) Plaintiffs do not dispute that LabCorp maintains a list price for its services, and the law imposes no duty on LabCorp to alert Plaintiffs to that price before performing services. That Plaintiffs chose not to ask what that list price was before accepting those services does not somehow allow them to avoid paying that price—and it does not somehow mean LabCorp breached any implied contract between it and Plaintiffs by simply asking for the payment it was entitled to. (*See, e.g.*, Doc. 32 at 23 ("Plaintiffs dismiss [the suggestion that they should have asked their health care providers about costs and insurance coverage before ordering the tests] as 'not a practical solution' and seek by this litigation to put the onus on LabCorp to preemptively decline to provide any testing a patient orders until it first determines whether that the testing is covered by insurance. There is no legal basis for this requirement, and the failure to do so, whatever it may be, is certainly not fraud.").)

PPAB 4432018v1

In the end, Plaintiffs' new implied-in-fact contract theory fails: first, because they have not adequately pled the existence of such a contract; second, because there is no "open" price term and because Plaintiffs plead the existence and application of LabCorp's list prices to their own tests; and third, because as this Court already held, LabCorp had no duty to disclose its list prices where Plaintiffs failed to ask for them.

## C. Plaintiffs' Statutory Claims Remain Deficient.

In the face of LabCorp's initial motion to dismiss, Plaintiffs essentially abandoned their statutory deceptive-trade-practices claims, and their approach to the amended complaint is no different. Plaintiffs offer nothing of substance beyond their failed implied-in-fact contract theory to ground these claims, alleging that "[e]ach invoice sent by LabCorp that overbills each Plaintiff and Class member … establishes a separate offense of the UDTPA." (Compl. ¶ 487.) As already explained by this Court, there is nothing unfair or deceptive about charging a price, even if it "exceeds what [LabCorp] charges an insurer." (Doc. 32 at 12.) This remains true of each of Plaintiffs' statutory claims.[6] Further, even if Plaintiffs managed to state a claim for breach of an implied

---

[6] *See, e.g., id.* at 7–13, 25–31 (dismissing claims under North Carolina, California, and Tennessee law); *Leslie*, 2018 WL 1535235, at *3–6 (dismissing identical claims under New Jersey, Florida, Colorado, Pennsylvania, Arizona, Michigan, Maryland, Nevada, and California law); *Canestaro v. Raymour & Flanigan Furniture Co.*, 984 N.Y.S.2d 630, at *3 (N.Y. Sup. Ct. 2013) ("[C]ourts are not empowered to set policy on prices … even charging excessive prices is not itself actionable under [N.Y. Gen. Bus. Law] § 349."); *Abbott Labs., Inc. v. Segura*, 907 S.W.2d 503, 507–11 (Tex. 1995) (Cornyn, J., concurring) (approving rule requiring more than mere price disparity to constitute unfair trade practice, as "[t]o hold otherwise would require courts to determine what constitutes a 'fair price' price").

PPAB 4432018v1

contract (they do not), the alleged breach of contract cannot support a deceptive-trade-practices claim.  *See, e.g.*, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 346 (4th Cir. 1998) ("The district court erred, however, by allowing plaintiffs to advance tort and [North Carolina] UTPA counts paralleling their breach of contract claims.  The crux of this matter is and always has been a contract dispute.").

Beyond that, Plaintiffs point only to the allegations of one Plaintiff, Ramzi Khazen, which they claim "remove[] this case from the *Bumpers* [*v. Community Bank of Northern Virginia*] ambit."  (*See* Doc. 37 at 15.)  The amended complaint alleges that Plaintiff Khazen called "one of LabCorp's local Austin labs and asked for prices" *after* he had already received services, and was allegedly quoted a price that differed from the one he was invoiced.  (Compl. ¶ 216.)  This, Plaintiffs claim, constitutes illegal "bait-and-switch pricing tactics."  (*Id.* ¶ 217.)  LabCorp denies engaging in any such conduct, but even taking the allegations at face value, Plaintiffs ignore that a "bait-and-switch" only works if a deceptive price is provided *first*.  As it is, the amended complaint remains devoid of *any* allegations that LabCorp represented *anything* about its prices to *any* Plaintiff *before* they decided to use LabCorp's services.  (*See* Doc. 32 at 23 ("Here, there is no claim that any Plaintiff was misled or induced into undergoing medical testing based on LabCorp's representation or omission.  That Plaintiff's now claim they are surprised by, or are placed in financial difficulty because of, LabCorp's pricing does not render LabCorp's differential pricing <u>fraudulent</u>.").)  Indeed, Plaintiffs' implied-contract-theory rests on the very premise that Plaintiffs *did not receive* any pricing information

PPAB 4432018v1

prior to receiving services, and, therefore, the price term for those services remained open. They cannot have it both ways.

