IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHERYL ANDERSON, MARY CARTER,      )
ROBERT HUFFSTUTLER, RAMZI          )
KHAZEN, CHAIM MARCUS, LILY         )
MARTYN, JONAH MCCAY, HOLDEN        )
SHERIFF, MICHELLE SULLIVAN,        )
SHONTELLE THOMAS, and JOSEPH       )
WATSON, individually and on        )
behalf of all,                     )
                                   )
            Plaintiff,             )
                                   )            1:17cv193
        v.                         )
                                   )
LABORATORY CORPORATION OF          )
AMERICA HOLDINGS,                  )
                                   )
            Defendant.             )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This putative class action challenging the billing practices of Defendant Laboratory Corporation of America Holdings ("LabCorp," although sometimes intermittently referred to by the parties as "Labcorp") returns to the court on Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3). (Doc. 99.) The motion is fully briefed, and the record is voluminous. (Docs. 111, 126, 190, 191, 192, 194, 213, 214.) Plaintiffs and LabCorp also filed a joint motion to seal materials relating to class certification. (Docs. 196, 197.) Plaintiffs filed an objection to the joint motion (Doc. 198), and LabCorp filed a reply (Doc. 199). On November 8, 2022,

the court heard oral argument on the pending motions. (Doc. 210.) For the reasons set forth below, the joint motion to seal will be granted and the motion for class certification will be denied.

## I.  BACKGROUND

### A.  Facts

The 138-page amended complaint, complete with a table of contents, contains extensive factual allegations about LabCorp, its "business model," and Plaintiffs' various claims. The key allegations are as follows, while more detailed allegations relevant to the analysis are set out later in this opinion.

LabCorp provides laboratory testing services to healthcare recipients internationally. (Doc. 42 ¶ 1.) It has more than 115 million patient encounters annually and has "generated more revenue from clinical lab testing services than any other company in the world." (Id.) Its "LabCorp Diagnostics" segment is an independent clinical laboratory business that provides the services that are the subject of Plaintiffs' amended complaint. (Id. ¶¶ 44-45.) LabCorp's customers are managed care organizations, biopharmaceutical companies, governmental agencies, physicians and other healthcare providers, hospitals, employers, patients, and consumers. (Id. ¶ 47.)

LabCorp routinely charges different customers different rates for the same services. These rates include an undiscounted retail rate, which Plaintiffs variously term the "fee schedule rate,"

2

"list price" (or "PLP"), and "chargemaster rate" (hereinafter, "list price"); the discounted rates LabCorp has negotiated with certain third-party payors, such as insurers; a standardized rate for Medicare clients; and rates that LabCorp negotiates with certain uninsured or underinsured individuals. (Id. ¶¶ 41, 48–49, 70–71, 87, 211.) These rates vary greatly, but the list prices tend to be much higher than the other rates. (Id. ¶¶ 5, 469.)

There are eleven Plaintiffs seeking class certification.[1] (Id. ¶¶ 23–36.) Their common complaint is that they were provided services by LabCorp for which they were charged LabCorp's list price, which they allege is grossly too high and without any prior agreement. Some Plaintiffs — Michelle Sullivan, Mary Carter, and Chaim Marcus — arranged for their diagnostic testing at a LabCorp facility, presumably in their states of residence, California, Maryland, and New Jersey, respectively.[2] (Id. ¶¶ 24, 28, 33, 149, 227, 323.) Others, including Shontelle Thomas (resides in Tennessee), and Lily Martyn (resides in New York but had services performed in North Carolina), authorized their physicians to order laboratory testing without knowing what lab would do the work.

_____

[1] There were initially fourteen Plaintiffs. (Doc. 111.) At the hearing on the class certification motion held on November 8, 2022, however, Plaintiffs' counsel confirmed that former Plaintiff Victoria Smith is no longer in the case, and Plaintiffs Tena Davidson and Michael Wilson are only pursuing individual claims. (Doc. 210 at 21–22.)

[2] Unlike the other Plaintiffs, Marcus procured testing services for his two sons, not himself. (Doc. 42 ¶¶ 225–31.)

3

(Id. ¶¶ 29, 34, 240-42, 345-47.) Still others, including Sheryl Anderson (resides in Alabama) and Ramzi Khazen (resides in Texas), had blood drawn by their health care providers who sent the specimens to LabCorp without advising either Plaintiff that the sample was being sent to any laboratory testing company. (Id. ¶¶ 23, 27, 121-25, 203-05.) At the time the services were rendered, none of these Plaintiffs had an express agreement with LabCorp to pay the list prices LabCorp subsequently charged. (E.g., id. ¶ 111, 156-58, 229, 325.) Most Plaintiffs had health insurance, but the relevant testing performed by LabCorp was not covered by their policies; Martyn and Thomas were uninsured. (Id. ¶¶ 122, 148, 167, 176, 203, 225-26, 239, 253, 278, 297, 322, 344, 360, 379.) As a result, Plaintiffs were charged LabCorp's list prices. Some Plaintiffs paid the charges under protest, while others have refused to pay.

**B. Procedural History**

Plaintiffs filed an eight-count complaint on March 8, 2017. (Doc. 1.) On March 28, 2018, the court granted LabCorp's motion to dismiss the original complaint in a memorandum opinion and order finding that the allegations failed to state a claim upon which relief could be granted. See Sullivan v. Laboratory Corp. of America Holdings, No. 1:17cv193, 2018 WL 1586471 (M.D.N.C. Mar. 28, 2018). On August 10, 2018, after the court granted leave, Plaintiffs filed an amended complaint. (Doc. 42.) The amended

4

complaint contains eleven claims, each on behalf of a putative class. In Count I, Plaintiffs seek a declaratory judgment that they never contractually assented to LabCorp's list prices, and therefore that LabCorp's right of recovery against them for the relevant laboratory testing services is limited to an implied-contract recovery of the "reasonable value" of the services rendered. (Id. ¶¶ 466–68.) Further, Plaintiffs seek a declaration that LabCorp's list prices exceed the "reasonable value" of its services. (Id. ¶ 470.) In Count II, as to all Plaintiffs who paid LabCorp's list prices, Plaintiffs seek to recoup the amounts they paid above the "reasonable value" of the services rendered. (Id. ¶¶ 480–82.) In Counts III–XI, Plaintiffs allege that LabCorp's billing practices violate various consumer protection statutes prohibiting unfair or deceptive trade practices in North Carolina, Alabama, California, Florida, Maryland, New Jersey, Tennessee, and Texas. (Id. ¶¶ 483–555.)

On August 16, 2019, this court granted LabCorp's subsequent motion to dismiss the amended complaint in part, dismissing Count II and any claim in Counts III–XI based on nondisclosure of CPT codes, and denied in part as to all other claims. (Doc. 55.) Following discovery, Plaintiffs filed the present class certification motion (Doc. 99), which is fully briefed (Docs. 111, 126, 190, 191, 192, 194, 213, 214, 218, 219, 220, 223) and ready

for decision.[3]  The court also held extensive oral argument on the claims on November 8, 2022.

## II.  ANALYSIS

### A.  Motion for Class Certification

#### 1.  Legal Standard

Plaintiffs move to certify one class and three subclasses under Federal Rule of Civil Procedure 23: the nationwide "Common Law Class" under Count I, composed of "Labcorp patients in the United States who, without any express contract with Labcorp that establishes the amount of fees to be paid to Labcorp, were charged based on [the list price] in excess of the reasonable market rate for the clinical lab testing services Labcorp performed" (Doc. 111 at 25);[4] the "Misleading Estimate Subclass" under Counts III, IV, VII, VIII, IX, X, and XI, composed of "Labcorp patients who were provided a written statement describing potential charges not based on [the list price], but were charged based on [the list price] in excess of the reasonable market rate for the clinical lab testing services Labcorp performed" (id. at 25-26); the "Urine Testing Subclass," composed of LabCorp patients in the United

_____

[3] The parties filed evidence and briefs under seal which "contain sensitive personal health information, Labcorp's nonpublic business information, and analysis describing confidential information of a non-party competitor to LabCorp."  (See Doc. 197 at 2.)

[4] All citations to the record are to the paragraph number or ECF docket page except for testimony.

6

States "who were overbilled for urine testing" done "in violation of industry practice" (id. at 26, 36); and the "Select Silver Subclass," composed of LabCorp patients "who were out-of-network with certain [BlueCross Blue Shield of Alabama] insurance plans" and charged the list price (id.).[5] Plaintiffs also move for appointment of class counsel under Rule 23(g). (Id. at 37; Doc. 99-1 at 2.) LabCorp opposes certification, challenging whether several of the prerequisites to certification have been met. (Doc. 190.)

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (citation and internal quotation marks omitted). To be certified, a party seeking class certification must "establish by a preponderance of the evidence that the action complies with each part of Rule 23." Brown v. Nucor Corp., 785 F.3d 895, 931 (4th Cir. 2015) (Agee, J., dissenting) (citing cases). First, a plaintiff must satisfy the four requirements set out in Rule 23(a): "(1) numerosity of parties; (2) commonality of factual and legal issues; (3) typicality of claims and defenses of class representatives; and (4) adequacy of representation." Gunnells v.

---

[5] The court assumes for the purposes of class certification that the potential Urine Testing and Select Silver subclass members were also allegedly charged the list price "in excess of the reasonable market rate." See infra note 10.

Healthplan Services, Inc., 348 F.3d 417, 423 (4th Cir. 2003); see Thorn v. Jefferson-Pilot Life Insurance Co., 445 F.3d 311, 317 (4th Cir. 2006) (citation and alterations omitted) ("Plaintiffs bear the burden of demonstrating satisfaction of the Rule 23 requirements and the district court is required to make findings on whether the plaintiffs carried their burden.")

Next, the proposed class must show that it is one of the three types of classes described in Rule 23(b). See Thorn, 445 F.3d at 318. Here, Plaintiffs seek to certify their Common Law Class pursuant to Rule 23(b)(2), which provides that a class action is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). (See Doc. 99-1 at 1.) Plaintiffs seek to certify the proposed subclasses pursuant to Rule 23(b)(3), which provides that a class action may be maintained if the court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). (See Doc. 99-1 at 2.) Although it is Plaintiffs' burden to demonstrate compliance with Rule 23, the court "has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014) (quoting Wal-Mart

8

Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (2011)).

At the class certification stage, "[m]erits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, 568 U.S. 455, 466 (2013). Otherwise, "[a]n evaluation of the probable outcome on the merits is not properly part of the certification decision." Id. (quoting Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment); Brown, 785 F.3d at 903 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." (quoting Amgen, 568 U.S. at 466)).[6] Persuasiveness of the class-wide evidence is, in general, a matter for a jury. See Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 459 (2016); Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 678 (9th Cir. 2022).[7] "[A]t the certification stage, the Plaintiff or the Court can refine the classes as necessary to bring

---

[6] The findings in this order apply only to the motion for class certification. See Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004) (noting that if the jury or factfinder's "finding on any fact differs from a finding made in connection with class action certification, the ultimate factfinder's finding on the merits will govern the judgment").

[7] Of course, if no reasonable juror could believe the class-wide evidence, Plaintiffs would lack common proof. Tyson Foods, 577 U.S. at 459 (comparing class certification standards to standards for summary judgment and directed verdict).

them within the requirements of Rule 23, if appropriate." See Abdur-Rahman v. Wells Fargo Bank N.A., No. 3:21-CV-00207-RJC, 2022 WL 481788, at *6 (W.D.N.C. Feb. 16, 2022) (citing Manuel v. Wells Fargo Bank, National Ass'n, No. 3:14CV238, 2015 WL 4994549 (E.D. Va. Aug. 19, 2015)).