Plaintiffs also claim Plaintiff Khazen received "threatening letters demanding payment," Doc. 37 at 15, an allegation repeated by many Plaintiffs in the amended complaint. At base, these allegations reduce to the claim that LabCorp's collection letters, "*if sent by a collection agency*, would have violated 15 U.S.C. § 807(4) [the Fair Debt Collection Practices Act]." (Compl. ¶ 224.) This is a non-sequitur. As Plaintiffs themselves recognize, LabCorp did not (and could not) violate the FDCPA. (*See id.* ¶ 138.)[7] Thus, while LabCorp disputes Plaintiffs' characterization of its collection practices, these allegations simply have no bearing on Plaintiffs' claims.[8]

*     *     *

Try as they might, just as this Court anticipated, Plaintiffs cannot articulate a claim that avoids the fatal deficiencies of the original complaint. Plaintiffs' claim still reduces to the simple fact that they think LabCorp's prices are too high, and they do not want to pay them. While LabCorp disagrees that its prices are unreasonable, it remains clear that

---

[7] *See also Obando v. Lab. Corp. of Am.*, 2010 WL 8510159, at *1 (S.D. Fla. May 4, 2010) (dismissing FDCPA claim based on letter from "LCA COLLECTIONS, A Division of Laboratory Corporation of America," because FDCPA does not regulate creditors who seek to collect debts in their own name); *Mahan v. Lab. Corp. of Am.*, 2011 WL 836674, at *2–3 (S.D. Ala. Mar. 9, 2011) (same).

[8] Additionally, this Court squarely rejected Plaintiffs' claims that LabCorp's alleged "aggregate" billing was in any way deceptive. (Doc. 32 at 23–24.) Thus, to the extent the amended complaint still alleges LabCorp's invoices are deceptive, it fails for the same reasons outlined by this Court.

PPAB 4432018v1

Plaintiffs cannot state a claim on that basis or any other. This Court should dismiss the complaint once again—this time with prejudice.

## II.   PLAINTIFFS STILL CANNOT PROCEED AS A CLASS.

The amended complaint not only fails to fix the problems inherent in the merits of Plaintiffs' claims, it also fails to address the myriad class issues previously raised by both LabCorp's original motion and this Court's opinion dismissing the original complaint. In fact, the amended complaint raises still more individualized issues that continue to make this case inherently unsuitable for class-wide treatment.

### A.   Plaintiffs Have Done Nothing To Fix The Problems Inherent In The Putative Class.

In its original motion, LabCorp identified numerous individualized issues inherent in Plaintiffs' claims that make this case improper for class-wide treatment on its face— and cited nearly as many decisions that reached the same conclusion in similar cases. (*See* Doc. 12 at 18–33.) While this Court's dismissal of the original complaint on the merits mooted LabCorp's motion to strike the original class allegations, the substance of the Court's discussion highlighted the inescapable impediments to class-wide treatment of Plaintiffs' claims.

The principal obstacle to class-wide treatment was and is that Plaintiffs' "reasonable value" theory "invites the court to make scores of fact-based determinations for class members on thousands of tests." (Doc. 32 at 14.) In trying to avoid this obstacle, Plaintiffs offered an "estoppel-type argument" that the "value would be artificially constrained, on a claimant-by-claimant basis, to no more than the rate each

- 18 -

claimant's insurer negotiated for that claimant." (*Id.* at 19.) This Court rejected that theory as contrary not only "to the Nation's basic free enterprise economic system," but also to "Plaintiffs' admission at the hearing that each insurer negotiated different rates for the same tests, which is proof that the reasonable value of such tests is a highly fact-bound determination." (*Id.* at 19–20 (citing numerous authorities for the common proposition that determination of a reasonable fee requires an individualized analysis of each medical service provided to each class member).)