### 2. Subclass Certification

As noted, Plaintiffs seek certification of one nationwide class (the "Common Law Class") and three subclasses: (1) the "Misleading Estimate Subclass," that includes "Labcorp patients who were provided a written statement describing potential charges not based on [the list price], but were charged based on [the list price] in excess of the reasonable market rate for the clinical lab testing services Labcorp performed" (Doc. 111 at 25); (2) the "Urine Testing Subclass," composed of LabCorp patients in the United States "who were overbilled for urine testing" conducted "in violation of industry practice" (id. at 26, 36); and (3) the "Select Silver Subclass," composed of LabCorp patients "who were out-of-network with certain BlueCross Blue Shield of Alabama insurance plans" and charged the list price. (Id.)

"When appropriate, a class may be divided into subclasses that are each treated as a class under this rule," Fed. R. Civ. P. 23(c)(5), so long as each subclass "independently meet[s]" the requirements for certifying a class under Rule 23. See Gunnells, 348 F.3d at 441 (citing In re A.H. Robins, 880 F.2d 709, 728 (4th

10

Cir. 1989)); Johnson v. Meriter Health Servs. Emp. Ret. Plan, 702
F.3d 364, 368 (7th Cir. 2012). In addition, under the Federal
Rules of Civil Procedure's requirement of notice pleading,
defendants in all lawsuits must be given notice of the specific
claims against them. See Fed. R. Civ. P. 8(a)(2) ("A pleading that
states a claim for relief must contain . . . a short and plain
statement of the claim showing that the pleader is entitled to
relief"). Although the notice pleading requirement does not
require detailed factual allegations in each instance, the
complaint must "give the defendant fair notice of what the . . .
claim is and the grounds upon which it rests." Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 555 (2007) (citation omitted). Here,
LabCorp argues that certification of the Plaintiffs' three
proposed subclasses is inappropriate because the "three proposed
subclasses are untethered from the Amended Complaint" and were
therefore not properly pleaded. (Doc. 190 at 35-36.) Plaintiffs,
in turn, argue that LabCorp "had notice of the subclass claims,"
ostensibly because the factual allegations animating the
underlying theories of liability were apparent on the face of
complaint, even if the precise theories of liability themselves
were not. (Doc. 192 at 18-21.)

LabCorp is correct. As a general matter, it is improper for
a plaintiff to seek certification of a class or subclass based on
new claims and facts not asserted in the complaint. See Anderson

v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d 525, 528-29 (5th Cir. 2008) (trial court abused discretion certifying class where plaintiffs' claims were "based on a totally different course of conduct" than those pleaded in the complaint); In re Canon Cameras, 237 F.R.D. 357, 358 n.1 (S.D.N.Y. 2006)("[T]he plaintiffs' instant motion [for class certification] attempts to rely, in part, on factual allegations that were not pled in the Second Amended Complaint. . . . [and therefore] in considering the plaintiffs' instant motion, the Court has considered only those factual allegations pled in the Second Amended Complaint"); Brown v. Am. Airlines, Inc., 285 F.R.D. 546, 560 (C.D. Cal. 2011)("Class certification is not a time for asserting new legal theories that were not pleaded in the complaint"); Trinidad v. Victaulic Co. of Am., No. 85-1962, 1986 WL 276 *3 (E.D. Penn. Aug. 15, 1986) (denying certification of subclass based on claims not alleged in complaint). Yet here, Plaintiffs do just this. For the reasons set out below, the court declines to find that the subclasses are properly before the court.

### a. "Misleading Estimate Subclass"

Plaintiffs first offer the "Misleading Estimate Subclass." As LabCorp rightly points out, the "Patient Acknowledgment of Estimated Financial Responsibility" ("Patient Estimate") and "credit card authorization form" are separate documents "at the heart" of this subclass. (Doc. 190 at 36.) Plaintiffs acknowledge

in their motion for class certification that the Misleading Estimate Subclass seeks relief, pursuant to Counts III through XI (except Counts V and VI), for "any person who signed a Patient Estimate or credit card authorization and was subsequently billed a price that was not disclosed on that form." (Doc. 111 at 24 (emphasis added); see also id. at 35 (asserting that "the members of the Misleading Estimate Subclass are ascertainable" because "Labcorp knows when it issues a credit card authorization form or Patient Estimate.").)

The amended complaint, however, does not once mention a "Patient Estimate" or otherwise plead that any named plaintiff ever received one. Nor could it have. As Plaintiffs candidly acknowledge, "the Patient Estimate only came into regular use after this lawsuit was filed." (Doc. 111 at 26, n.15). This much is confirmed by a separate, but related, putative class action filed against LabCorp in this district. See Nolan v. Laboratory Corp. of Am. Holdings, No. 1:21-cv-979 (M.D.N.C.). In that case, the complaint (also filed by Plaintiffs' counsel in this case) notes that "the Patient [Estimate] came into use by Labcorp on or about the date of filing of the Amended Complaint in Anderson . . . and accordingly is not referenced in that Amended Complaint."[8] (Case

---

[8] The court may take judicial notice of pleadings filed in other actions. See Anderson v. FDIC, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990) (explaining that "a district court should properly take judicial notice of its own records"); In re Deepwater Horizon, 934 F.3d 434, 440 (5th Cir. 2019)

No. 1:21-cv-979, Doc. 1 ¶ 1.)  The point of the parallel <u>Nolan</u> litigation, the complaint continues, was to properly "bring" the Patient Estimate "before the Court."  (<u>Id.</u>)  The first mention of the Patient Estimate in this case appears in Plaintiffs' briefing on the present motion for class certification.  (Doc. 111 at 10.) It indicates that the Patient Estimate is a two-page form that provides LabCorp's estimate of the "Health Plan Allowed Rate" for each test a patient orders based on the insurance information the patient disclosed to LabCorp, along with information about the deductible and co-insurance, as well as certain disclaimers.  (<u>See id.</u> at 10-12; Doc. 114-2.)  Because the amended complaint contained no allegation that the Patient Estimate was in any way misleading, it did not put LabCorp on notice that its use of the Patient Estimate ostensibly violated the law.  Therefore, the Patient Estimate cannot form the basis of LabCorp's liability in this action.

In like fashion, no claim in the amended complaint is based on LabCorp's allegedly misleading credit card authorization form. To be sure, the amended complaint refers to the credit card authorization only as to Plaintiff Mary Carter.  (Doc. 42 ¶¶ 156-58.)  But as LabCorp points out, Plaintiffs only mention Carter's

---

(taking judicial notice of the "docket and complaint" in a related but separate action because courts "may take judicial notice of prior court proceedings as matters of public record").

credit-card authorization form to establish that she signed no
express contract with LabCorp. (See Doc. 42. ¶¶ 156-58 (alleging
that Carter signed a credit card authorization that authorized
LabCorp to charge her credit card up to $484, which turned out to
be less than the list price, the balance of which she was later
billed); Doc. 190 at 36, n.11.) This assertion, while necessary
to show that Carter is a member of the putative "Common Law Class"
- one who "without any express contract with LabCorp . . . [was]
charged fees for clinical lab testing services performed by LabCorp
that were in excess of the reasonable market rates for the same
services" (Doc. 42, ¶ 449; see also Doc. 111 at 25) - is not
relevant to establishing that the document itself was "misleading"
or "deceptive" under state consumer protection laws.[9]   While
Plaintiffs now also argue that Plaintiff Marcus signed a credit

_____

[9] On January 25, 2023, Plaintiffs moved to supplement the record with an
affidavit from Jeffrey Frist, a non-party, which the court allowed.
(Docs. 218, 219, 224.)  In the affidavit, Frist states that on November
28, 2022, he went to a LabCorp patient service center and was presented
with a credit card authorization form to sign before LabCorp would
perform his lab tests.  (Id. ¶¶ 4-5.)  Plaintiffs contend that this
evidence establishes that LabCorp still uses the credit card
authorization form and, therefore, that Plaintiffs "Marcus and Carter's
claims are not moot." (Doc. 219 at 3.)  LabCorp contends that it only
uses the credit card authorization form infrequently when a patient's
insurance information cannot be accessed electronically and that
Plaintiffs' filing is tardy because they knew this during the discovery
period for class certification. (Doc. 220.)  LabCorp also points out
that Frist's form accurately disclosed LabCorp's list prices and that
all of his charges were paid by his insurer. (Id.)  Plaintiffs respond
that is only because LabCorp's policy is to disclose the list prices up
to an aggregate of $150, as evidenced by Plaintiffs Marcus's and Carter's
forms.   Even accepting Plaintiffs' contentions as true, they are
insufficient to revive the Misleading Estimate Subclass claim, which
fails for not having been pleaded.

card authorization form, the amended complaint similarly makes no reference to such a document, alleging rather that Marcus did not execute <u>any</u> agreement with LabCorp as to the scope of his services or the "potential costs or charges." (Doc. 42 ¶ 229.) Nowhere does the amended complaint allege that the credit card authorization was misleading.

These deficiencies are fatal to Plaintiffs' proposed Misleading Estimate Subclass. <u>See</u> <u>Anderson</u>, 554 F.3d at 529 ("[B]y defining the class based on" factual allegations not mentioned in the complaint, "the district court changed the nature of the lawsuit and rendered the complaint inadequate"); <u>Guadiana v. State Farm Fire & Cas. Co.</u>, 2009 WL 6325542, at *8 (D. Ariz. Dec. 18, 2009) (holding that a "theory of the case ... not raised in [the plaintiff's] amended complaint . . . cannot form the basis for class certification"). It is a fundamental proposition that "a complaint must do more than name laws that may have been violated by the defendant; it must also allege facts regarding what conduct violated those laws." <u>Anderson,</u> 554 F.3d at 528. Because the Plaintiffs have failed to do that here, the Misleading Estimate Subclass is not considered at this time for certification.

### b.   "Urine Testing" Subclass

For similar reasons, the "Urine Testing Subclass" also fails. According to Plaintiffs' motion for class certification, the Urine Testing Subclass consists of those who were "overbilled for urine

16

testing" conducted "in violation of industry practice" - an amorphously-phrased standard. (Doc. 111 at 26, 36.) The amended complaint, however, is silent about what allegedly constitutes the relevant "industry practice" much less how such individuals would be identified or even identifiable. More to the point, it omits any discussion about how LabCorp's conduct with respect to its urine testing services violates the law.[10] Put another way, Plaintiffs entirely fail to explain how the putative claims of the Urine Testing Subclass relate to any pleaded claim in the amended complaint.[11] In their reply brief, Plaintiffs attempt to remedy this pleading deficiency by arguing that "the Court could find" that LabCorp's "billing practice violates industry standards" and therefore "constitutes an unfair and deceptive trade practice." (Doc. 194 at 20.) However, it is axiomatic under the Federal Rules

---

[10] Plaintiffs' motion for class certification, moreover, does not define what "industry practice" LabCorp unlawfully violates merely by billing the list price for urine tests. (See Doc. 111 at 36 (vaguely asserting that "[n]o patient would knowingly consent to a methodology for billing for urine tests that was inconsistent with industry standards" (emphasis added).) Plaintiffs do argue that "industry practice is to pay one price for generating multiple test results from a single urine sample . . . , [but] Labcorp charges [list prices] separately for each compound tested." (Id. at 20-21.) Plaintiffs do not explain, however, why charging underinsured patients the list price is inherently unlawful. Nevertheless, for the reasons discussed herein, these fatal defects cannot be cured in Plaintiffs' reply brief.