More than a year has passed since LabCorp filed its initial motion, yet Plaintiffs still have not presented this Court with a meaningful proposal for how to address the commonality, typicality, and manageability problems that have plagued each and every non-settlement rate-setting class that has been attempted. Instead, Plaintiffs offer only that they "anticipate relying upon an expert to analyze the private third-party payer and government payer data to develop a formula to calculate the market rate for any given clinical lab test" (although Plaintiffs gloss over the fact that "any given lab test" includes more than 1600 different tests). (Compl. ¶¶ 109–10.) Courts have rejected reliance on "expert" determinations where the proposals were far more detailed than Plaintiffs' generic appeal here. *See, e.g.*, *Hale v. Sharp Healthcare*, 180 Cal. Rptr. 3d 825, 838 (Cal. Ct. App. 2014) (denying certification where "[plaintiff]'s proposal to submit an expert to testify to an across-the-board reduction in fees based on a percentage of the Chargemaster rate or even some statistical sampling is not an adequate evidentiary substitute for establishing commonality or entitlement to damages and such a method

- 19 -

would deny [defendant] the ability to defend").  Moreover, Plaintiffs raise still more

manageability problems through their apparent plan "to obtain the private third-party

payer proprietary rates in discovery," which they themselves recognize "are considered

proprietary and maintained as closely guarded secrets."  (Am. Comp. ¶¶ 87, 108–10.)

In other words, Plaintiffs continue to ignore that determining the so-called

reasonable value of services rendered would require examining at least: (1) the price

LabCorp charged for each and every test provided to each and every class member for an

indeterminate period of time; (2) the cost basis for each of those thousands of tests; (3) all

the prices charged to all other buyers—including third-party payers, the government, and

uninsured patients—for each one of those tests based on the place and time those tests

were performed; (4) the prices for each and every available competitor who offers the

same testing services; (5) the amount charged to each class member; (6) the value of the

services rendered to each class member; and (7) the amount paid by each class member,

if any, including discounts or other relief obtained.  (*See* Doc. 12 at 20–31.)

Just as before, these individualized inquiries—none of which are solved by the

amended complaint—prohibit class-wide treatment of Plaintiffs' claims.  *See, e.g.*,

*Colomar v. Mercy Hosp., Inc.*, 242 F.R.D. 671, 676–77 (S.D. Fla. 2007) (denying

certification where "the legality—or ultimate reasonableness—of Mercy's charges can

only be determined by looking at the specific bills in question and analyzing them against

factors like the market rate for the same services at other hospitals, Mercy's internal costs

for those particular services, and the prices Mercy charged for those services to patients

- 20 -

with health insurance or other benefits"); *Hale*, 180 Cal. Rptr. 3d at 838 (denying

certification under analogous class-action rule where "to determine the reasonableness of

the [hospital's] Chargemaster rates, one must analyze over 7,000 line items for individual

and bundled procedures, services, and goods derived for each individual patient");

*Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007) (affirming

denial of certification where "the amount paid by the class members themselves varies

significantly, as Ochsner offered numerous discounts to uninsured patients"); *Hefner v.

Mission Hosp., Inc.*, 2014 WL 7591860, at *8–9 (N.C. Super. Ct. Dec. 8, 2014) (denying

certification where "there are significant variations among putative class members

themselves as to how they may have been billed, negotiated discounts, paid their bill, or

qualified for revised charges based on ultimate Medicaid eligibility").

### B.    Plaintiffs' New Theory Raises Still More Individual Issues.

What is more, Plaintiffs' new theory actually adds to the number of individualized

issues preventing class treatment.  As discussed above, Plaintiffs' new implied-in-fact

contract theory requires careful examination of "the actions of the parties showing an

implied offer and acceptance."  *Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593,

602 (1980).  Even a cursory glance at Plaintiffs' differing circumstances illustrates that

Plaintiffs' contract theory is unavoidably individualized.