[11] To be sure, Plaintiffs claim in their motion for class certification that "[t]his subclass applies to Counts III through XI (except Counts V and VI)." (Doc. 99-1 at 2.) Plaintiffs' proposed subclass is not cognizable, however, because there are no allegations in the complaint that LabCorp's practices with respect to urine testing are somehow unlawful.

17

of Civil Procedure that the complaint itself contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8 (a)(2). The court cannot, as Plaintiffs wish, "infer a claim for relief and, in addition, certify a class on the basis of that inference without violating . . . the rules of civil procedure." Trinidad v. Victaulic Co. of Am., No. CIV. A. 85-1962, 1986 WL 276, at *3 n.3 (E.D. Pa. Aug. 15, 1986).[12]

### c. "Select Silver Subclass"

Plaintiffs' "Select Silver" subclass suffers from the same defects. That subclass seeks damages for all patients "who were Select Silver patients, or had other [Blue Cross Blue Shield] insurance that was out-of-network with Labcorp and were charged [the patient list price]." (Doc. 111 at 25-26.) In their reply brief, Plaintiffs argue that "the Court could . . . find" that LabCorp's "fail[ure] to take reasonable measures to inform BCBS subscribers that Labcorp was out of network" violates "the Alabama

---

[12] It is true, of course, that the Federal Rules of Civil Procedure do not require a plaintiff to plead legal theories in the complaint. See Johnson v. City of Shelby, Miss., 574 U.S. 10, 11 (2014) (per curiam). The problem here, however, is that Plaintiffs' invocation of "industry practice" as the relevant comparator to LabCorp's list price comes - at the class certification stage - too late in the day. Allowing such a constructive amendment at the class certification stage "would unfairly prejudice the defendant, by depriving it of the notice it needs to conduct effective discovery." Faulconer v. Centra Health, Inc., 808 F. App'x 148, 154 (4th Cir. 2020)(unpublished)(explaining that constructive amendment of the complaint at the summary judgment undermines the complaint's purpose and thus can unfairly prejudice the defendant).

consumer protection statute." (Doc. 192 at 20.) Plaintiffs, however, fail to connect this subclass with allegations pleaded in the amended complaint. Although the amended complaint contains vague allegations that LabCorp "knew or was reckless in failing to know" that patients in this putative subclass might not get insurance coverage for LabCorp's testing services, <u>see</u> Doc. 42 ¶ 126, 185, it does not contain any allegations that LabCorp <u>acted deceptively</u> by failing to disclose to patients or providers that those with a BlueCross BlueShield "Select Silver" plan were out-of-network with LabCorp. As such, the court cannot certify the "Select Silver" subclass. <u>See</u> <u>Guadiana</u>, 2009 WL 6325542, at *8.

The Urine Testing Subclass and the Select Silver Subclass, moreover, fail for a second reason. Local Rule 7.3(h) provides that "[a] reply brief is limited to discussion of matters newly raised in the response." LR 7.3(h); <u>see</u> <u>Henry v. N.C. Acupuncture Licensing Board</u>, No. 1:15CV831, 2017 WL 401234, at *4 (M.D.N.C. Jan. 30, 2017). Courts in this district "have consistently held that '[r]eply briefs . . . may not inject new grounds . . . [and that an] argument [that] was not contained in the main brief . . . is not before the Court.'" <u>Tyndall v. Maynor</u>, 288 F.R.D. 103, 108 (M.D.N.C. 2013) (quoting <u>Triad International Maintenance Corp. v. Aim Aviation, Inc.</u>, 473 F. Supp. 2d 666, 670 n.1 (M.D.N.C. 2006)). It is improper, under Local Rule 7.3(h), to wait until a reply brief to provide support for an unsupported argument made in a

19

party's first motion. See <u>Jarvis v. Stewart</u>, No. 1:04CV00642, 2005 WL 3088589, at *1 (M.D.N.C. Nov. 17, 2005). In sum, Rule 7.3(h) "exists to give the replying party a chance to rebut newly raised arguments, not to give the replying party an unfair advantage in having a chance to make new arguments that should have been raised initially." <u>Pouncey v. Guilford County</u>, No. 1:18CV1022, 2020 WL 1274264, at *5 (M.D.N.C. Mar. 17, 2020).

Here, Plaintiffs submitted the Urine Testing and Select Silver Subclasses in their original motion for class certification but failed to provide support that these subclasses satisfied Rule 23(a).[13] (See Doc. 111 at 27-33.) As LabCorp points out, as to the Urine Testing and Select Silver Subclasses, Plaintiffs "say[] nothing about numerosity or ascertainability," and "no common question is identified." (Doc. 190 at 37.) In their reply, Plaintiffs put forward new arguments to support their contention that the Urine Testing and Select Silver Subclasses meet the requirements of Rule 23(a). (Doc. 192 at 20-21.) However, "[t]his is precisely the kind of briefing tactic that Local Rule 7.3(h) seeks to prevent." <u>Pouncey</u>, 2020 WL 1274264, at *5-6. Accordingly, LabCorp is correct that Plaintiffs have failed to meet their burden to satisfy the Rule 23(a) requirements for the

---

[13] Other Rule 23 factors were addressed by Plaintiffs in their brief (Doc. 111 at 36-37), and LabCorp addressed these arguments in its response (Doc. 190 at 39-40).

Urine Testing and Select Silver Subclasses.

For all these reasons, Plaintiffs' motion to certify the proposed subclasses is denied.[14]

### 3. Rule 23(a) Requirements

The decision whether to certify a class is governed by Federal Rule of Civil Procedure 23, under which certification requires two showings: first, that the four "prerequisites" of Rule 23(a) are met; and second, that the case fits within at least one of the three "types of actions" described in Rule 23(b). A failure on either front dooms the class. See EQT Prod. Co., 764 F.3d at 357. The court begins with Rule 23(a), under which LabCorp argues that the plaintiffs cannot satisfy two prerequisites: commonality and typicality. LabCorp also contends that each proposed class fails to meet Rule 23's "implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" Id. at 358 (quoting Hammond v. Powell, 462 F.2d 1053, 1055 (4th Cir. 1972)).

---

[14] As discussed below, however, the court also finds that, even assuming these subclasses were properly pleaded, they nevertheless fail to meet the requirements of Rule 23 and therefore cannot be certified. See United States v. Ford, 703 F.3d 708, 711 n.2 (4th Cir. 2013) ("Where a court makes alternative holdings to support its decision, each holding is binding precedent."); Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 253 (3d Cir. 2006) ("Courts routinely decide cases on multiple grounds, each of which has been fully litigated and given careful consideration due to their potentially dispositive role in the case.")

Case 1:17-cv-00193-TDS-JLW   Document 225   Filed 02/13/23   Page 21 of 69

Each requirement will be addressed in turn.[15]

### a. Commonality

Commonality means that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This "requires the plaintiff[s] to demonstrate that the class members have suffered the same injury" in the sense that "[t]heir claims . . . depend upon a common contention," the determination of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 564 U.S. at 350 (internal quotation marks omitted); Brown, 785 F.3d at 909 ("Wal-Mart instructs that plaintiffs must present a common contention capable of being proven or disproven in 'one stroke' to satisfy Rule 23(a)(2)'s commonality requirement."). "'This provision does not require that all the questions of law and fact raised by the dispute be common,' just that any 'dissimilarities between the claims do not impede a common resolution.'" Johnson v. Jessup, 381 F. Supp. 3d 619, 634 (M.D.N.C. 2019) (quoting 7A Charles Alan Wright et al., Federal Practice and Procedure § 1762 (3d ed. 2018)). "A question is not common . . . if its resolution turns on a consideration of the individual circumstances of each class member." Thorn, 445 F.3d at 319 (citation omitted).

---

[15] LabCorp does not contest the adequacy of representation or the numerosity of the Common Law Class. (See Doc. 190 at 27-33).) Because the Common Law Class fails on other grounds, the court assumes, without deciding, that those requirements of Rule 23(a) are met.

Plaintiffs proffer the following common questions of law for the Common Law Class: (1) "[W]hen a patient and Labcorp do not agree in writing on a specific price for a test before the test is performed, as a matter of law is Labcorp entitled to be paid only the reasonable value of its services in performing the test?"; and (2) "Did patients, solely by virtue of having lab tests performed by Labcorp, consent to [the list price]?" (Doc. 111 at 29-30.) Plaintiffs also argue the common questions of fact are (1) whether LabCorp can justify its list prices, and (2) determining the common method of determining the reasonable value of tests. (Id. at 30-31.)

In response, LabCorp argues that Plaintiffs' motion has an "overarching flaw" because Plaintiffs' theory of liability is premised on "LabCorp charg[ing] [the list price] in excess of the reasonable value for each test and panel" yet Plaintiffs fail to provide a "common methodology for determining the 'reasonable value' of LabCorp's tests." (Doc. 190 at 23.) LabCorp contends that "to establish class-wide liability, Plaintiffs' theory requires a uniform method to calculate reasonable value for each test and panel" and that "Plaintiffs cannot meet their burden under Rule 23 with promises of future proof." (Id. at 23-24.) LabCorp also argues that, rather than Plaintiffs' proposed questions, "the real question is: what is the nature of the relationship between each class member and Labcorp?" (Id. at 30.) It contends "a court

must first rule out the existence of an express contract and an implied-in-fact contract" by "examin[ing] the parties' conduct" before the court may "determine whether an implied-in-law contract exists." (Id.) Accordingly, LabCorp concludes, Plaintiffs' Common Law Class does not satisfy Rule 23(a)'s commonality requirement. (Id.)

In reply, Plaintiffs argue that determining the "reasonable value" does not "require[] an individualized inquiry into the various factors considered in pricing each test." (Doc. 192 at 6.) Rather, they argue, regardless of whether an implied-in-fact or implied-in-law contract exists,[16] "the party seeking compensation [LabCorp] has the burden of showing its price is reasonable." (Id. at 7 (emphasis added).) They further contend that "[t]o justify certification, Plaintiffs need not develop a methodology for determining a 'reasonable' price," and that the court should select from "one of the Plaintiffs' suggested benchmarks" to determine the extent of LabCorp's liability. (Id. at 9.) Finally, Plaintiffs argue LabCorp's individualized factual questions are "irrelevant" as "the central fact is that class members did not agree to [the list price]." (Id. at 12.)

Each of Plaintiffs' proposed questions will be addressed in

---

[16] This court has previously discussed the doctrinal distinction in North Carolina law between implied-in-fact and implied-in-law contracts. Anderson v. Lab'y Corp. of Am. Holdings, No. 1:17CV193, 2019 WL 3858320, at *3 (M.D.N.C. Aug. 16, 2019).

turn.

### i. Burden

As a preliminary matter, each party argues that the other has failed to meet the burden regarding the "reasonableness" of the list price.[17] (See Doc. 190 at 23-24; Doc. 192 at 7-8.) Plaintiffs are correct that, under a contract implied-in-law theory, at the merits stage "[t]he burden is always upon the complaining party to establish by evidence such facts as will furnish a basis for [the] assessment [of reasonable value], according to some definite and legal rule." Cline v. Cline, 128 S.E.2d 401, 404 (N.C. 1962) (citation omitted). However, the Fourth Circuit has "stressed in case after case that it is not the defendant who bears the burden of showing that the proposed class does not comply with Rule 23, but that it is the plaintiff who bears the burden of showing that the class does comply with Rule 23."[18] Thorn, 445 F.3d at 321 (rejecting plaintiff's argument that the defendant had the "burden of proving that its statute of limitations defense presents issues that must be decided on an individual basis"); see In re Hydrogen

_____

[17] Plaintiffs also appear to attempt shift the burden to the court. (See Doc. 192 at 9 ("To justify [class] certification, Plaintiffs need not develop a methodology for determining a 'reasonable' price. Rather, . . . the Court could establish reasonable amounts Labcorp is entitled to collect without prior patient agreement by using one of the Plaintiffs' suggested benchmarks.").)