Plaintiff Marcus, for instance, "visited a LabCorp testing center with his two

children and provided LabCorp with his QualCare insurance card" before his children

received laboratory services onsite.  (Compl. ¶ 227.)  Plaintiff Carter also went to a

LabCorp facility to have blood drawn and tests run, where she signed a form authorizing LabCorp to charge her credit card for unpaid services. (*Id.* ¶¶ 148–56.) Plaintiff Anderson's dermatologist sent her blood samples to LabCorp, apparently without Anderson's knowledge of LabCorp's involvement. (*Id.* ¶ 125.) Plaintiffs Davidson, Martyn, and Thomas similarly had their blood drawn at their respective doctor's office, but did not know what particular lab company performed the testing. (*Id.* ¶¶ 168–70, 240–41, 345–46.) The Alabama pain clinic patients claim their samples were sent to LabCorp by the clinic without their knowledge or consultation, with some apparently under the mistaken assumption the services would be performed by a different lab altogether. (*See id.* ¶¶ 182–84, 254–55, 303–04.) Plaintiff Khazen, for his part, had his blood sample taken by a Planned Parenthood facility without knowing that it would send the sample to LabCorp rather than perform the tests in-house. (*Id.* ¶¶ 203–05.)

Even assuming the Court found that a given interaction with LabCorp gave rise to an enforceable implied-in-fact contract, that conclusion would offer no insight into whether the same was true of any of the other Plaintiffs. This problem plagues even just the fourteen named Plaintiffs, to say nothing of the potentially millions of would-be class members, each with their own differing set of circumstances. "Plaintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998); *see also Kreger v. Gen. Steel Corp.*, 2010 WL 2902773, at *18 (E.D. La. July 19, 2010) (refusing to certify class based on implied-in-fact contract theory because "[a]

PPAB 4432018v1

contract implied in fact arises from the parties' conduct which evidences a mutual intention to enter into a contract," and "[m]utual intent cannot be proven unilaterally"); *Harrison v. Wal-Mart Stores, Inc.*, 170 N.C. App. 545, 552, 613 S.E.2d 322, 328 (2005) (affirming trial court's refusal to certify class based on implied-in-fact contract theory because individualized issues predominated).

These flaws, which go to the heart of Plaintiffs' theory of liability, "are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982) Accordingly, this Court should strike Plaintiffs' class allegations.

## CONCLUSION

For all these reasons, Plaintiffs' claims should be dismissed with prejudice, and their class allegations should be stricken.

PPAB 4432018v1

Dated: September 10, 2018          Respectfully submitted,

/s/  Charles E. Raynal, IV

Charles E. Raynal, IV (NC Bar No. 32310)
Scott E. Bayzle (NC Bar No. 33811)
PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street, Suite 1400
Raleigh, North Carolina 27601
Phone: (919) 828-0564
Email: charlesraynal@parkerpoe.com
        scottbayzle@parkerpoe.com

Stephen G. Sozio
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114-1190
Phone: (216) 586-3939
Email:  sgsozio@jonesday.com

Heather M. O'Shea
JONES DAY
77 West Wacker Drive
Chicago, Illinois 60601-1692
Phone: (312) 782-3939
Email:  hoshea@jonesday.com

Aaron M. Healey
Dustin M. Koenig
JONES DAY
325 John H. McConnell Blvd.
Suite 600
Columbus, Ohio 43215-5017
Phone: (614) 469-3939
Email: ahealey@jonesday.com
Email: dkoenig@jonesday.com

*Attorneys for Defendant Laboratory
Corporation of America Holdings*

PPAB 4432018v1

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that the foregoing brief complies with the type-volume limitation provided in Local Rule 7.3(d). The foregoing brief contain 6,236 words in Times New Roman (13-point) proportional type. The word processing software used to prepare this brief was Microsoft Office Word 2016.

/s/ Charles E. Raynal, IV

*An Attorney for Defendant Laboratory Corporation of America Holdings*

PPAB 4432018v1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 10, 2018, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel or parties of record addressed as the following:

> Jonathan Drew Sasser
> Jeremy M. Falcone
> ELLIS & WINTERS, LLP
> 4131 Parkdale Avenue, Ste. 400
> Raleigh, NC 27612
> Email: jon.sasser@elliswinters.com
> jfalcone@elliswinters.com
>
> Robert C. Finkel
> WOLF POPPER LLP
> 845 Third Avenue 12th Floor
> New York, NY 10022
> Email: rfinkel@wolfpopper.com

/s/ Charles E. Raynal IV
_____
Charles E. Raynal, IV (NC Bar No. 32310)
PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street, Suite 1400
Raleigh, North Carolina 27601
Phone: (919) 828-0564
Email: charlesraynal@parkerpoe.com

PPAB 4432018v1