[18] Plaintiffs erroneously rely on cases outside of the class certification context. (See Doc. 192 at 7-8.)

Peroxide Antitrust Litigation, 552 F.3d 305, 318 (3d Cir. 2008), as amended (Jan. 16, 2009) ("A party's assurance to the court that it intends or plans to meet the [Rule 23] requirements is insufficient.").

Further, the court's prior order denying LabCorp's motion to strike Plaintiffs' class allegations made clear that it was the Plaintiffs who would bear the burden of establishing a method to determine "reasonable value" at class certification. See Anderson v. Laboratory Corp. of America Holdings, No. 1:17CV193, 2019 WL 3858320, at *9-*10 (M.D.N.C. Aug. 16, 2019) (stating that "Plaintiffs have not yet moved to certify a class and therefore need not yet meet these standards," and "although LabCorp identifies serious hurdles Plaintiffs will have to overcome to achieve class certification — Plaintiffs' chances of attaining certification are not so wholly nonexistent as to justify the drastic remedy of striking their class allegations" (emphasis added)).[19] Thus, the court rejects Plaintiffs' contention that LabCorp bears the burden of proving Plaintiffs' contract implied-in-law claim class does not satisfy Rule 23 by failing to "demonstrate that it has a rational basis for charging [the list

---

[19] Contrary to this court's previous order, Plaintiffs assert, without providing support, that "[t]o justify certification, Plaintiffs need not develop a methodology for determining a 'reasonable' price." (Doc. 192 at 4; see Doc. 120-2 ¶ 8 (plaintiffs' expert was asked whether "there [is] a methodology for determining a fair and reasonable price that could be applied to all of Labcorp's tests").)

26

price]." (Doc. 192 at 9.) Instead, the court will determine whether Plaintiffs have satisfied their burden, as promised, to "develop a formula to calculate the [reasonable] market rate for any given clinical lab test." Anderson, 2019 WL 3858320, at *10 (quoting Doc. 42 ¶ 110).

### ii. Application

Here, Plaintiffs have failed to make the necessary showing for commonality. For example, Plaintiffs' first proposed common question of law is overbroad. Even if all class members "d[id] not agree in writing on a specific price for a test before the test is performed," it is still possible that LabCorp could be entitled to recover the list price "as a matter of law," under an implied-in-fact contract theory, rather than "reasonable value" under an implied-in-law contract. See Ellis Jones, Inc. v. Western Waterproofing Co., 312 S.E.2d 215, 218 (N.C. Ct. App. 1984) ("Because plaintiff's pleadings and evidence were broad enough to support the alternative theories of an implied in fact contract and an implied in law contract, the trial judge should have instructed on both theories."); Whitfield v. Gilchrist, 497 S.E.2d 412, 415 (N.C. 1998) ("[Q]uantum meruit is not an appropriate remedy when there is an actual agreement between the parties."). In North Carolina, "[a]n implied contract refers to an actual contract inferred from the circumstances, conduct, acts or relations of the parties, showing a tacit understanding." Archer

27

v. Rockingham County, 548 S.E.2d 788, 793 (N.C. Ct. App. 2001); Southeast Caissons, LLC v. Choate Construction Co., 784 S.E.2d 650, 656–57 (N.C. Ct. App. 2016)(citation omitted) ("A valid contract may be implied in light of the conduct of the parties and under circumstances that make it reasonable to presume the parties intended to contract with each other."); but see Forsyth County Hospital Authority, Inc. v. Sales, 346 S.E.2d 212, 214 (N.C. Ct. App. 1986) ("Failure to agree on the amount of compensation entitles the physician to the reasonable value of his services.").

Whether an implied-in-fact contract may be inferred depends on "the circumstances, conduct, acts or relations" between LabCorp and each individual class member. Archer, 548 S.E.2d 793. For instance, this question could turn on whether and, if so, how much information was known about LabCorp's pricing by a class member or his agent before receiving a test. See Anderson, 2019 WL 3858320, at *10 n.21 (citing Manecke v. Kurtz, 731 S.E.2d 217 (N.C. Ct. App. 2012) (discussing liability of principals for contracts entered into by their agents)); see also Convergent Acquisitions & Development, Inc. v. Credent Real Estate, Inc., No. 3:06CV324, 2007 WL 2137829, at *3 (W.D.N.C. July 23, 2007) ("A principal may be liable for the actions of his agent if it is determined that the agent acted within either his actual or apparent authority to take said actions.") (citing McGarity v. Craighill, Rendleman, Ingle & Blythe, P.A., 349 S.E.2d 311, 313 (N.C. Ct. App. 1986))).

28

An individual class member may be liable for the list price if an agency relationship was created with his physician and the physician ordered a test from LabCorp on that patient's behalf.[20] Some individual class members may be liable for the list price if their physician informed them about it beforehand. Others may have learned about the list price from resources such as the Laboratory Contact Center, which provides patients with information about LabCorp's list prices upon request.[21] (Doc. 190-3 at 72, 83-85.) And still others may have learned the list price from LabCorp's Patient Portal, a digital application through which patients can, among other things, "review billing statements, pay bills, and contact LabCorp with billing and pricing questions, among other things." (Doc. 190-2 at 74, Doc. 190-3 at 103-104.) Thus, as LabCorp contends, a common "question is: what is the nature of the relationship between each class member and Labcorp?" (Doc. 190 at 30.) Rather than presenting a question which would "resolve an issue that is central to the validity of each one of

---

[20] LabCorp representatives "continually have conversations with providers surrounding new tests, new pricing, existing pricing[,]" insurance coverage, and "customizable patient fee schedules." (Doc. 190-3 at 130, 143-44, 160-61.) Plaintiffs also submit the common question of "Did patients, solely by virtue of having lab tests performed by Labcorp, consent to PLPs?" Answering this question in any meaningful way for the parties would require the court to explore a possible agency relationship for each individual class member, along with circumstances that might otherwise create a valid contract with LabCorp.

[21] LabCorp may instead seek to recover the list price pursuant to a possible financial agreement between an individual class member's physician and LabCorp. (See Doc. 63 at 42-45.)

the claims," Dukes, 564 U.S. at 350, the question of whether LabCorp would be limited to recover the "reasonable" value of its services "turns on a consideration of the individual circumstances of each class member." Thorn, 445 F.3d at 319 (citation omitted); see also Scarlett v. Air Methods Corp., No. 16-CV-02723-RBJ, 2020 WL 2306853, at *11 (D. Colo. May 8, 2020) (finding that class action certification was not appropriate because whether an implied-in-fact contract had been formed would require findings of fact applicable to each patient's individual case); Agostino v. Quest Diagnostics Inc., 256 F.R.D. 437, 467 (D.N.J. 2009) ("With the contracts at issue potentially numbering in the thousands and containing materially different provisions, proof of a right to recovery under one contract does not necessarily establish a classwide right to recovery.").[22]

Setting aside the particularized nature of Plaintiffs' claims, Plaintiffs have also failed to satisfy their burden of establishing a method to determine "reasonable value" to achieve class certification. Plaintiffs, citing the report of Zirui Song, M.D., Ph.D. (Docs. 120-2), "intend to present expert testimony

---

[22] To the extent Plaintiffs seek to avoid these particularized questions through their class definition, they attempt to create an improper fail-safe class. See EQT Prod. Co., 764 F.3d at 360 n.9 (citing Messner v. Northshore Univ. HealthSys., 669 F.3d 802, 825 (7th Cir. 2012) (explaining that a fail-safe class "is defined so that whether a person qualifies as a member depends on whether the person has a valid claim")). "Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." Messner, 669 F.3d at 825.

30

showing that a common methodology can be used to determine the reasonable value of tests on a Class-wide basis." (Doc. 111 at 31.) In his report, Dr. Song determines "the [LabAccess Program ('LAP')] price is an ideal option for a fair, reasonable, and conservative benchmark." (Doc. 120-2 ¶ 40.) In response, LabCorp argues that LAP pricing is only available for 565 tests, or 0.53 percent of the total test codes, and "allows self-pay patients to prepay . . . a discounted price prior to testing." (Doc. 190 at 12.) The discount varies depending on the particular test and "take[s] into account, among other factors, that up-front payment eliminates the risk of non-payment and the expense of post-test billing and collections." (Id.)

Dr. Song also lists various other benchmark prices, previously identified to the court, that in his opinion "would be fairer and more reasonable compared to the [list] prices." (Doc. 120-2 ¶ 46.) Dr. Song proposes that these benchmarks, "[r]elative to the [list] price, . . . would be a step towards fair and reasonable." (Id. ¶ 47 (emphasis added); see id. ¶ 50 (opining that each existing price option is "reasonable" besides the list price).) As such, Plaintiffs argue, the court would only need to determine which benchmark establishes the "reasonable" price and then apply that finding across the possible tests. (Doc. 111 at 21-22.) These benchmarks include the "client price" paid by healthcare provider clients following negotiation, the "pixel

31

price," paid for 10 advertised tests capable of "home-based sample collection," and the LAP price. (Doc. 120-2 ¶¶ 12, 14, 48.) Dr. Song's report contends that "Labcorp's process for setting its [list prices] is [a] completely arbitrary" 20% markup from the Client Price. (Id. ¶ 45.) Dr. Song's report concludes that, while "each of the [pricing] options described above is reasonable" in his opinion, "the LAP price is the best available benchmark because it is the price LabCorp charges when it cannot take advantage of patients' lack of information." (Id. ¶ 50.) Ultimately, Dr. Song believes that LabCorp patients should only be responsible for an indefinite "fair and reasonable price." (Id. ¶ 51.)

However, as LabCorp properly contends, Dr. Song's report falls far short of Plaintiffs' promise to "develop a formula to calculate the market rate for any given clinical lab test" subject to common proof. (See Doc. 42 ¶ 110.) First, LAP pricing – Dr. Song's preferred benchmark - is only available for 565 tests, or 0.53 percent of the total test codes, so it fails to provide a uniform formula "for any given clinical lab test." (Id.; see Doc. 190 at 26.) Put another way, because LAP pricing is not available for over 99 percent of all LabCorp tests, it is by definition an inappropriate "benchmark" for all but one percent of LabCorp's tests. Tellingly, Dr. Song could only produce the LAP for 26 of the 74 unique LabCorp tests administered to the class representatives in this case – meaning that, even for his preferred

32

benchmark, he could only determine the "reasonable" price for 35 percent of the tests administered to the class representatives. (Doc. 120-2 ¶ 23.)

The LAP pricing benchmark that Dr. Song proposes is also flawed because, under his theory, the reasonable value of any particular lab-testing service is determined by the <u>average</u> amount of all 565 tests for which is a LAP price. (<u>Id.</u> ¶ 23.) It is well-established, however, that averages can mask significant variation across individual cases. <u>See</u> David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in Reference Manual on Scientific Evidence* 213, 266 & n.130 (Fed. Jud. Ctr., 3d ed. 2011); Louis Kaplow & Steven Shavell, *Fairness Versus Welfare*, 114 Harv. L. Rev. 961, 1193 (2001). Accordingly, Dr. Song's LAP model – by using averages – fails to accurately measure the "reasonable value" of any single lab test and therefore "flouts the requirement that an expert's model reliably prove that <u>each</u> putative class member suffered individual injury." <u>In re Aluminum Warehousing Antitrust Litig.</u>, 336 F.R.D. 5, 57 (S.D.N.Y. 2020) (emphasis added). Put differently, Dr. Song's model necessarily fails because it does not capture the "reasonable value" of any particular test and therefore "do[es] not reflect the individual characteristics of class members." <u>Gates v. Rohm & Haas Co.</u>, 655 F.3d 255, 266 (3d Cir. 2011) (stating that averages evidence "is not 'common' because it is not shared by all (possibly even most) individuals in the

33

class") (internal quotations marks omitted); <u>Sheet Metal Workers</u> <u>Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC</u>, Civ. A. No. 04-5898, 2010 WL 3855552, at *30 (E.D. Pa. Sept. 30, 2010) (internal quotation marks omitted)(noting that methodology using average prices was insufficient as a common method capable of showing class-wide injury because "averaging by definition glides over what may be important differences"); <u>Reed v. Advocate Health</u> <u>Care</u>, 268 F.R.D. 573, 591 (N.D. Ill. 2009) ("Measuring average base wage suppression does not indicate whether each putative class member suffered harm from the alleged conspiracy. In other words, it is not a methodology common to the class that can determine impact with respect to each class member."); <u>Freeland v. AT & T</u> <u>Corp.</u>, 238 F.R.D. 130, 151 (S.D.N.Y. 2006) (internal quotation marks omitted) (rejecting a methodology that used an average overcharge for cellular phones to show class-wide impact and noting that "averages that include prices for different products can lead to serious analytical problems").

For similar reasons, Plaintiffs' suggestion that the client list price[23] could serve as an appropriate benchmark also fails. Even if the court determined that any class member was "unreasonably" overcharged with a list price approximately 20

---

[23] The client list price, in contrast to the LAP Price discussed above, "is the retail price charged to healthcare providers (rather than to a patient or insurer)." (Doc. 190 at 10.)

34

percent above the "reasonable" client price, this would not justify a finding that any other class plaintiff was likewise injured. See, e.g., Harrison v. Blount EMS, Inc., No. 7:08-CV-1039-LSC, 2010 WL 11615000, at *4-5 (N.D. Ala. Jan. 12, 2010) ("The accumulation of this [individualized] evidence may determine the reasonableness of the charges made to a particular class member, but it will establish nothing regarding any other class member."); Colomar v. Mercy Hospital, Inc., 242 F.R.D. 671, 677 (S.D. Fla. April 11, 2007) ("Put differently, the legality — or ultimate reasonableness — of [defendants'] charges can only be determined by looking at the specific bills in question and analyzing them" individually); Day v. Sarasota Drs. Hosp., Inc., No. 8:19-CV-1522-T-33TGW, 2020 WL 4539145, at *6 (M.D. Fla. July 23, 2020)("As numerous courts have recognized, determining the reasonableness of charges for medical services entails an individualized, fact-dependent analysis.") As discussed above, the evidence the court would be required to examine would require an individualized inquiry and vary from test to test.[24] Analyzing this evidence for a particular class member may determine the reasonableness of the charges made in that plaintiff's instance, but it is insufficient to establish the reasonableness of charges for any other potential

---

[24] For instance, the client list price can sometimes be identical to, or higher than, the patient list price. (See Doc. 190 at 3; Doc. 190-8 at 92 n.147.)

class member.

Additionally, Plaintiffs have not demonstrated why LabCorp should accept government-imposed rates (essentially nationalizing LabCorp's business) or negotiated rates with commercial payors (essentially eliminating LabCorp's ability to decide what price to charge in a free-market economy), for every test and every patient. (Cf. Doc. 32 at 19-20 ("Plaintiffs' theory is fundamentally flawed because it . . . presumes that a negotiated rate is as a matter of law the only reasonable rate."); see Doc. 120-2 ¶ 50 (opining that "it would be overly conservative to use the Client List price as a benchmark because it is rarely (if ever) paid in practice.").) Thus, as Plaintiffs' expert "admittedly has no [common] answer to that question," the court "can safely disregard what he has to say." See Dukes, 564 U.S. at 354-55. Without a common methodology to determine the reasonable value of LabCorp's 100,000 or more tests, there is "nothing to unite all of Plaintiffs' claims" that "touch and concern all members of the class." See id. at 359 n.10.

At bottom, Plaintiffs' mere "inten[t]" to provide "expert testimony showing that a common methodology can be used to determine the reasonable value of tests on a Class-wide basis" (see Doc. 111 at 31) fails to satisfy their burden at class certification. "Rule 23 does not set forth a mere pleading standard." Dukes, 564 U.S. at 350. Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance

36

with the Rule — that is, he must be prepared to prove that there are <u>in fact</u> sufficiently numerous parties, common questions of law or fact, etc." <u>Id.</u> (emphasis in original); <u>see</u> <u>EQT Prod. Co.</u>, 764 F.3d at 361-62 (stating that a district court must definitively determine that the requirements of Rule 23 have been satisfied and that "[c]ertifying a class in the face of . . . uncertainty runs afoul of the rule that 'actual, not presumed, conformance with Rule 23(a) [is] . . . indispensable'") (citing <u>General Telephone Co. of Southwest v. Falcon</u>, 457 U.S. 147, 160 (1982)).

Simply put, how to calculate the "reasonable value" of a particular test is "the essential question on which [Plaintiffs'] theory of commonality depends" for each proposed class. <u>Dukes</u>, 564 U.S. at 354. For the reasons stated above, Defendants correctly state that an evaluation of the "reasonableness" of the list price for each test "requires an individualized inquiry into the various factors considered in pricing each test." (Doc. 190 at 18 (citing Doc. 190-3 at 45-48).) Proposing to proceed on an average value across several different tests simply does not suffice. Thus, Plaintiffs have failed to carry their burden to establish commonality for any of their proposed classes. Class certification is therefore inappropriate.

### b. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of

37

the class." Fed. R. Civ. P. 23(a)(3). "The essence of the
typicality requirement is captured by the notion that 'as goes the
claim of the named plaintiff, so go the claims of the class.'"
Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th Cir. 2006)
(quoting Broussard v. Meineke Discount Muffler Shops, Inc., 155
F.3d 331, 340 (4th Cir. 1998)). Typicality is satisfied so long
as plaintiffs' claims are not "so different from the claims of
absent class members that their claims will not be advanced by
plaintiff's proof of his own individual claim." Id. at 466-67;
see Lienhart v. Dryvit Systems Inc., 255 F.3d 138, 146 (4th Cir.
2001) (explaining that "'a class representative must be part of
the class and possess the same interest and suffer the same injury
as the class members'") (quoting Falcon, 457 U.S. at 156)). To
determine whether a named plaintiff's "claims or defenses" are
typical of those of the proposed class, the court will frequently
have to undertake some investigation of "the merits of the
plaintiff's underlying claim." Dukes, 564 U.S. at 351; see id. at
349 n.5 (noting that "the commonality and typicality
requirements . . . tend to merge").

Plaintiffs argue that the named Plaintiffs "have suffered the
same injuries as Common Law Class members: they were billed PLP
instead of a price set at the reasonable value of the testing
service." (Doc. 111 at 32.) They also contend that "Plaintiffs'
claims all boil down to the same legal issue: what is Labcorp

38

entitled to bill to perform a test when it has not agreed with the plaintiff on a price." (Id.)

The court finds that Plaintiffs have also failed to demonstrate that their claims and defenses are typical of the claims or defenses of the class. As discussed above, the question of whether LabCorp would be limited to recover the "reasonable value" of its services "turns on a consideration of the individual circumstances of each class member." Thorn, 445 F.3d at 319 (citation omitted); see also Agostino, 256 F.R.D. at 467. Even if Plaintiffs can show that the list price charged to a Plaintiff by LabCorp for a particular test is unreasonable as to that Plaintiff's unique and fact-specific circumstances, Plaintiffs can show nothing about the other tests. Further, the record reflects that none of the Plaintiffs agreed to arbitration or class-waiver clauses that might bar other potential class members' claims.[25] See Jensen v. Cablevision Sys. Corp., 372 F. Supp. 3d 95, 122-24 (E.D.N.Y. 2019)(finding that named plaintiffs, who were not subject to arbitration agreement, failed to satisfy typicality requirement where putative class members had arbitration provisions); Tan v. Grubhub, Inc., No. 15-CV-05128-JSC, 2016 WL 4721439, at *3 (N.D. Cal. Jul. 19, 2016), aff'd sub nom. Lawson v.

---

[25] All patients who use LabCorp's Patient Portal "agree to arbitrate their disputes with LabCorp and to a class-action waiver." (Doc. 190 at 14; see Doc. 190-3 at 12.) Those who use the Patient Portal number in the millions. (Doc. 190-2 at 74.)

39

_Grubhub, Inc._, 13 F.4th 908 (9th Cir. 2021) ("[T]ypicality . . . [is] lacking where the lead plaintiff was not subject to the same arbitration provisions as unnamed plaintiffs."); _King v. Capital One Bank (USA)_, N.A., No. 3:11-CV-00068, 2012 WL 5570624, at *14 (W.D. Va. Nov. 15, 2012) (finding that the plaintiff not subject to the arbitration provision "could not fairly and adequately represent in this Court the interests of individuals who are bound to pursue their claims in arbitration"). Thus, the question of what LabCorp is entitled to recover requires a transaction-by-transaction inquiry into each class members' individual circumstances, and therefore Plaintiffs' claims are not typical of proposed class members.

Furthermore, Plaintiffs' claims of injury are dependent on the price charged for only a small fraction of LabCorp's more than 100,000 clinical lab tests and panels. (Doc. 190 at 8.) To be sure, Plaintiffs need not allege an injury for every test LabCorp offers to satisfy typicality. Here, however, the record demonstrates that LabCorp maintains that it sets its list price for each test based on numerous factors analyzed by its pricing department, and Plaintiffs merely claim that _sometimes_ that price for a particular test is unreasonable.[26] It is difficult to imagine

---

[26] At least one named Plaintiff has conceded that, in his particular circumstances, the list prices charged for several tests were "reasonable." (Doc. 191 at 32.)

how Plaintiffs, even if they could show that the list price for a particular test was unreasonable, can demonstrate that LabCorp's list prices for thousands of other tests are unreasonable without having to address myriad factual issues for each test.

In sum, Plaintiffs have failed to provide this court with a common nexus sufficient to tie these varying claims together. Therefore, the court finds that, even if commonality were met, the proposed classes do not satisfy the typicality requirement.

### c. Ascertainability

In addition to Rule 23(a)'s enumerated requirements of numerosity, commonality, typicality, and adequacy, Plaintiffs must also satisfy "an implicit threshold requirement that the members of a proposed class be readily identifiable," a requirement "sometimes called 'ascertainability.'" Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 654-55 (4th Cir. 2019) (citation omitted). "[A] class cannot be certified unless a court can readily identify the class members in reference to objective criteria." Id. at 655 (quoting EQT Prod. Co., 764 F.3d at 358). "The goal is not to identify every class member at the time of certification, but to define a class in such a way as to ensure that there will be some administratively feasible way for the court to determine whether a particular individual is a member at some point." Id. at 658. In other words, the ascertainability requirement dictates that "class litigation should not move forward when a court cannot

41

identify class members without extensive and individualized fact-finding or 'mini-trials.'" Id.

Plaintiffs do not argue that the Common Law Class is ascertainable but instead contend that "[t]he Fourth Circuit has not applied an 'ascertainability' requirement to a Rule 23(b)(2) class." (Doc. 111 at 33 n.19.) In response, LabCorp contends that the Fourth Circuit does apply an ascertainability requirement to Rule 23(b)(2) classes. (Doc. 190 at 29.) Furthermore, it argues that the Common Law Class is not ascertainable because Plaintiffs have failed to demonstrate a method of identifying patients (1) "to whom [the list price] were disclosed before testing;" (2) "to whom [the list price] were disclosed by an intermediary" such as their physician; or (3) "who were charged (or paid) a [list price] that was 'in excess' of the reasonable value for the specific test performed." (Id. at 27.) LabCorp also argues that Plaintiffs' proposed classes "are . . . impermissible fail-safe classes" which "violate the ascertainability requirement and raise due process concerns." (Id. at 28-29.) In reply, Plaintiffs "urge this court to follow the cases holding an ascertainability requirement does not apply to Rule 23(b)(2)." (Doc. 192 at 15.) Alternatively, they argue the 23(b)(2) classes are ascertainable as "Labcorp keeps track of the collectability rate of non-covered services . . . , which means that it is able to identify patients whose insurance did not

42

pay for a test" and were charged the list price.  (Id.)

###    i.    Fourth Circuit Standard for Rule 23(b)(2) Classes

As a threshold matter, the Fourth Circuit has not explicitly held that the implied requirement of ascertainability - that plaintiffs identify an administratively feasible way to identify class members - should apply to Rule 23(b)(2) cases.  However, the court finds the reasoning in J.O.P. v. U.S. Department of Homeland Security persuasive.  338 F.R.D. 33 (D. Md. 2020).  There, the court found that the Fourth Circuit's opinion in EQT Production Company v. Adair "at least suggests" that the ascertainability requirement applies to Rule 23(b)(2) actions.  338 F.R.D. at 51. In that case, "the Fourth Circuit discussed ascertainability with respect to the plaintiffs' 'ownership classes' for which plaintiffs sought class certification under both Rules 23(b)(2) and (3)."  Id. at 51 (citing EQT Prod. Co., 764 F.3d at 357) (emphasis in original).[27]  "Specifically, the classes that the Fourth Circuit ultimately ordered the district court to reconsider on ascertainability grounds sought 'a declaration that the class members [were] true owners of CBM, as well as payment of the royalties they believe [defendants] have improperly escrowed or

---

[27] Thus, Plaintiffs are plainly incorrect when they assert "the discussion of ascertainability [in EQT] was [only] in the context of a Rule 23(b)(3) class."  (Doc. 192 at 15 n.6.)  The only discussion in EQT specific to a Rule 23(b)(3) class concerned "underpayment of royalties" class claims. See EQT Prod. Co., 764 F.3d at 364-71.

43

withheld.'" Id. (quoting EQT Prod. Co., 764 F.3d at 358) (emphasis in original). The Fourth Circuit neither "suggest[ed] a different analysis for each rule" nor "distinguish[ed] between rulings that involve declaratory relief, covered by Rule 23(b)(2), and rulings rewarding royalties or other individualized relief." Id. Thus, the J.O.P. court held that "threshold requirement of ascertainability that is implicit in Rule 23 applies to Plaintiffs' propose class." Id. So it is here. Accordingly, the court finds that the ascertainability requirement applies to Plaintiffs' proposed Common Class.

### ii. Application

Here, LabCorp is correct that even were Plaintiffs' proposed Common Law Class able to overcome the other hurdles for certification, it fails to satisfy the ascertainability requirement. As discussed above, each class depends on a class member being charged a list price "in excess of the reasonable market rate" despite no agreement or awareness of the potential charges. (See, e.g., Doc. 111 at 25.) However, even assuming LabCorp possesses the internal records to identify each potential class member who was charged the list price (see Doc. 111 at, 33 n.19, 35), Plaintiffs have failed to identify an objective and administratively feasible way to determine whether a potential

44

class member (or their "agent")[28] nevertheless was aware of or agreed to pay the list price.[29] Such determinations and extensive fact finding would require the sort of "mini trials" that the ascertainability requirement is designed to avoid. See Peters v. Aetna Inc., 2 F.4th 199, 242 (4th Cir. 2021). LabCorp is correct that Plaintiffs' attempt to curtail these administrative problems through their class definitions creates impermissible fail-safe classes; whether a potential plaintiff qualifies as a member cannot depend on whether LabCorp is unable to raise various individual fact-driven defenses. See supra note 22. Thus, the court finds that Plaintiffs' Common Law Class fails to satisfy the ascertainability requirement.

### 4. Rule 23(b) Requirements

In addition to meeting the Rule 23(a) requirements, "the [proposed] class action must fall within one of the three categories enumerated in Rule 23(b)." Gunnells, 348 F.3d at 423. Plaintiffs seek to certify their Common Law Class under Rule 23(b)(2). (Doc. 111 at 33-34, 36-37.) Plaintiffs also seek to certify the Misleading Estimates, Select Silver, and Urine Testing

---

[28] See supra notes 20-21 and accompanying text.

[29] Additionally, there is already evidence in the record that the list price is not "unreasonable" or "in excess of the reasonable market rate" in at least some instances. See supra note 26. Plaintiffs have not submitted an administratively feasible way of distinguishing where the list price charged was "reasonable" and where it was not.

subclasses pursuant to Rule 23(b)(3), and alternatively, under Rule 23(b)(2). (Doc. 111 at 34-36.)[30]

### a. Rule 23(b)(2)

Certification under Rule 23(b)(2) is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[31] Fed. R. Civ. P. 23(b)(2). By its terms, Rule 23(b)(2) therefore sets forth two requirements: (1) that the defendant acted or refused to act on grounds generally applicable to all class members, and that (2) final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to the class, is appropriate.

---

[30] As explained above, the Plaintiffs' proposed subclasses cannot be certified because the underlying claims were not adequately pleaded. See supra, Part II-A-2 ("Subclass Certification"). However, the court also finds that, in the alternative, these subclasses fail to satisfy the requirements of Rule 23. See Ford, 703 F.3d at 711 n.2. For purposes of the following analysis, moreover, the court considers Plaintiffs' claims as to the credit card authorization in the Misleading Estimate Subclass in the context of Plaintiffs' overarching claim that LabCorp is limited to seek a "reasonable value" for its services and not some other disclosed value. (Doc. 111 at 25 (defining the Misleading Estimate Subclass as those "Labcorp patients who were provided a written statement describing potential charges not based on PLP, but were charged based on PLP in excess of the reasonable market rate for the clinical lab testing services Labcorp performed") (emphasis added).)

[31] "Because of the group nature of the harm alleged and the broad character of the relief sought, the (b)(2) class is, by its very nature, assumed to be a homogenous and cohesive group with few conflicting interests among its members. Accordingly, Rule 23(b)(2) classes are 'mandatory,' in that 'opt-out rights' for class members are deemed unnecessary and are not provided under the Rule." Berry v. Schulman, 807 F.3d 600, 608-09 (4th Cir. 2015) (quotations omitted).

See Thorn, 445 F.3d at 330; Shook v. Board of County Commissioners of County of El Paso, 543 F.3d 597, 604 (10th Cir. 2008) (noting that the Tenth Circuit has "interpreted the rule to require that a class must be amenable to uniform group remedies" (citation omitted)).

"Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 360 (2011); Shook, 543 F.3d 597, 604 ("[T]he class must be sufficiently cohesive that any class-wide injunctive relief can satisfy the limitations of Federal Rule Civil Procedure 65(d) — namely, the requirement that it 'state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required.'"). "The requirement that declaratory or injunctive relief predominate, of course, echoes the predominance requirement of Rule 23(b)(3), and, albeit indirectly, serves essentially the same function." Thorn, 445 F.3d at 330. This rule does not authorize class certification, however, when "each class member would be entitled to an individualized award of monetary damages." Dukes, 564 U.S. at 360-61. "Rule 23(b)(2)'s categorical exclusion of class actions seeking primarily monetary relief, like Rule 23(b)(3)'s predominance requirement, therefore ensures that the class is sufficiently cohesive that the class-action device is properly employed." See Thorn, 445 F.3d at 330. Moreover, "[i]f

47

redressing the class members' injuries requires time-consuming inquiry into individual circumstances or characteristics of class members or groups of class members, 'the suit could become unmanageable and little value would be gained in proceeding as a class action.'" Shook, 543 F.3d at 604 (quoting Barnes v. American Tobacco Co., 161 F.3d 127, 143 (3d Cir. 1998)). "In short, under Rule 23(b)(2) the class members' injuries must be sufficiently similar such that they can be addressed in a single injunction that need not differentiate between class members." Id.; Thorn, 445 F.3d at 330 ("[T]he goal of the remedy phase is either to make a declaration about or enjoin the defendant's actions affecting the class as a whole, and individual hearings will not be necessary.")

Plaintiffs argue that the Common Law Class satisfies Rule 23(b)(2) because an injunction would prevent LabCorp from recovering a list price amount "that exceeded a reasonable value" and require "advanced disclosure" of the list price. (Doc. 111 at 33.) Additionally, Plaintiffs argue that the Misleading Estimate, Urine Testing, and Select Silver subclasses may be certified under Rule 23(b)(2) because "Labcorp has acted in a uniform manner" in "providing uniform documents with inadequate and misleading estimates," not acting "in conformance with industry standards" when billing Urine Testing class members, and not "charging Select Silver patients" the list price. (Id. at 37.)

48

In response, LabCorp argues that the Common Law class "fails to satisfy Rule 23(b)(2)" because "disparate factual circumstances" surround each potential class member. (Doc. 190 at 33.) For example, LabCorp argues that "an unidentified segment of the proposed class . . . actually knew the PLP before service or had their services ordered by a provider on their behalf who knew the PLP" – render the proposed class "not cohesive." (Id.) They also argue that "Plaintiffs have not offered a workable injunction plan with sufficient specificity." (Id. (noting Plaintiffs' proposed injunction is "unlimited as to time" and "would enjoin conduct unrelated to liability").) Further, LabCorp contends that the Misleading Estimate, Urine Testing, and Select Silver subclasses should not be certified under Rule 23(b)(2) in the alternative, as "such a class may be certified only when monetary damages are 'incidental' to the injunction sought." (Id. at 40 (citing Berry v. Schulman, 807 F.3d 600, 609 (4th Cir. 2015)). In reply, Plaintiffs suggest various types of injunctive relief the court "could" provide to generally "protect class members." (Doc. 192 at 8, 8 n.5.)

The problems that inhere in the determination of a "reasonable price" for the thousands of tests for the class members infect the injunctive relief request. (See Doc. 120-2 at 17 (Dr. Song acknowledging the existence of 281,341 unique tests); Doc. 190-3 at 260 (deposition of LabCorp Senior Vice President Tammy Karnes,

49

explaining that LabCorp has "thousands of tests").) As discussed above, determining the list price for each test will depend on a factfinder analyzing numerous factors, including those offered by LabCorp's pricing department.[32] (See Doc. 190 at 9-10.) Thus, even if a list price for one test for one class member was deemed unreasonable and LabCorp was enjoined from collecting it, that would not necessarily mean that a different list price for any of the thousands of different tests is unreasonable for different class members. Any appropriate injunctive relief would require individualized assessments of whether a particular class member is entitled to an order barring the collection of the list price as to each test in his or her bill, and thus there is no "cohesiveness among class members with respect to their injuries." Shook, 543 F.3d at 604; see Dukes, 564 U.S. at 360. In other words, Plaintiffs do not satisfy Rule 23(b)(2) because "as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made." Jamie S. v. Milwaukee Pub. Sch., 668 F.3d 481, 499 (7th Cir. 2012) (finding district court erred by certifying an injunction class under Rule 23(b)(2)). This cuts against the very definition of a cohesive class. See Gates, 655 F.3d at 264 ("The key to the [Rule 23](b)(2) class is 'the indivisible nature of the injunctive or

---

[32] See supra note 26 and accompanying text.

declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'") (quoting <u>Dukes</u>, 564 U.S. at 360)); <u>see Shook</u>, 543 F.3d at 604 ("The latter half of Rule 23(b)(2) requires that final injunctive relief be appropriate for <u>the class as a whole</u> . . . and we have interpreted the rule to require that a class must be amenable to uniform group remedies." (internal quotation marks omitted)(emphasis in original)); <u>see also</u> <u>Thorn</u>, 445 F.3d at 330 ("[T]he goal of the remedy phase is either to make a declaration about or enjoin the defendant's actions affecting the class as a whole, and individual hearings will not be necessary.").

Furthermore, Plaintiffs do not attempt to justify their proposed injunctive remedy, which asks the court to "enjoin[] collection of PLPs on past or future lab tests when there is no patient written acknowledgment of that price." (Doc. 111 at 24.) This proposal is problematic because it appears to reach what even Plaintiffs concede is lawful conduct. Plaintiffs' theory of liability in this case is that it is unlawful for LabCorp to collect the list price without disclosing that price before the test is performed. (Doc. 111 at 9.) Yet under their proposed injunction, LabCorp would be subject to contempt proceedings even when a patient was orally advised of the list price – whether by LabCorp, a treating physician, or otherwise - but did not provide

51

that patient with a written acknowledgment of that price.  As such,
the proposed injunction goes far beyond enjoining the conduct
complained of and violates "traditional concepts of judicial
restraint in equity matters."  Bhd. of R.R. Carmen of Am., Local
No. 429 v. Chi. & N.W. Ry. Co., 354 F.2d 786, 800 (8th Cir. 1965);
see N.L.R.B. v. Express Publ'g Co., 312 U.S. 426, 435-36 (1941)
("This Court will strike from an injunction decree restraints upon
the commission of unlawful acts which are thus [disassociated]
from those [acts] which a defendant has committed."); Mallet & Co.
Inc. v. Lacayo, 16 F.4th 364, 390 (3d Cir. 2021) ("Injunction
orders should not restrain competitors from engaging in lawful
business activities.").

    Plaintiffs' other vague suggestions for injunctive relief
fare no better.  (See Doc. 192 at 8, 8 n.5 ("The Court could also
enjoin Labcorp from collecting PLPs from class members, to make
its PLPs publicly available (such as on its website), and/or
requiring a patient's signature to acknowledge PLPs before being
billed them.").)  While Plaintiffs need not "come forward with an
injunction that satisfies Rule 65(d) with exacting precision at
the class certification stage," Shook, 543 F.3d at 605 n.4, they
must at least be able to describe it in "reasonably particular
detail" to permit the court to "at least 'conceive of an injunction
that would satisfy Rule 65(d)'s requirements,' as well as the
requirements of Rule 23(b)(2)."  Id. at 605 (alteration omitted)

(quoting Monreal v. Potter, 367 F.3d 1224, 1236 (10th Cir. 2004)).
"Rule 65(d) reflects Congress'[s] concern with the dangers
inherent in the threat of a contempt citation for violation of an
order so vague that an enjoined party may unwittingly and
unintentionally transcend its bounds." Sanders v. Air Line Pilots
Ass'n, Int'l, 473 F.2d 244, 247 (2d Cir. 1972) (citing Int'l
Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n, 389
U.S. 64 (1967)). Here, Plaintiffs' indefinite intentions for their
injunction are not sufficient to trigger the remedial power of the
court to dictate how a private company conducts its business. See
Gunn v. University Committee to End the War in Vietnam, 399 U.S.
383, 389 (1970) ("An injunctive order is an extraordinary writ,
enforceable by the power of contempt."); CPC Int'l, Inc. v. Skippy
Inc., 214 F.3d 456, 459 (4th Cir. 2000) ("The terms of Rule 65(d)
are mandatory and must be observed in every instance.") (internal
quotation marks omitted).

Finally, LabCorp is correct that, although Plaintiffs' class
certification of the Misleading Estimates, Urine Testing, and
Select Silver subclasses nominally seeks an injunction, "[w]here
monetary relief predominates, Rule 23(b)(2) certification is
inappropriate." Berry, 807 F.3d at 609. The clear purpose of
each of Plaintiffs' proposed subclasses is monetary relief – it is
not enough that LabCorp ceases to perform the conduct at issue to
each class member. In order to be granted relief, each class

53

member primarily seeks compensation for LabCorp's alleged wrongdoing. Thus, Rule 23(b)(2) certification is improper as "the presumption of cohesiveness" is broken down and "the procedural safeguard of opt-out rights" is necessary. Id.

Accordingly, Plaintiffs' proposed classes fail to satisfy the requirements of Rule 23(b)(2).

### b. Rule 23(b)(3)

Rule 23(b)(3) class actions are proper where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These two requirements relate to the action's "manageability," which is "a practical problem, and primarily a factual one with which a district court generally has a greater familiarity and expertise." See Windham v. American Brands, Inc., 565 F.2d 59, 65 (4th Cir. 1977) (en banc) (citation omitted). Accordingly, trial courts enjoy "a wide range of discretion" in evaluating whether the requirements of Rule 23(b)(3) have been met. Id. (citation omitted); see Reiter v. Sonotone Corp., 442 U.S. 330, 345 (1979) (noting that district courts "have broad power and discretion vested in them" as to the "certification and management of potentially cumbersome" class actions).

The predominance requirement - that questions common to the

54

class "predominate" over other individual questions - is more stringent than the "commonality" requirement under Rule 23(a). See Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 146 n.4 (4th Cir. 2001). An individual question is one where proposed class members will need to present "evidence that varies from member to member," while a common question can be proved by the same evidence for each member in order to make a prima facie showing "or the issue is susceptible to generalized, class-wide proof." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016) (citation omitted). The predominance inquiry begins "with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011). At bottom, the inquiry determines whether a trial meant to resolve class-wide issues is manageable or whether it is likely to devolve into a series of individual mini-trials examining questions specific to individual class members. See Thorn, 445 F.3d at 327-29.

Plaintiffs argue that, as to the Misleading Estimate, Urine Testing, and Select Silver subclasses, their class definitions satisfy the predominance requirement. (Doc. 111 at 34-36.) In response, LabCorp argues that "individualized [fact] questions" will predominate over Plaintiffs' proposed common questions, and that "Plaintiffs also failed to show that individualized issues regarding state law will not predominate." (Doc. 190 at 39.) LabCorp further contends that "Plaintiffs previously represented

55

to this Court that 'each state's [consumer protection law] statute is distinct and requires separate analysis as to whether the claim may proceed.'" (<u>Id.</u> at 39-40 (citing Doc. 36 at 14).) Plaintiffs did not respond to these arguments in their reply. (<u>See</u> Doc. 192.)

That silence is ordinarily deemed a concession of the argument. <u>See</u> <u>Mahdi v. Stirling</u>, 20 F.4th 846, 905 (4th Cir. 2021) (citations omitted) (explaining that a failure to respond to an argument in reply brief results in waiver of that issue). But even so, it is apparent that common questions for these proposed classes do not predominate. First, as discussed above with respect to Rule 23(a)'s requirement of commonality, the question of whether a class member was charged a list price that exceeds a reasonable value "turns on a consideration of the individual circumstances of each class member." <u>Thorn</u>, 445 F.3d at 319 (citation omitted). Whether the factors LabCorp considers when determining the list price for a particular test at a particular time in a particular region was "reasonable" for that particular class member is necessarily a specific inquiry for individual class members. <u>Cf.</u> <u>Maldonado v. Ochsner Clinic Foundation</u>, 493 F.3d 521, 525 (5th Cir. 2007) ("[T]he reasonableness of medical fees depends on multiple factors, including the services rendered, patient's financial status, and customary fee for similar services, [so] it is unlikely Appellants could ever demonstrate that the chargemaster rates are unreasonable."). Such individualized

56

questions, applied to the diverse situations of the potential class members, illustrates that the predominance requirement cannot been met.

In addition to the nature of each test, there is an individualized component as to the damages suffered. See Deiter, 436 F.3d at 467 (discussing, in class action antitrust claim context, the requirement that the plaintiffs establish proof of damages). While individual questions as to damages do not necessarily defeat class certification alone, see Gunnells, 348 F.3d at 429, Plaintiffs' theory assumes that proof that one test exceeds the "reasonable value" is sufficient to show injury across the class. Not only is that not true for any specific test, it is not true across the hundreds (perhaps thousands) of tests at issue in this litigation. Merely demonstrating that a list price exceeds the reasonable value as to one test for one class member in one locale does not necessarily demonstrate that a separate list price exceeds a separate reasonable value for a different class member.

Further, as to the Misleading Estimates subclass, LabCorp is correct that "Plaintiffs have not tried to show that the consumer protection laws of all states are sufficiently similar to warrant certification of nationwide subclasses." (Doc. 190 at 39.) Where attempting to certify a class across the law of several states, "plaintiffs have the burden of showing that common questions of law predominate, and they cannot meet this burden when the various

57

laws have not been identified and compared." <u>Gariety v. Grant Thornton, LLP</u>, 368 F.3d 356, 366 (4th Cir. 2004) (emphasis added).[33] Here, Plaintiffs have failed to identify and compare the possible consumer protection statutes applicable to their class claims. Additionally, Plaintiffs' prior representations to this court suggests that any effort to do so would be fruitless. (<u>See</u> Doc. 36 at 14 (noting that "each state's [consumer protection law] statute is distinct and requires separate analysis as to whether the claim may proceed"); <u>see also</u> Doc. 190 at 40 (discussing "relevant differences" between the consumer protection laws at issue here).) <u>See</u> <u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559, 568-70 (1996) (describing the states' deceptive trade practice laws as "a patchwork of rules representing the diverse policy judgments of lawmakers in 50 States").

Accordingly, Plaintiffs' motion for class certification (Doc. 99) will be denied, and Plaintiffs' motion for appointment of class counsel under Rule 23(g) contained therein will be denied as moot.

### B. Motion to Seal

The parties have moved jointly to seal certain portions of the record. (Docs. 196, 197.) Plaintiffs later filed an objection to certain designations addressed in the joint motion (Doc. 198),

---

[33] This is borne out by the related case, <u>Nolan</u>, <u>supra</u>, whose claims are predicated on the unfair and deceptive trade practice laws of Florida and Nevada, which differ not only in their statutory text but also in their judicial interpretations.

58

and LabCorp filed a reply (Doc. 199). For the reasons stated below, the motion to seal will be granted.

"[T]he courts of this country recognize a general right to inspect and copy . . . judicial records and documents." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978). "The operations of the courts and the judicial conduct of judges are matters of utmost public concern," Landmark Commc'ns, Inc. v. Virginia, 435 U.S. 829, 839 (1978), "and the public's business is best done in public." Cochran v. Volvo Grp. N. Am., LLC, 931 F. Supp. 2d 725, 727 (M.D.N.C. 2013). The right of public access derives from both the common law and the First Amendment. See Va. Dep't of State Police v. Washington Post, 386 F.3d 567, 576 (4th Cir. 2004). "While the common law presumption in favor of access attaches to all 'judicial records and documents,' the First Amendment guarantee of access has been extended only to particular judicial records and documents." Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 178, 180 (4th Cir. 1988) (citation omitted). Accordingly, in any given case, some documents will "fall within the common law presumption of access," others will be "subject to the greater right of access provided by the First Amendment," and some "may not qualify as 'judicial records' at all." United States v. Moussaoui, 65 F. App'x 881, 889 (4th Cir. 2003) (unpublished) (citing United States v. Amodeo, 44 F.3d 141, 145–46 (2d

59

Cir.1995)).[34]

When a party makes a request to seal judicial records, a district court "must comply with certain substantive and procedural requirements." Washington Post, 386 F.3d at 576. Procedurally, the court must (1) give the public notice and a reasonable opportunity to challenge the request to seal; (2) "consider less drastic alternatives to sealing"; and (3) if it decides to seal, make specific findings and state the reasons for its decision to seal over the alternatives. Id. "As to the substance, the district court first must determine the source of the right of access with respect to each document, because only then can it accurately weigh the competing interests at stake." Id. (internal quotation marks and alteration omitted).

As to the source of the right at issue, this court has previously explained that "[t]here does not appear to be a First Amendment right of access" to briefs and exhibits filed in connection with a motion for class certification. Cochran, 931 F. Supp. 2d at 728; see Garey v. James S. Farrin, P.C., No. 1:16CV542, 2020 WL 1676947, at *1 (M.D.N.C. Apr. 6, 2020). Nevertheless, as "documents filed with the court that play a role in the adjudicative process," briefs and exhibits filed in connection

---

[34] Unpublished opinions of the Fourth Circuit are not precedential but can be cited for their persuasive, but not controlling, authority. See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

with a motion for class certification are considered "judicial records" to which the common law presumption of access attaches. See Cochran, 931 F. Supp. 2d at 727-29 (citing In re Application of U.S. for an Order Pursuant to 18 U.S.C. Section 2703(d), 707 F.3d 283, 290 (4th Cir. 2013)).

The common law presumption of access may be overcome when "there is a 'significant countervailing interest' in support of sealing that outweighs the public's interest in openness." In re Application, 707 F.3d at 293 (quoting Under Seal v. Under Seal, 326 F.3d 479, 486 (4th Cir. 2003)). The burden of establishing such a countervailing interest is on the party seeking to keep the information sealed. See Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir. 1988).

In evaluating whether a party has met its burden to overcome the public's right of access, the court should consider "the interests advanced by the parties in light of the public interest and the duty of the courts." Nixon, 435 U.S. at 602. As the Nixon Court noted, "access has been denied where court files might have become a vehicle for improper purposes," such as using court records to gratify private spite, to promote public scandal, or as "sources of business information that might harm a litigant's competitive standing." Id. at 598.

In their joint motion to seal, the parties contend that there are three categories of documents and information appropriate for

61

sealing: (1) "Medical, insurance, and records containing Plaintiffs' individually identifiable health information," including "information protected by" the Health Insurance Portability and Accountability Act ("HIPPA"); (2) "LabCorp's sensitive and confidential competitive business information"; and (3) "[A]nalysis discussing information produced by a non-party, Quest Diagnostics, Inc.," which was "designated by Quest's counsel as" highly confidential. (Doc. 197 at 4-5.) Two weeks after filing the joint motion to seal, however, Plaintiffs apparently changed tack and objected to certain of LabCorp's "sealing designation of data derived from LabCorp's publicly available pricing." (Doc. 198 at 3.) They also sought to "withdraw their sealing designations for any Protected Health Information" for all named plaintiffs and affiants, except for Lily Martyn and Ramzi Khazen. (Id.) In reply, LabCorp maintains that its confidential business information should be sealed and stresses that Plaintiffs' objection mischaracterizes its request as an effort to seal its patient list prices. (Doc. 199 at 3.) As to Plaintiffs' reversal of their own request to seal portions of their documents containing HIPPAA-protected information, LabCorp "takes no position" but "respectfully seeks further direction from the Court to ensure compliance with federal law" as it relates to the protected health information contained in its own filings. (Id. at 3-5.)

First, as to the joint motion's second and third categories – concerning LabCorp's sensitive and confidential business information and certain confidential analysis provided by Quest Diagnostics, a non-party – the court finds that that the presumption of access has been overcome and therefore that sealing is appropriate.  It is well-established that "[o]ne exception to the public's right of access is where such access to judicial records could provide a 'source[] of business information that might harm a litigant's competitive standing.'"  Woven Electronics Corp. v. Advance Group, Inc., 930 F.2d 913 (4th Cir. 1991) (unpublished) (quoting Nixon, 435 U.S. at 598); see Bayer Cropscience, Inc. v. Syngenta Crop Prot., LLC, 979 F. Supp. 2d 653, 656–57 (M.D.N.C. 2013) (explaining that sealing is appropriate when the information contains "certain marketing, sales, and licensing information which is not ordinarily public" whose disclosure would harm "[t]he competitive and financial interest of the part[y]"); Longman v. Food Lion, Inc., 186 F.R.D. 331, 335 (M.D.N.C. 1999) (noting documents could "be sealed even given the public access requirements because they contain Defendants' trade secrets, confidential business information, or information protected by attorney-client privilege").

While statements by counsel in briefs are not evidence, INS v. Phinpathya, 464 U.S. 183, 188 n. 6 (1984), superseded by statute on other grounds, 8 U.S.C. § 1254(b)(3), LabCorp's representation

63

to the court "that documents contain confidential business information can be considered as some evidence." <u>Cochran</u>, 931 F. Supp. 2d 730 (citing <u>Pittston Co. v. United States</u>, 368 F.3d 385, 406 (4th Cir. 2004)). Moreover, the court's own review of the materials reveals that LabCorp, far from attempting to conceal the patient list prices, seeks only to keep secret certain non-public business information whose disclosure would harm its competitive standing. Furthermore, LabCorp has narrowly tailored its proposed redactions to allow for public access to the majority of the filings, a less drastic alternative to sealing the documents in their entirety. <u>See</u> <u>Garey</u>, 2020 WL 1676947, at *2. Here, too, the public notice of the request to seal was filed on January 12, 2022, over a year ago, and since then no member of the public has objected despite a reasonable opportunity to do so. <u>See</u> <u>Silicon Knights, Inc. v. Epic Games, Inc.</u>, No. 5:07-CV-275-D, 2008 WL 3914463, at *3 (E.D.N.C. Aug. 22, 2008). Accordingly, the motion to seal, as it relates to LabCorp's confidential and sensitive business information, is granted.

Next, as to the joint motion's second category of information – the "[m]edical, insurance, and records containing Plaintiffs' individually identifiable health information and other health information, including information protected by [HIPPA]" – the court also finds that the presumption of access has been overcome. Courts regularly recognize that an individual's interest in the

64

privacy of his or her health information is a legitimate basis for sealing.  See Ansara v. Maldonado, No. 219CV01394GMNVCF, 2022 WL 17253803, at *3 (D. Nev. Nov. 1, 2022); K.K. v. Premera Blue Cross, No. 21-cv-1611, 2022 WL 1719134, at *4 (W.D. Wash. May 27, 2022); Frohn v. Globe Life & Accident Ins. Co., No. 1:19-CV-713, 2022 WL 214553, at *1 (S.D. Ohio Jan. 25, 2022); U.S. ex rel. Lockyer v. Hawaii Pac. Health, No. CIV. 04-00596 ACK-LE, 2007 WL 128853, at *1 (D. Haw. Jan. 10, 2007).  Congress, too, has recognized the importance of that privacy interest when it enacted HIPAA, 42 U.S.C. § 1320d et seq., a federal statute which obliges LabCorp, as a covered entity, to carefully guard the use and disclosure of its patients protected health information. (Doc. 199 at 4).  This, too, weighs in favor of sealing.  See Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan, 825 F.3d 299, 308 (6th Cir. 2016) (explaining that sealing is appropriate when the information is protected by statute or regulation).  Finally, the public's interest in access to this information is at best minimal, especially considering the court's limited reliance on the information sought to be kept secret.[35]  See Lesnik v. Eisenmann SE, No. 16-CV-01120-LHK, 2021 WL 2093062, at *2 (N.D. Cal. Feb. 12, 2021) (explaining that because the court "did not rely on any of the information that the parties seek to seal" the "public

_____

[35] The court's only citation to this redacted information can be found at footnote 26, supra.

interest in access to this information is minimal.")  Accordingly, the compelling reasons for sealing here outweigh the public's need for direct access to the information sought to be redacted.

Plaintiffs indicate, however, that they no longer "object to the public disclosure" of their medical information and thus seek to "withdraw" their requests to seal made in connection with their filings.  (Doc. 198 at 6.)  LabCorp does not oppose this request.  (Doc. 199 at 4-5.)  Of course, should they so choose, Plaintiffs may voluntarily file documents on the public docket which contain references to their own confidential health information.  Accordingly, the court grants the motion to seal; provided, however, that the grant is stayed for seven days and is without prejudice to Plaintiffs' withdrawal of the sealed documents filed with the court and refiling same for public view with redactions of only personal identifiers (such as birthdate, social security number, etc.).  See United States v. Dunlap, 458 F. Supp. 3d 368, 372 (M.D.N.C. 2020).

## III. CONCLUSION

This case, which has been through various iterations over almost six years, seeks to address an issue endemic to the present health care economy: the often-indeterminate cost of healthcare.  The present context involves laboratory testing.  Many, perhaps most, patients who seek laboratory testing do so at the behest of a treating physician.  With the patchwork of insurance coverage

options – including Medicare, Medicaid, and scores of insurers - physicians themselves are ill-suited to know the range of prices applicable to any particular patient for any particular test by any particular testing laboratory. While patients could inquire of their physician's business staff or of the laboratory services company itself about their full potential financial liability, this case demonstrates that some, perhaps many, fail to do so. The same is true when patients order tests directly from LabCorp at one of its service centers. By contrast, it would be a rare thing for a customer to conduct any other business transaction in a similar fashion.

Plaintiffs here seek to prohibit LabCorp from charging its list prices to patients who order laboratory testing through their physicians or at LabCorp service centers on the grounds that such prices, which often exceed negotiated prices with insurers or the government, are excessive and undisclosed. Plaintiffs' proposed remedy is a court-imposed nationwide average "reasonable rate" across hundreds, if not thousands, of tests. This "reasonable rate" would be imposed as well on all LabCorp customers who presented to a LabCorp service center and received an estimate of their costs based on the customer's proffered insurance information but for whom the insurer later denied coverage, in whole or in part. Finally, Plaintiffs seek injunctive relief, including a requirement that LabCorp post its list prices on the

67

internet and disclose its list prices in its interactions with patients at its service centers, even though the patients claim to have insurance which, if applicable, would likely entitle them to a lower rate.

Some jurisdictions have addressed so-called "surprise" medical billing legislatively, mandating certain disclosures.[36] While legislatures are not bound by the Federal Rules of Civil Procedure, this court is. In seeking to impose such a remedy judicially in this proposed class action, Plaintiffs' claims cannot overcome the important hurdles that distinguish a court from a legislature. For the reasons stated, the problems alleged in this case are not amenable to judicial relief. Therefore,

IT IS ORDERED that the Plaintiffs' motion for class certification (Doc. 99) is DENIED, their motion for appointment of class counsel under Rule 23(g) (Doc. 99) is DENIED as moot, and the parties' joint motion to seal (Doc. 196) is GRANTED, provided, however, that the grant is STAYED for seven days and is without prejudice to Plaintiffs' withdrawing those identified sealed documents filed with the court and re-filing them for public view with redactions of only personal identifiers (such as birthdate, social security number, etc.).

---

[36] See, e.g., No Surprises Act, Pub. L. 116-260, 134 Stat. 2758 (2021); Conn. Gen. Stat. § 38a-477aa (2015) (the "Surprise Billing Law"); Wash. Rev. Code § 48.49, et seq. (2019) ("Balance Billing Protection Act"); N.M. Stat. Ann § 59a, et seq. (2019) (the "Surprise Billing Protection Act").

68

<u>   /s/   Thomas D. Schroeder</u>
                                    United States District Judge

February 13, 2023